UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
                                                  :
D'AMICO DRY LIMITED,                              :
                                                  :
                              Plaintiff,          :        Case No.: 09-CV-7840 (JGK)
                                                  :
              - against -                         :
                                                  :
PRIMERA MARITIME (HELLAS) LIMITED,                :
                                                  :
                                                  :
                              Defendant.          :
                                                  :
------------------------------------------------------------------------x

## DEFENDANT PRIMERA'S MOTION TO DISMISS
## FOR LACK OF SUBJECT MATTER JURISDICTION

Defendant Primera Maritime (Hellas) Limited ("Primera") respectfully submits this

memorandum in support of its motion pursuant to Fed. R. Civ. P. 12(b)(1) and 12(h)(3) to

dismiss the action for lack of subject matter jurisdiction.  Also submitted is the declaration with

exhibits of Linos D. Choo ("Choo Decl."), the London solicitor representing Primera in the

underlying action in the Commercial Court part of the Queen's Bench Division of the High

Court of Justice in London.[1]

---

[1]     The Queen's Bench Division is one of the three divisions of the High Court, together
with the Chancery Division and the Family Division.  The Queen's Bench Division is comprised
of four parts: the Divisional Court, the Admiralty Court, the Commercial Court, and the Tech-
nology and Construction Court.  D'Amico filed its action in the Commercial Court, not the
Admiralty Court, which lacked jurisdiction to adjudicate D'Amico's claim.  *See* Choo Decl. ¶¶
2-5.

## PRELIMINARY STATEMENT

The complaint of D'Amico Dry Limited ("D'Amico") pleads admiralty jurisdiction,

incorrectly, to enforce a money judgment issued by the English High Court ("English Money

Judgment"), pursuant to Article 53 of the New York C.P.L.R.  The English Money Judgment is

based on Primera's failure to pay D'Amico sums due under a forward freight agreement ("FFA")

that is a form of swap derivatives contract calling only for the payment of money from one party

to the other.  As we explain, this Court lacks admiralty jurisdiction to adjudicate D'Amico's

complaint for two independent reasons.  D'Amico's action belongs, if at all, in a New York state

court, not in a Federal court exercising admiralty and maritime jurisdiction.

      A.     First, an action to enforce a foreign judgment directing the payment of money is

not within the Court's admiralty jurisdiction.  That is especially true when (a) the foreign court

that issued the judgment is not, as here, an admiralty court, and (b) the judgment concerns the

breach of a swap contract providing only for the payment of money.  That should be the end of

the matter.

      B.     Second, the English Money Judgment aside, the FFA is not a maritime contract

and an action to enforce the FFA (as opposed to the English Money Judgment) would not present

a maritime claim.  The FFA, as noted, is a financial instrument, *i.e.*, a swap contract, without any

physical performance of any kind (apart from the money that one party pays the other, as in any

swap or derivatives contract).[2]  This Court would therefore lack admiralty jurisdiction even if

---

[2]    This Court would also have no basis in the absence of diversity for applying C.P.L.R. Article 53.  Federal courts enforce foreign judgments under international comity rules.  D'Amico's pleading of C.P.L.R. Article 53 demonstrates that its action belongs in a New York court.

D'Amico were suing to enforce the FFA rather than the English Money Judgment (which is not the case).

**BACKGROUND**

The English Money Judgment is based on Primera's failure to pay moneys due under the parties' FFA. The Baltic Exchange defines a forward freight agreement as "taking a position in a futures (paper) market as a substitute for a forward cash (physical) transaction."[3] As explained by SSY Futures Ltd., the freight-forward-agreement division of the long-established brokerage firm Simpson Spence & Young:

> Forward Freight Agreements (FFAs) are paper swap deals, bought
> or sold on specific Baltic assessments at an agreed rate, quantity
> and specified period in the future and are then settled against the
> appropriate physical index at the end of each period. . .
>
> The main difference between an FFA and a physical charter is that
> it involves no physical commitment from either party to move a
> ship or a cargo. The agreement is cash settled for the differences
> against the approved index rate provided by the panel for the
> chosen route.[4]

A forward freight agreement is a form of derivative contract. *See*, *generally*, *Dampsibsselskabet "Norden" A/S v. Andre & Cie. S.A.*, [2003] 1 Lloyd's Rep. 287, 288, ¶ 3 [Q. B. (Com. Ct.)] ("Like other derivatives, FFA's may be used for various purposes—pure speculation, arbitrage, or hedging.") Its value is derived from the value of an underlying benchmark, *i.e.*, ocean freight rates. As a prominent investment company notes, "[f]reight derivatives, like all derivatives, are

---

[3]     The Baltic Exchange in a London-based membership organization that among other things provides daily shipping market information. *See* http://www.balticexchange.com/-default.asp?action=article&ID=21#forwardFreight Agreement. The parties agreed to refer to the Baltic Exchange's Panamex Index ("BPI") for the settlement of their FFA.

[4]     *See* http://www.generatecommunications.com/ssyonline/SSY-F-Brochure.pdf (Simpson Spence & Young is the largest privately-held shipbroker in the world).

essentially a form of betting.  A hedger or speculator in the freight derivative market bets

whether the freight cost will be higher or lower than one predicted in one of the indices."[5]  As a

maritime news organization also notes, "[an FFA] does not involve any actual freight or any

actual ships.  It is purely a financial agreement."[6]

Privately-negotiated freight derivatives are known as "over the counter" derivatives or

"swaps."[7]  They are financial contracts based on an agreed price for ocean freight over an agreed

shipping route for a specified period.  The contracts are settled only in cash and there is no phy-

sical voyage or shipment.  On settlement, if the contract rate is less than the average of the rates

for the contract route over the contract period, as determined by reference to the relevant index,

the seller of the FFA is required to pay the buyer an amount equal to the difference between the

contract rate and the settlement rate multiplied by the number of days specified in the contract.

Conversely, if the contract rate is greater than the settlement rate, the buyer is required to pay the

seller the settlement sum.[8]

The parties' FFA is based on the Forward Freight Agreement Brokers Association

("FFABA") 2007 Terms and the 1992 ISDA Master Agreement, standard forward-freight-

---

[5]     *See* http://www.gaebler.com/Freight-Derivatives.htm. *See also Norden*, [2003] 1 Lloyd's
Rep. at 288, ¶¶ 1-2.

[6]     *See* http://www.olympicvessels.com/derivatives.php.

[7]     *See* "Forward Freight Agreements, Client Advisory", D. Kennedy and R. Califano, Carter
Ledyard & Milburn, May 17, 2006, available at http://www.clm.com/publication. cfm/ID/85. A
different form of FFAs are standardized, exchange-traded derivatives known as "futures" or
cleared contracts.  One of the major differences between swaps and exchange-traded futures is
the assumption of counterparty risk.  In the case of OTC derivatives, the risk of default by either
party to the FFA is assumed by the other party to the agreement.  With exchange-traded deriva-
tives, in contrast, the risk of default is assumed by a clearing house, and a party to the agreement
only assume exposure to the other party if the clearing house defaults.

[8]     *Id.*

4

agreement forms. (*See* Choo Decl. ¶ 5, referring to the annexed Witness Statement (Ex. 1) submitted by William J. Marshall, D'Amico's London solicitor, with the FFABA terms at WJM 4-10 and the ISDA Master Agreement at WJM 11-34. *See also* Choo Decl. Ex. 2, D'Amico's "Amended Particulars of Claim" in the English action, also explaining the FFA terms.)  As explained in D'Amico's High Court submissions, the FFA's "Settlement Rate" was based on the difference between the agreed contract rate of $55,750 per day and the average freight rate of 4 Panamex time charter routes as provided on the BPI index ("BPI Average 4 Panamex TC Routes") for 45 days during January, February and March 2009 (15.5 days in each of January and March, and 14 days in February). (*See* Choo Decl., Ex. 1 (Marshall Statement ¶ 9); Ex. 2 (Amended Particulars of Claim ¶ 2))

The parties' payment rights and obligations are spelled out in D'Amico's Amended Particulars of Claim. (Choo Decl. Ex. 2, ¶¶ 3-18.)  Basically, the FFA provided for payment of a "Settlement Sum" at the end of each contract month.  If the BPI average rate was higher than the contract rate, Primera was required to pay D'Amico the rate difference multiplied by the agreed days in the previous contract month.  Conversely, if the BPI average rate was lower than the contract rate, D'Amico would have been required to pay Primera the rate difference multiplied by the agreed days in the previous contract month.  (*Id.*)

In the English action D'Amico claimed Primera failed to pay the $795,963.20 Settlement Sum owed for the 15.5 contract days in January (the difference between the contract rate of $55,750.00 per day and the BPI average rate of $4,397.5357, multiplied by 15.5 days). (*See* Linos Decl., Ex. 2 at ¶¶ 4-11.)  As a result, D'Amico terminated the FFA as of February 23, 2009. (*See id.* at ¶¶ 12-13.)  D'Amico claimed damages in the amount of $1,752,973.30, consisting of the January Settlement Sum of $795,963.20 plus $170,60 in interest, together with

$1,306,839.50 for anticipated losses for the February and March contract months, plus interest to accrue (minus $350,000 paid by Primera on February 26, 2009). (*See id.* at ¶¶ 14-19.)

D'Amico based its claim on the Baltic Forward Assessment prices as of February 23, 2009. (*See* Linos Decl., Ex. 1 at ¶ 17 and pg. 59.)  The damages claimed by D'Amico for February and March 2009 represented the difference between the Baltic Forward Assessment freight rate and the contract freight rate of $55,750 per day.  (*Id.*)  The London High Court issued the English Money  Judgment against D'Amico in the amount of $1,766,278.54, the full amount claimed by D'Amico plus interest and costs of $28,056.39. (*See* Complaint, ¶ 13.)

On September 29, 2009, D'Amico served its complaint seeking to enforce the English Money Judgment, which it claims now totals $1,937,881.50 with interest.  The complaint pleads only admiralty jurisdiction under 28 U.S.C. § 1333, as the foreign parties are not diverse.  On October 9, 2009, D'Amico filed a motion to enforce the English Money Judgment.  On October 19, 2009, Primera answered D'Amico's complaint, pleading among other things lack of subject matter jurisdiction.  The parties agreed to address the jurisdictional issue before the Court considers D'Amico's motion to enforce the English Money Judgment.

Because the Court lacks admiralty jurisdiction, it should dismiss the complaint.

**ARGUMENT**

**A.      The Court Lacks Admiralty Jurisdiction To Enforce A Foreign Money Judgment.**

There is nothing about this case that brings it within this Court's admiralty jurisdiction. and D'Amico does not even seek to enforce a judgment issued by a foreign admiralty court.

An action to enforce a foreign judgment is a separate civil action imposing its own jurisdictional requirements. *See* Restatement (Third) Foreign Relations § 481 cmts. g. and h. (1987) ("the judgment creditor must establish a basis for the exercise of jurisdiction by the enforcing court").  The path to decision is charted in *Bergen Indus. & Fishing Corp. v. Joint Stock Holding*

6

*Co.*, 2002 AMC 1078 (W.D. Wash. 2002), in which the court explains that an action to enforce a

foreign money judgment is not cognizable in admiralty even if the underlying claim giving rise

to the judgment (unlike here) concerns the breach of a maritime contract. As *Bergen* states:

> Plaintiffs argue that because the underlying facts centered on a
> charter agreement, the action arises under this Court's admiralty
> jurisdiction. But this action no longer involves a maritime dispute;
> the action on the charter contract, unquestionably maritime in
> character, was litigated in England. The separate question here is
> whether the English judgment should be enforced. This is a unique
> civil action untouched by the substantive law leading up to
> judgment. Admiralty does not supply jurisdiction over this action.

2002 AMC at 1080. That reasoning applies with equal force here.

In addition, the full faith and credit clause does not provide jurisdiction over a claim to

enforce a foreign judgment. *Aetna Life Ins. Co. v. Tremblay*, 223 U.S. 185, 190 (1912) ("No

such right, privilege or immunity, however, is conferred by the Constitution or by any statute of

the United States in respect to the judgments of foreign states or nation * * * ."); *Guinness PLC

v. Ward*, 955 F.2d 875, 883 (4th Cir. 1992) ("[T]the Full Faith and Credit Clause of Article IV

§ 1 of the Constitution of the United States does not apply to foreign judgments."). D'Amico

does not allege that any treaty between the United States and England would afford federal ques-

tion jurisdiction. Nor does the Court have jurisdiction under 28 U.S.C. § 1963, which permits

registration of judgments from other district courts. *See Fox Painting Co. v. NLRB*, 16 F.3d 115,

118 (6th Cir. 1994).

Plaintiff's action to enforce the English Money Judgment belongs instead in a New York

court applying New York state law. *See Seetransport Wiking Trader Schiffarhtsgesellschaft

MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 583 (2d Cir.

1993) ( "[T]he recognition of foreign judgments is governed by state law."); *see also Bergen

Indus.*, 2002 AMC at 1080 ("The proper forum in this district for this claim between the parties

7

is Washington's state courts. There is simply no Article III predicate for this claim. Therefore, this Court cannot enforce the British judgment.")

It follows that this Court must dismiss the action for lack of subject matter jurisdiction.

**B.      A Forward Freight Swap Agreement Is Not A Maritime Transaction.**

Although not dispositive, the FFA underlying the English Money Judgment is not even a maritime contract. The FFA is a privately-negotiated agreement by which the parties hedged the risk of future freight prices during a 45-day period in January-March, 2009 using a benchmark freight index. (*See* Choo Decl. ¶¶ 4-7, Exs. 1 and 2.) The FFA did not involve the charter of any vessels or the performance of any shipment obligations. It is a derivative futures contract, providing for no performance other than the payment of a monthly "Settlement Sum."

Although D'Amico seeks to enforce the English Money Judgment, not the FAA, this Court would not have admiralty jurisdiction even if D'Amico were suing on the FFA rather than the English Money Judgment. As Your Honor recently explained in *Representaciones Y Distribuciones Enya S.A. De C.V. v. Global Explorer LLC*, 2009 U.S. Dist. LEXIS 96598, at * 6-7 (S.D.N.Y. Oct. 15, 2009) (Koeltl, J.), "the fundamental interest giving rise to maritime jurisdiction is the protection of maritime commerce" (quoting *Exxon Corp. v. Cent. Gulf Lines, Inc.*, 500 U.S. 603, 608, 111 S. Ct. 2071 (1991)). As a result, whether a contract falls within the Court's admiralty jurisdiction depends on "whether the services performed under the contract are maritime in nature" (*Representaciones*, 2009 U.S. Dist. LEXIS 96598, at * 6-7 (quoting *Exxon*, 500 U.S. at 612) (citing *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 24, 125 S. Ct. 385, 393 (2004)).

In *Norfolk S. Ry.*, the United States Supreme Court instructed courts evaluating whether a contract falls within Federal admiralty jurisdiction to "to look to the contract's 'nature and character' to see 'whether it has reference to maritime service or maritime transactions." *See Folksamerica Reinsurance Co. v. Clean Water of N.Y., Inc.*, 413 F.3d 307, 312 (2d Cir. 2005) (quoting

8

*Norfolk S. Ry.*, 543 U.S. at  24, 125 S. Ct. at 393).  The focal point is the subject matter of the

contract.  *Folksamerica*, 413 F.3d at 312.  "The [jurisdictional] decision turns on whether the

contract has 'reference to maritime service or maritime transactions.'" *Representaciones*, 2009

U.S. Dist. LEXIS 96598, at *7 (quoting *Norfolk S. Ry.*, 543 U.S. at 24).  *See also Williamson v.

Recovery Ltd. P'ship*, 542 F.3d 43, 49 (2d Cir. 2008) ("[t]he proper inquiry is 'whether the prin-

cipal objective of a contract is maritime commerce'") (quoting *Folksamerica*, 413 F.3d at 315).

     Applying that "reference-to-maritime-service-or-maritime-transaction" and "principal-

objective-is-maritime-commerce" test, the FFA would not fall within the Court's admiralty juris-

diction even if D'Amico's action were not based on the English Money Judgment but rather on

the FFA.  As explained above, the FFA is a form of derivative or swap contract that does not

contemplate performance of any maritime service of any kind.  (*See* Choo Decl. ¶¶ 4-7, Exs. 1

and 2.)  The FFA provides only for the payment of money, not the rendering of any maritime

service or the fulfillment of any maritime transaction.  Indeed, the principal feature of the FFA—

reflected in the incorporated FFABA terms and ISDA Master Agreement terms—is that it is

*solely* a financial instrument that does *not* require any physical performance of any kind.  The

fact that fluctuations in indexed ocean freight rates determined the monthly Settlement Sums

owed under the FFA does not render the FFA, without more, a maritime contract under the

*Norfolk S. Ry.*, *FolksAmerica*, and *Williamson* standard.

     Furthermore, as noted, "[l]ike other derivatives, FFA's may be used for various pur-

poses—pure speculation, arbitrage, or hedging" (*Norden*, [2003] 1 Lloyd's Rep. at 288, ¶ 3).

The underlying purpose is financial gain or loss based on independent market factors, *i.e.*,

fluctuations in ocean freight rates, outside the parties' control.

The only decision holding a forward freight agreement to be a maritime contract is *Brave Bulk Transport Ltd. v. Spot On Shipping Ltd.*, No. 97 Civ. 4546, 2007 U.S. Dist. Lexis 81137 (S.D.N.Y. Oct. 30, 2007), arising in the context of a Rule B(1) maritime attachment. While Judge McMahon "was initially skeptical about the saltiness of forward freight agreements" ("[a]n FFA is not a maritime contract * * * but rather is a means of hedging financial risk and making costs and revenues more predictable", *Brave Bulk*, 2007 U.S. Dist. LEXIS 69751, at *4 (S.D.N.Y. Sept. 14, 2007)), she was apparently "persuaded that they are sufficiently part of the business of maritime commerce to confer admiralty jurisdiction." *Id.*

And while Judge McMahon cited eight cases in which courts granted Rule B(1) maritime attachments based on claims arising from forward freight agreements, none of those cases is a reasoned decision analyzing why a forward freight agreement should constitute a maritime contract, the breach of which would give rise to a maritime claim cognizable in admiralty . *See Brave Bulk* 2007 U.S. Dist. Lexis 81137, at * 5-6. The courts in all eight cases simply granted maritime attachments based on allegations in the complaints, without any later adjudication of whether the complaint truly stated a maritime claim.[9]

---

[9]    Judge McMahon also relied on *Setsea S.P.A. v. Source Link Shipping Co. Ltd.,* 07 CV 6230, another Rule B(1) maritime attachment action. *See Brave Bulk*, 2007 U.S. Dist. Lexis 81137, at * 6-7.  In *Setsea*, Judge Batts initially denied an application for a maritime attachment based on a breach of an FFA because the FFA was not a maritime contract:

> [T]he Agreements, when signed related to reciprocal future
> promises of payment in cash and they do not address maritime
> services or transactions such as the transportation of specific
> cargoes or the involvement of specific vessels.  The Agreements
> merely seek to establish a means of minimizing financial risk and
> establishing a formula to make future costs and revenues more
> predictable.  Plaintiff has therefore failed to establish that this
> Court has admiralty jurisdiction over the alleged breach of the
> agreements.

Notwithstanding Judge McMahon's decision in *Brave Bulk*, an examination of the FAA demonstrates that it would not fall within the Court's admiralty jurisdiction even if D'Amico were suing on the FFA rather than on the English Money Judgment. (*See* Choo Decl. ¶¶ 4-7, Exs. 1 and 2.) An FAA—a derivatives contract calling only for the payment of money—is simply not a contract for maritime services. The fact that the FFA's payment provisions are based on fluctuations in ocean freight rates is not sufficient to place non-payment of Settlement Sums within this Court's admiralty jurisdiction even if that jurisdictional issue turned on the nature of the FAA rather than the English Money Judgment (which it does not).

## CONCLUSION

Primera therefore respectfully requests that this Court (a) dismiss the complaint at D'Amico's cost and expense, and (b) grant Primera such other and further relief as law and equity warrant.

Dated: New York, New York
November 9, 2009

DLA PIPER LLP (US)

By: _____
   Stanley McDermott III
   David Wenger
   1251 Avenue of the Americas
   New York, New York  10020-1104
   (212) 335-4500
   (212) 335-4501
   stanley.mcdermott@dlapiper.com
   david.wenger@dlapiper.com

   *Counsel for Defendant*
   *Primera Maritime (Hellas) Limited*

---

(No. 09 CV 4147, S.D.N.Y. June 5, 2007, at 8.)  After Judge Batts granted leave to re-plead, the plaintiff filed an amended complaint as a new action (Docket No. 07 CV 6230).  Judge Batts then signed an attachment order without explaining why the amended complaint transformed the forward freight agreement at issue into a maritime contract.