END

Best Regards,

*******************************************************************************

LB DEP 042



"Oscar SGARABOTTOLO"
<operations@ifchor.ch>
27/11/2008 16:42

To   "Cogema sam - ops" <ops.dry@damicoint.com>, "COGEMA SAM, MONTECARLO" <dry@damicoint.com>, "D'Amico Dry Singapore Pte Ltd" <dry@damicoint.com>, "D'Amico Dry

cc

bcc

Subject   IFCHOR/D'AMICO FCO6S239 - MV MEDI SINGAPORE - acceptance

Doc-No. 5535338    27/NOV/2008 (THU)   16:42  (+0100)  OS

IFCHOR SA, Lausanne, Switzerland
Doc.No 5535129

A T L /OSCAR

    Subject : IFCHOR/D' AMICO FCO6S239 - ENEL COA 14.12.2006

        MV MEDI SINGAPORE - acceptance

FOLL RECVD FROM CHARTERERS:

QUOTE
Date : 27/11/2008

Dear Sirs,

WITH reference to the subject, we hereby confirm our acceptance of MV
MEDI SINGAPORE in agreed laycan to load as follows)

Loading port :           Balikpapan / Indonesia
Laycan :                 16/25 Dec 2008

Kindly ask owners to appoint following agents at loading port :

PT. LBH INDONESIA
Manara Ravindo 10th Floor
Jl. Kebon Sirih Raya Kav. 75
Jakarta 10340 - INDONESIA
Tel: +62 21 390 8816 (hunting)
Fax: +62 21 315 3751
info@lbhindonesia.com
operations@lbhindonesia.com
sulvia@lbhindonesia.com
darwin@lbhindonesia.com
acct@lbhindonesia.com
Mobile Phones:
Gen, Syamsu:  +62 811 810 810
Sulvia:          +62 815 1072 9888
Darwin:          +62 815 858 001
Capt. Hendry  +62 818 880 807
Roni (finance): + 62 812 825 7221

and please instruct them to keep us informed by sending their
correspondence to following contacts in ENEL Rome:

Francesca Annesi           tel. +39 06 8305 4412
francesca.annesi@enel.it;
Rossana Bernabei           tel +39 06 8305 8210        ADH +39
3294878297      rossana.bernabei@enel.it;

Roberta Bottomei          tel. +39 068305 4851          AOH +39
3292267163                roberta.bottomei@enel.it
Ester Donnini             tel +39 06 8305 7003
ester.donnini@enel.it;
Eugenio Mosca             tel +39 06 8305 4762          AOH +39
3294145887                eugenio.mosca@enel.it;

Kindly make sure:
- that we receive vessel itinerary including ETC of previous discharging
port and daily position (Eta, Lat, Long) to above email addresses
- that Master is aware of the current port rules, regulations and
loading terms
- that due notices are tendered as per loadport regulations
- that vessel to proceed, with all utmost speed and through the shortest
route.
- master to give 15/10/7/4/3/2/1 days notice of vessel's E.T.A as per
contract terms to shippers/suppliers/charterers directly and/or via
appointed agents .

Furthermore please be informed about the following:

- master is requested to advise cargo temperature on board hold by hold
immediately upon departure from loading port;
- master is requested to present to receivers at discharging port, the
report with last temperatures taken during navigation;
- to make sure that Blue Code certificate contains the self ignition
temperature.

Agents that read us in copy are kindly requested to keep us informed
about the following:

- confirmation of appointment from owners;
- availability of cargo at l/port;
- master notices of arrival;
- daily updates during loading operations;
- verify that quantity shown in master stowplan is the same requested by
shippers and in case of difference please immediately advise us. In this
respect pls also send us written confirmation of stowplan received from
shippers;
- make sure owners/master give 15/10/7/4/3/2/1 days notice of vessel's
E.T.A as per contract terms and immediately advise if same is not done.
Pls insert this information in the official statement of facts.

I M P O R T A N T : Please ask owners/master to urgently send us cargo
stowage plan and latest vsl position and ETA ASAP.

Thanks, regards

Roberta Bottomei

ENEL TRADE S.p.A.
Fuel Operations
GEM division / EM  Business Area

UNQUOTE

REGARDS
IFCHOR S.A./GS


*********************************************************
IFCHOR SA, Place Pépinet 1, 1003 Lausanne, Switzerland
as brokers only

capes@ifchor.ch - panamax@ifchor.ch - handy@ifchor.ch
securities@ifchor.ch - operations@ifchor.ch - capesops@ifchor.ch

LB DEP 044

—— Forwarded by Paolo Montella/Montecarlo/Cogema/D'Amico Group on 13/03/2009 16:08 ——

"Riccardo Ravano"
&lt;panamax@ifchor.ch&gt;          To   dry@damicoint.com

13/03/2009 16:03                 cc

                                 Subj   MEDI SINGAPORE / COSCO
                                 ect

Doc-No. 5797929   13/MAR/2009 (FRI)   18:03   (+0100)   RR

IFCHOR SA, Lausanne, Switzerland

TO COSCOEUROPE      ATT ANSHAOXIONG
TO DAMCIO           ATT PAOLO
FM IFCHOR/RG+RR

RE MEDI SINGAPORE / COSCO

GLAD TO CONFIRM WE CLEAN FIXED AS FOLLOWING, WITH CP DATED 13RD MARCH 2009

 - Negotiations and/or any eventual fixture to be strictly private and
   confidential

MEDI SINGAPORE
BLT : 2006 JUN. PANAMA FLAG
DWMT : 75,397MT
GRT : 39,643
NRT : 25,277
LOA : 225M
BEAM : 32.2M
DRAFT: 13.842
TPC : 67
H/H : 7/7
GRAIN : 3,158,209 CFT
HATCH SIZE : 1) 16.34 X 12.96 2)-7) 17.20 X 14.58
TWO SIDE PANELS SIDE ROLLING TYPE
BALLAST ABT 14.5KTS ON ABT 37.5MT(IFO)+0.1MT(MDO)
LADEN ABT 13.7KTS ON ABT 37.5MT(IFO)+0.1MT(MDO)
PORT CONS: ABT 3.5MT(IFO)+0.1MT(MDO)
ALL DETAILS ABT

   FOR

A/C COSCO EUROPE BULK SHIPPING GMBH

DELY DOP TUZLA EX DD ATDNSHINC

LAYCAN 18/22 MARCH 0001 HRS / 2400 HRS LT 2009 - ETR 19TH MARCH AGW/UCE/WOG

LB DEP 045

1 TCT OF 1 LADEN LEG VIA BLACKSEA, LOADING PORT INT YUZHNY, TO CONTI/MED WITH
COAL ALWAYS LOADED IN ACCORDANCE WITH IMO RULES VIA SP/S SB/S SA/S, DURATION
ABOUT 20/25 DAYS.

REDEL DLOSP ONE SP WITHIN SKAW PASSERO RANGE INT FOS ATDNSHINC

HIRE USD 21,750 PDPR INCLOT

BUNKERS CL -
BOD ABT 200 MT IFO AND ABT 50 MT MDO.
BOR ABT 400 MT IFO AND ABT SAME AS ON DELY FOR MDO
PRICES ON DLY USD 260 PMT IFO / USD 500 PMT MDO.
PRICES ON REDELY FOR SAME QUANTITY ON BOARTD ON DLY USD 260 PMT IFO AND
   USD 500 PMT MDO
PRICES ON REDELY FOR QUANTITY OF FUEL IN EXCESS OF DELIVERED ONE TO BE
CHRRS ACTUAL COST AGAINST CHRRS INVOICE

ILOHC USD 4,500 L/SUM ON REDELY

CVE USD 1.250 PMPR

COMM - 3.75 ADC + 1.25 PCT IFCHOR

OWISE AS PER OWNERS HEAD CP DD 6TH SEPT 2005 WITH LOGICAL ALTERATIONS AND
FOLLOWING AMMENDMENTS :

LINE 36          INSERT "OWNS TO TENDER 5/3/2/1 DAYS DEL NOTICE"
LINE 79          DELETE "ALL OTHER... ACCOUNT."
LINE 108         DELETE "30/20"
LINE 252         NO D/D UNLESS EMERGENCY

CLS 36           LINE 3 DELETE "THE VESSEL'S CONDITION"
CLS 71           NO D/D UNLESS EMERGENCY
CLS 77           DEL

-END-


TKS FOR BOTH PARTIES EXCELLENT SUPPORT!


****************************************************************
IFCHOR SA, Place Pépinet 1, 1003 Lausanne, Switzerland
as brokers only

capes@ifchor.ch - panamax@ifchor.ch - handy@ifchor.ch
securities@ifchor.ch - operations@ifchor.ch - capesops@ifchor.ch
        www.ifchor.ch

Phone: +41 21 310.31.31 - Fax: +41 21 310.31.00/01
   Tlx: 450 351 IFC CH - 450 352 IFOPS CH

****************************************************************

LB DEP 046

/0

FROM: BIDSTED AND CO., COPENHAGEN
TO  : medimax monaco
NJO15497401 22-10-2008 13:58:11


paolo/nick

ref: m/v medi sentosa / stx panotean sel
---

plsd to confirm having fixed clean asf with op ████████████████

/ this nego and eventaul fixture must be kept top p n d //

-vessel :
medi sentosa
pan flag blt sanoyes jan 2008
registered owners: mida maritime company limited, ireland
disponent owners : el amico dry limited. dublin
83,690 mtdwat on 14,555 m ssw
229.00 m lpa / 32.26 m beam
gt about 45,800
7/7 ho/ha ? side-rolling h/covers
96,000 cbm gr m/h
hatch size :(1) 17,29 x 15,66 ? (2/7) 17,29 x 15,66
speed/consumption in good weather, calm sea up to bf4/dss3
no adv current excl sailing in/out port s/s restricted areas:
ballast about 14.0 knots on about 34.5 mt ifo for m/e
laden about 13.5 knots on about 36.5 mt ifo for m/e
d/g consumption at sea about 1.8 mt ifo + about 0.2 mt mdo
port consumption : about 2.8 mt (idle) / 3.5 mt (working) ifo + 0.2 mt
mdo
ifo rmg35 (iso 8217) / mdo dmb (iso 8217)
vessel may consume mdo while navigating narrow, shallow,
busy/restricted
waters,
canals, in and out of port, and when starting/stopping engine and
generators
highest class nk or equivalent
fully pandi/itf /ism/doc covered
ahl/suez/panama fitted
all figures about


owrs g'tee that:
-vsl is a grain-clean
g'less self trimming,
classed highest in lloyds or equivalent,
pandi covered,
ism certified,
ahl/itf/wwf/issc fitted,
vsl has clear & unobstructed hold without centreline bulkhead
and fully hull+machinery insured bulker.
and owrs gurantee vsl shall comply with the isps code and issc on
board
for the duration of this charter and upon request the owners shall

LB DEP 047

provide charterers with a copy of the issc(international ship security
certificate) and chartereres questionnaire(if any) to be fully
incorporated in the c/p

-chtrs to hv the option to supply mgo i/o mdo dur this charter.
-last 5 cargoes have been coal

ows bank details:

      remit to ............ jp morgan chase bank, new york
      swift code .......... chasus33
      to the credit of .... j.p.morgan bank (ireland) plc, dublin
      swift code .......... chasie2x
      in favour of ........ damico dry limited
      account no. ........ 79700802
      iban code .......... ie23 chas 9309 0379 7008 02


      for

1, disponent ows : d'amico dry limited, dublin
      head owners : nyk tokyo

2. acct : stx pan ocean co.,ltd.
3. dely : passing gibraltar, atdnshinc
4. lay/can : 0001/2400hrs 21st oct., 2008
5. route : 1 tct via sa(s),sb(s),sp(s) za,awiwl via us gulf to f.east
                   with gen/h'less/ lawful grain/grain products in
bulk.
6. redel : dlosp lsp sgp/jpn rge plco atdnshinc
7. hire   : usd 15,250 diot
8. payment : 1st 15 days hire plus bod tb paid w/i 3 banking days aft
      vsl's dely. chtrs are intitled to deduct from last sufficient hire
      payments est owns disbsmt, but max 500 usd per port
9. ilohc : usd 5,000 lumpsum
10. bunker cls : bunkers on dly abt 1300 ifo and abt 30-40 mdo
                        bunkers on redel abt same as on dly
                        same prices bends - usd 420 pmt ifo and
usd 750 pmt mdo
11.owns gtee tht vsl's h.covers are tb watertight all through this
      charter period n if any h.cover found deffective, same tb
      rectified at owns'time n exps to chtrs'satisfaction.
12.vsls'hold on dely tb clean swept/washed down by fresh water and
      dried up so as to rcve chtrs int cgos in all respects, free of
      salt, rust scale and previous cgo residue to the satisfaction
      of local,relavant surveyors.
      shud the vsl not approved by relavant surveyors as chtrs'intn cgo
      cleanliness, the vsl shud be palced off-hire from the rejection
until the
      vsl is fully accepted and any expenses/time incurred thereby tb
for
      owns'acct.
13.owns gtee tht vsl is not black-listed in any port of call with
      ahl/itf/wwf in good order for the whole period of this cp.
14.owns shud be responsible for any time and expns caused by
      failing in 'asian gypsy moth' inspection both at canadian and
      u.s.ports any expense incurred thereby at loading ports
      and discharging ports tb for owns acct.
15.owns gtee vsl not tb rejected at any port of call during
      charter period by reason of trading with cuba before and
      any time/exps incurred thereby tb for owns acct.

LB DEP 048

16. owns to allow chtrs to disch cgos w/o presentation of original
    b(s)/l by providing with loi in accordance with owns'pni club
    form n wording before dischg. loi tb signed by chtrs only and
chtrs stx panocean to
    provide owners with duly signed loi from cgo chtrs to stx
panocean.
17. for the purpose of computing hire payment, the time for dely/
    redelivery shall be adjusted to g.m.t.
18. usd 1000 per month or pro rata for cable/communication/ent/
    representation/victualing.
19. owns to give chtrs definite delivery notice upon lifting subs
20. add comm 3.75% + 1.25% to bidsted + 1.25% to neo
21.  o'wise as per "m/v medi sentosa / d'amico dry limited cp dd 8th
_march 2005" with logical amendments in line with mainterms agreed
except flwgs ;

- line 71   : insert "but not include what is caused by vsl's
flag/nationality of crew/visa"
                    after "watchman(if compulsory as custom of the
port")

- line 108 : delete "35/30"  after "not less than"

- line 256 : delete all and insert "no drydock allowed except
emergency case"

- cls 36 : add "all cost to be equally shared between owners and
chtrs" after "on-hire
                 survey at owner's time off hire survey at chtrs' time"
-end -

best regards
nick

+45 39 16 66 95 - dir
+45 20 82 12 63 - mob


   Please visit the Bidsted website at http://www.bidsted.dk



medi sentosa cp.pdf

17

Medi sentosa is fully fxd as below:

++

RE MEDI SENTOSA / E.A.S.T. - CP DTD

WE ARE PLSD TO RECAP CLEAN FIXTURE ASF:

- NEGOTIATIONS AND/OR ANY EVENTUAL FIXTURE TO BE STRICTLY
  PRIVATE AND CONFIDENTIAL

MEDI SENTOSA

Pan flag blt Senoya's Jan 2008
Registered Owners: Mida Maritime Company Limited, Ireland
Disponent Owners : d'Amico Dry Limited, Dublin
83,680 mtdwat on 14,555 m ssw
229.00 m Loa / 32.25 m Beam
GT about 45,000
7/7 Ho/Hs - side-rolling h/covers
96,000 cbm gr m/h
Hatch size : (1) 17.29 x 15.66 - (2/7) 17.29 x 15.66
Speed/consumption in good weather, calm sea up to BF4/DSS3
no adv current exl sailing in/out port a/o restricted areas:
Ballast about 14.0 knots on about 34.5 MT IFO for M/E
Laden about 13.5 knots on about 36.5 MT IFO for M/E
D/G consumption at sea about 1.8 MT IFO + about 0.2 MT MDO
Port consumption : about 2.0 MT (idle) / 3.5 MT (working) IFO + 0.2 MT MDO
IFO RMG35 (ISO 8217) / MDO DMB (ISO 8217)
Vessel may consume MDO  while navigating narrow, shallow, busy/restricted waters,
canals, in and out of port, and when starting/stopping engine and generators
Highest class NK or equivalent
Fully pandi/itf p&i/doc covered
ahl/suez/panama fitted
All figures about

FOR

- A/C E.A.S.T. INTL. LTD., LONDON
- DEL DLOSP 1SP TAIWAN (INTN KAOHSIUNG) ATDNSHINC
- LAYCAN 17/23 DEC, 2008
- ONE TCT VIA 3B(S), SP(S), SAFE ANCR(S) ALWAYS WITHIN I.W.L., IN/OUT
  GEOGRAPHICAL ROTATION, ON/OFF ROUTE ALWAYS IN CHTRS OPTION VIA NOPAC TO
  ARABIAN GULF PORTS INCLUDING UAE/SAUDI/OMAN ALWAYS EXCL IRAN/IRAQ
  YEMEN AND RED SEA PORTS TO BE EXCLUDED AT ALL TIMES
- CARGO INTENTION: GRAIN IN BULK AND/OR GRAIN PRODUCTS IN BULK
- VESSEL ON ARRIVAL FIRST LOAD PORT TO HAVE ALL HOLDS CLEAN, WASHED AND
  DRIED, FREE OF LOOSE RUST FLAKES/SCALES, INSECTS AND RESIDUES AND/OR
  ODOURS
  OF PREVIOUS CARGO(ES) AND IN EVERY WAY BE READY AND SUITABLE TO LOAD
  GRAIN TO
  GOVERNMENT SURVEYOR'S SATISFACTION. SHOULD VESSEL BE REJECTED BY
  SURVEYOR,

LB DEP 050

VESSEL TO GO OFF-HIRE UNTIL SUCH TIME AS VESSEL IS ACCEPTED. ANY
DIRECTLY RELATED
    EXPENSES INCURRED TO BE FOR OWNER'S ACCOUNT.
- CHARTERERS OPTION TO DISCHARGE BY VACUVATORS BUT SAME NOT
    TO EXCEED MAXIMUM PERMISSIBLE DECK / HATCH COVER STRENGTHS WHICH
    ARE --MT/SQ.M. CREW TO ASSIST, FREE OF EXPENSE TO CHARTERERS
    WITH THE PLACING AND REMOVING VACUVATORS ON AND FROM THE
    VESSEL.
- REDELIVERY DLOSP OR PASSING MUSCAT OUTBOUND ATDNHHINC.
- HIRE USD 4,000 DAILY PER DAY OR PRORATA INCLOT PAYABLE EVERY 15 DAYS IN
ADVANCE
    1ST HIRE PAYMENT TOGETHER WITH VALUE OF BUNKERS ON DELIVERY TO BE PAID
WITHIN 3
    DAYS AFTER DELIVERY.
- IN LIEU OF HOLD CLEANING/DEBRIS REMOVAL ON REDEL USD 5,000 LUMPSUM
- C/V/E USD 1500 PM/PR
- BUNKER CLS:
    BOD IFO ABT 1400 MT AND MDO ABT 30/35 MT
    BOR ABT SAME QUANTITY AS ON DELY
    PRICES SAME BOTH ENDS.. USD 265 FOR IFO / & USD 525 FOR MDO
- 3.75 PCT ADD COMMISSION + 1.25PCT TO MERIT + 1.25 TO IFCHOR

O'WISE AS PER BTB HEAD CP DATED 08/03/05 WITH LOGICAL ALTERATIONS
AS PER MAIN TERMS AGREED
EXCEPT

- CL 28 VESSELS DESCRIPTION TO INCLUDE
    CHRS QUESTIONAIRE & OWNERS CONFIRMATION TO CHRS Q (SEE BELOW)
- DELIVERY NOTICE ON FIXING AND 3/2/1 DAYS
- REDELY 20/15/10/7/5/3/2/1 DAYS
- CL 38 DELETE
- CL 67 DELETE
- OWNERS BANKING DETAILS : RVRTING


++

- OWNERS CONFIRM THE FOLLOWING:-

- VESSSL IS STSDBC, WITH E-B AFT, FULLY FITTED TO LOAD/STOW/CARRY N DISCH
(cargo) IN BULK AND TO
    TRADE BTWN LOAD/DISCH PORTS,FULLY SUITBALE FOR GRAB LOADING/DISCHARGE.
- OWNERS WARRANT THAT THE VESSEL IS A SELF-TRIMMING BULKCARRIER, SUITABLE
FOR CARRYING INTEND CARGO IN
    ALL HOLDS WITHOUT REQUIRING ANY FITTINGS AND/OR
BAGGING/STRAPPING/SECURING, THIS ON BASIS FULL
    CARGO. VESSEL HAS ON BOARD VALID CARGO LOADING BOOKLET IN ACCORDANCE
WITH CLASS REGULATIONS AND
    IMCO RESOLUTION AND ANY SUBSEQUENT AMENDMENTS. - AS PER NUMBER 33 OF
CHRS Q'NNAIRE
- VESSEL IS IN FULL COMPLIENCE WITH ISM CODE (BIMCO ISM CLAUSE TO BE FULLY
INCORPORATED IN THE C/P) - AS
    PER NUMBER 32 OF CHRS Q'NNAIRE
- VESSEL WL BE FULLY CLASSED THROUGHT THE DURATION OF THIS C/P
- VESSEL WL BE FULLY P&I COVERED THROUGHT THE DURATION OF THIS C/P
- VESSEL WL BE FULLY HULL N MACHINERY INSURED FOR THE DURATION OF THIS C/P
- ALL CERTS ON BOARD AND REQUIRED TO TRADE ARE VALID FOR THE DURATION OF
THE C/P
- THE VESSEL IS STSDBC AND VESSEL'S HOLDS/HATCHES ARE FREE OF
WALKWAYS/CENTREBEAMS/CENTRELINE BULK
    HEADS/OTHER OBSTRUCTIONS AND FULLY SUITABLE FOR GRAB LOAD/DISCHARGE - AS

LB DEP 051

PER NUMBER 23 OF CHRS Q'NNAIRE
- VESSEL IS NOT BLACK LISTED/BOYCOTTED OR ARRESTED DUE TO VESSELS FLAG/OWNERSHIP/MANGERS/CREW
  EMPLOYMENT/AGE/PAST TRADING IN COUNTRIES UNDER THIS CHARTER PARTY.
- VESSEL IS FREE OF ALL ENCUMBRANCES, ARRESTS AND MARITIME LIENS
- ALL CERTIFICATE (DOC,ISM,SMC,ISPS ETC) ARE VALID.
- VESSEL RIGHT SHIP APPROVED - REVERTING (IS THIS NECESSARY??)
- DURING VESSEL'S LAST CALL TO (load country), WAS VESSEL INSPECTED BY THE (load country) MARITIME
  AUTHORITIES ? IF SO, WHERE DID SUCH INSPECTION TAKE PLACE AND ON WHAT DATE ? - REVERTING

+

01)  NAME/EX. NAME : M/V MEDI SENTOSA / EX NAME : N/A

02)  TYPE : BULK CARRIER

03)  FLAG/PORT OF REGISTRY : PANAMA / PANAMA

04)  NATIONALITY OF CREW : ALL FILIPINO (PHILIPPINES)

05)  CONFIRM VESSEL FULLY ITF FITTED : YES

06)  WHERE BUILT-MONTH/YEAR : SANOYAS SHIPYARD, JAPAN / JANUARY 2008 (DELIVERY)

07)  CLASS (INCL NOTIFICATION) : NIPPON KAIJI KYOKAI (NS*/MNS*-BULK CARRIER-TYPE A, BC-XII)

08)  CONFIRM ENG/BRIDGE AFT : ENG/BRIDGE AT AFT POSITION

09)  LOA/BEAM AND DEPTH MOULDED :
        LOA : 229.0 M
        BEAM : 32.24M
        DEPTH : 20.20M

10)  DEADWEIGHT/DRAFT TPI/TPC:
        SUMMER   SW : 83,690 / 14.55 M / 71.24
        WINTER   SW : 81,530 / 14.25 M / 71.18
        TROPICAL SW : 85,852 / 14.85 M / 71.29
        PANAMA AT DRAFT 39'06'' : 63,580 / 70.33
        (AT DENSITY 0.9954)
        TPC AT SSW : 71.24

11)  CONSTANT EXCLUDING FRESHWATER : 200 MT

12)  DAILY FRESH WATER CONSUMPTION : 10 MT
        FRESHWATER CAPACITY : 587 MT
        CAPACITY OF FRESHWATER EVAPORATOR : 25 MT/DAY

13)  GT/NT
        INTERNATIONAL : GT 44,147 / NT 27,058
        PANAMA : NT 37,742
        SUEZ : GT 45,448.14 / NT 42,042.98

14)  AHL(AUSTR. HLD. LAD.)FITTED : YES
        GRAIN FITTED : YES
        CO2 FITTED IN HOLDS : NO

LB DEP 052

15)  ELECTRICALLY OR NATURAL VENTILATED : NATURALLY VENTILATED

16)  NO OF HATCHES : 7
     HATCH DIMENSIONS : L = 17.29M X B = 15.66M (NO. 1 - 7 C.H.)
     TYPE OF HATCHCOVERS = MACGREGOR - WATERTIGHT SIDE ROLLING TYPE, STEEL
HATCH
     COVER

17)  NO OF HOLDS : 7
     HOLD DIMENSIONS PER HOLD (L X B X H) : 25.48M X 32.24M X 18.46M
     TANKTOP FLATFLOOR DIMENSIONS :  L 25.48M X B 23.9 M
     MAX HEIGHT FM TANKTOP TO TOP OF HATCHCOVER : 21.6 M

18)  HOLD CAPACITIES
     GRAIN/BALE BREAKDOWN PER HOLD (IN M3), AND TOTAL (INCL HATCH SPACE)
     NO. 1 HOLD    =    12,963.6
                  HATCH    =        398.1
                  TOTAL    =     13,361.7
     NO. 2 HOLD    =    13,573.3
                  HATCH    =        356.4
                  TOTAL    =     13,929.7
     NO. 3 HOLD    =    13,605.5
                  HATCH    =        356.4
                  TOTAL    =     13,961.9
     NO. 4 HOLD    =    12,621.6
                  HATCH    =        356.4
                  TOTAL    =     12,978.0
     NO. 5 HOLD    =    13,605.5
                  HATCH    =        356.4
                  TOTAL    =     13,961.9
     NO. 6 HOLD    =    13,573.3
                  HATCH    =        356.4
                  TOTAL    =     13,929.7
     NO. 7 HOLD    =    13,673.1
                  HATCH    =        356.4
                  TOTAL    =     14,029.5
          GRAND TTL    =       96,152.4

19)  ALTERNATE HOLDS LOADING - PLEASE STATE COMBINATIONS
     HOLDS NO. 2, 4 & 6 MAY BE EMPTY

20)  MAXIMUM PERMISSIBLE UNIFORM LOAD ON TANKTOP :
     NO. 1 CH = 29.66 MT/M2
     NO. 2 CH = 17.91 MT/M2
     NO. 3 CH = 30.82 MT/M2
     NO. 4 CH = 17.91 MT/M2
     NO. 5 CH = 30.82 MT/M2
     NO. 6 CH = 17.91 MT/M2
     NO. 7 CH = 30.82 MT/M2

     DECKS : NO INFO

     HATCHCOVERS :
     NO. 1 HC = 6.73 T/M2
     NO. 2 HC = 3.90 T/M2
     NO. 3 - 7 HC = 3.50 T/M2

     MAXIMUM PERMISSIBLE LOCAL STRENGTH ON TANKTOP:
     NO. 1 CH = 29.66 MT/M2
     NO. 2 CH = 17.91 MT/M2
     NO. 3 CH = 30.82 MT/M2

LB DEP 053

```
             NO. 4 CH = 17.91 MT/M2
             NO. 5 CH = 30.82 MT/M2
             NO. 6 CH = 17.91 MT/M2
             NO. 7 CH = 30.82 MT/M2
```

21) DISTANCE FROM WATERLINE TO TOP OF HATCHCOVERS
    NORMAL BALLAST  : 18.5 M
    HEAVY BALLAST INCL NO 4 HOLD FLOODED : 15.49 M
    IN LOADED CONDITION (SSW DRAFT AND MINIMUM BUNKERS). : 8.59 M

22) DISTANCE FROM KEEL TO HIGHEST POINT  : 49.712 M

23) CONFIRM NO CENTERLINE BULKHEAD  : NO

24) OFFICIAL NO  :  33530-08
    LLOYD'S NO/IMO NO.  : 9350343
    CALL SIGN  : 3ENT6
    TELEX (INM-C) : 435231110
    PHONE (INM-F) : 7648-21554
    FAX (INM-F)    : 7648-21557
    E-MAIL  : medisentosa@orcajpn.co.jp

25) MASTER'S NAME ; CAPT. CRESENCIO G LONTOC
    NATIONALITY OF CREW/NO OF CREW  : ALL FILIPINO / 20 INCLUDING MASTER

26) P&I CLUB  : BRITANNIA

27) NAME OF UNDERWRITERS H&M  : MITSUI SUMITOMO INSURANCE CO. LTD
    H&M VALUE (USD)  : US$ 100,000,000

28) FULL STYLE OF OWNING COMPANY :
    MIDA MARITIME COMPANY LTD.
    25 FITZWILLIAM SQUARE
    DUBLIN 2, IRELAND

29) AND MANAGING COMPANY  :
    ORIENT MARINE CO., LTD.
    HIBIYA, DAIBIRU 14TH FLOOR 2-2
    UCHISAIWAI-CHOU
    1-CHOME CHIYODA-KU, TOKYO 100-0011, JAPAN

    OWNERS BANKING DETAILS  : NO INFO

30) LAST DRYDOCK  : N/A
    LAST SPECIAL SURVEY DATE AND PLACE : N/A
    NEXT SPECIAL SURVEY/DRY DOCKING PLANNED DATES:  JUNE 2010

31) PLEASE ADVISE IF VESSEL IS EQUIPED WITH CLEANING EQUIPMENT -
    IF AFFIRMATIVE PLEASE ADVISE TYPE AND NUMBERS :
    1 SET OF TOBY GUN

    SHOVELLING, WASHING & HOISTING EQUIPMENT TO FOLLOW COMPLETION OF
    VESSEL STORING : YES

32) PLEASE CONFIRM THE COMPANY HAS A VALID ISM DOCUMENT OF COMPLIANCE
    (FOR BULK CARRIERS) AND STATE DATE OF ISSUE :
    YES / 27 JUNE 2006

    PLEASE CONFIRM THE COMPANY HAS A VALID ISM SAFETY MANAGEMENT
    CERTIFICATE AND STATE DATE OF ISSUE :
    YES / 21 JUNE 2008

LB DEP 054

33) CONFIRM VESSEL FITTED FOR CARRIAGE OF GRAIN IN ACCORDANCE WITH CHAPTER
    VI OF SOLAS 1974, PROTOCOL 1978 AND LATEST AMENDMENTS, WITHOUT REQUIRING
    ANY BAGGING, STRAPPING AND SECURING WHEN LOADING A FULL CARGO (DEADWEIGHT)
    OF ANY GRAINS IN BULK. : YES

    NO OF HOLDS WHICH MAY BE LEFT SLACK WITHOUT REQUIRING BAGGING/STRAPPING/
    SECURRING : 2 HOLDS

    CONFIRM VESSEL IS SELFTRIMMING : YES

34) CONFIRM VESSEL IS STRENGTHENED FORTHE CARRIAGE OF HEAVY CARGOES AND
    SUITABLE FOR ALTERNATE HOLD LOADING - STATE NUMBER OF HOLDS WHICH MAY BE
    LEFT EMPTY WHEN OTHER FULL (ALL COMBINATIONS)  :
    YES / HOLDS NO. 2 4 & 6 MAY BE EMPTY

35) SPEED AND CONSUMPTION
    (SAME AS PER DESCRIPTION IN RECAP)

36) BUNKER CAPACITY
    IFO  : 2,471.63 M3 (85%)
    MDO : 223.29 M3 (85%)

37) PLEASE ADVISE IF VESSEL IS A MEMBER OF FUEL OIL TESTING SUCH AS FOBAS OR
    DNV PETROLEUM SERVICE.:
    YES / WITH MARITEC

38) MAIN ENGINE  MAKER/TYPE  : B & W 6S60MC-C
    OUTPUT BHP/RPM AT MCR  : 14,600 PS X 95.0 RPM
    AT NCR  : 12,410 PS X 90 RPM

39) AUX ENG MAKER/TYPE/OUTPUT  : YANMAR / 6N18AL-DV / 680 PS X 900 RPM

40) BALLAST CAPACITY
    EXCL HOLD NO 4  : 24,527 M3
    INCL HOLD NO 4  : 37,539 M3
    CAN OTHER THAN HOLD NO 4 BE BALLASTED IN PORT (LIST NO. AND CAPACITY)

    YES / NO 2 & 6 CARGO HOLD / 9,170 M3 EACH HOLD

41) OIL POLLUTION CERT. NO  : 08HO0947-OPP
    OIL POLLUTION CERT. EXPIRY DATE  : 09 JANUARY 2013
    COFR NO. AND EXPIRY DATE : NO. 861720 / 29 JANUARY 2011

42) WINDLASS - TYPE + NOS.  : ELECTRO-HYDRAULIC DRIVEN X 2 SETS
    CAPACITY (CHAIN WHEEL AND DRUM) : 29.5T X 9M/MIN  &  15T X 15M/MIN

    MOORING WINCH - TYPE + NOS. : ELECTRO-HYDRAULIC DRIVEN X 6 SETS
    CAPACITY : 15T X 15M/MIN

43) VARIOUS DETAILS
    DISTANCE FROM WATERLINE TO TOP OF HIGHEST MAST IN LIGHT BALLAST
    CONDITION (AIR DRAFT) = 42.50 M
    DISTANCE FROM BOW TO FORWARD END OF NO.1 HATCH = 19.6 M
    DISTANCE FROM STERN TO AFT END OF NO.7 HATCH = 38.0 M
    DISTANCE FROM TANK TOP TO TOP OF HATCHCOAMING = 20.2 M

LB DEP 055

```
           DISTANCE FROM SHIP'S SIDE TO HATCHCOAMING = 8.0 M
           DISTANCE FROM DECK TO TOP OF HATCHCOAMING = 2.0 M
           CEMENT/GRAIN HOLES IN HATCHCOVERS = NIL
```

44) CRANE OUTREACH / CRANE CYCLE TIME = N/A

45) SINCE WHEN IS VSL UNDER PRESENT OWNERSHIP OR MANAGEMENT
    (PLS STATE PREVIOUS NAME (S) OF THE VESSEL)
    SINCE DELIVERY LAST 10TH JANUARY 2008

46) HISTORY OF GROUNDINGS/STRANDINGS/COLLISIONS OR OTHER SERIOUS
    ACCIDENTS OVER THE PREVIOUS 12 MONTHS : NIL

47) IF THE VESSEL HAS BEEN ARRESTED IN THE PREVIOUS 12 MONTHS ADVISE
    DETAILS AND CONFIRM THAT THE VESSEL IS NOW FREE OF ALL ENCUMBERANCES
    (LAST 3 CHRTR'S COMMENCING WITH LAST) : N/A

48) TLX CNFMTN FROM P+I CLUB ABD HNM INSURERS THAT VESSEL IS FULLY COVERED
    BY OWNERS/DIPONENT OWNERS (AS PER C/P)  FOR INTENDED VOYAGE AND
    PREMUIMS PAID ACCORDINGLY, FURTHER OWNER'S TO FAX A COPY OF VSL'S
    CLAAS CERTIFICATE : YES

49) NAME OF VSL'S CLASSIFICATION SOCIETY AND VESSEL'S ACTUAL CLASS
VALIDITY
PERIOD OF
       CLASS CERTIFICATE   ANY O/S RECOMMENDATIONS OR DEFICIENCIES AS
REPORTED BY
       CLASS/PORT SATE CONTROL ETC:
       NIPPON KAIJI  KYOKAI / VALIDITY PERIOD 09 JANUARY 2013
       NO O/S RECOMMENDATION OR DEFICIENCIES AS REPORTED BY CLASS/PORT
STATE
CONTROL.

50) VALIDITY PERIOD OF THE FLWG CLASS CERTIFICATES:-
    SAFETY CONSTRUCTION : 09 JAN 2013
    SAFETY EQUIPMENT : 09 JAN 2013
    SAFETY RADIO : 09 JAN 2013
    GEAR : N/A
    HNM : ? (PLEASE CLARIFY)
    INTL LOADLINE : 09 JAN 2013
    DERATISATION : 19 DEC 2008 (TO BE RENEWED AT KAOSIUNG)
    OPA : ? (PLEASE CLARIFY)
    COFR : 29 JAN 2011


END RECAP


REGARDS

MERIT SEOUL 0633_001.pdf
```

/2

RE MEDI SENTOSA/WINDROSE
--------------------------------

HEREWITH CLEAN RECAP

We are glad to confirm havng now fully fixed as per your authority as fllws:

- Negotiations and/or any eventual fixture to be strictly private and
  confidential

- C/party dd xxxxxxxxxx

MEDI SENTOSA
Pan flag blt Sanoyas Jan 2008
Registered Owners: Mida Maritime Company Limited, Ireland
Dispoment Owners : d'Amico Dry Limited. Dublin
83,690 mtdwat on 14,555 m ssw
229.00 m loa / 32.26 m beam
GT about 45,000
7/7 Ho/Ha - side-rolling h/covers
96,000 cbm gr m/h
Hatch size :(1) 17,29 x 15,56 - (2/7) 17,23 x 15.56
Speed/consumption in good weather, calm sea up to BF4/DSS3
no adv current excl sailing in/out port a/o restricted areas:
Ballast about 14.0 knots on about 34.5 MT IFO for M/E
Laden about 13.5 knots on about 36.6 MT IFO for M/E
D/G consumption at sea about 1.8 MT IFO + about 0.2 MT MDO
Port consumption : about 2.8 MT (idle) / 3.5 MT (working) IFO + 0.2 MT MDO
IFO RMG35 (ISO 8217) / MDO DMB (ISO 8217)
Vessel may consume MDO while navigating narrow, shallow, busy/restricted
waters, canals, in and out of port, and when starting/stopping engine and
generators
Highest class NK or equivalent
Fully P and I/ H & M /ism/doc covered
shi/suez/panama fitted
All figures about

FOR

A/C WINDROSE SPS SHIPPING AND TRADING, SA GENEVA
--------------------------------------------------

- Dely pmo atdnshinc

- Laycan 26/28 feb 2009 (00.01/24.00 hrs lt)
  expect dely 26 feb at 13.00hrs lt agw ncs up,
  understood vessel already passed muscat and will revert overnight with
  exact dely time/details.

- 1 tc trip as awiwl via sas sbs sps with bulk hless grain/grain
  prods/agriprods always excl expellers and naphsa in ecsa allowed as
  per clse 6 nype cparty

- Redly dolsp 1sp hamburg/medi rge but not East of 25 degrees East or
  passing same points wbound but always excl adriatic

LB DEP 057

- Hire: usd 10,250 diot for redly dolps or passing 1sp Gib/Hamburg rge
       usd 10,750 diot for redly dolsp 1sp Med but not East of 25
       degrees East or passing same wbound but always extl adriatic.

- Vessel on arrival first load port to have all holds clean, washed and
  dried, free of loose rust flakes/scales, insects and residues and/or
  odours of previous cargo(es) and in every way be ready and suitable to
  load grain to government surveyor's satisfaction. should vessel be
  rejected by surveyor, vessel to go off-hire until such time as vessel
  is accepted. any directly related expenses incurred to be for owner's
  account.

- Bunker clse
  bod ifo abt 1400 mt and mdo abt 30/35 mt
  bor abt same quantity as on dely
  same prices both ends to be usd 260 and 450 resp pmt ifo/mdo

- Ilohc: $ 5,000 l/sum on redly

- Cve: $ 1,500 pmpr

- 3.75% addcom + 1.25% ifchor

- Owise as per MEDI SENTOSA/E.A.S.T. - cp dd 15.12.2008 - logically
  amended as per mterms above and with alterations herebelow:

- Clse  6: after "aground" delete "(1) Max. Three (3) times per year,"

- Clse 49: hire payment clse: add at the end "for the pourpose of
  computing hire time to be converted into GMT but lay/can always to
  remain as Locat time to apply,"
END RECAP

LB DEP 058

13

Herewith clean recap of Medi Lausanne


-----Original Message-----
From:  "Michele Mazza" <penamax@ifchor.ch>

Date: Fri, 26 Sep 2008 15:41:41
To: <williams.m@damicoint.com>
Subject: MEDI LAUSANNE/OLDENDORFF - CLEAN RECAP


Dog-No. 5364217  26/SEP/2008  15:41 h  MIM

TO DAMICO - K.A. MICHAEL
TO VELO   - K.A. ARNE

RE MEDI LAUSANNE/OLDENDORFF

WOULD YOU PLEASE FIND CLEAN RECAP FIXTURE AGREED WITH YOUR AUTHORITY

- CP TO BE DATED 26/09/2008

- PRIV AND CONFIDENTIAL

MEDI LAUSANNE
GEARLESS KAMSARMAX BC
BUILT TSUNEISHI 02/2006, PAN FLAG
83,002 DWT ON 14,429 M SSW (TPC 70.12)
LOA 229.0 M/BEAM 32.25 M
GT/NT 42,887/ 27,547
GRAIN CBF 97,232.4 CBM
7 HO/7 HA
SPEED & DAILY CONSUMPTION AT SEA, IN SMOOTH WEATHER UPTO BF4/DSS3,
NO ADVERSE CURRENT :
ABT 14(B)/13.5(L) ON ABT 34.5(B)/36.5(L) MT IFO (380) MDAS
PORT CONS (D/G + BOILER)
IDLE ABT 2.8 MT IFO
WORKING ABT 3.5 MT IFO
AA

FOR

ACC OLDENDORFF

- DELY DLOSP KAOHSIUNG ATDNSHINC

- L/CAN STARTING WITH LIFTING SUBS
  (VESSEL SAILED KAOHSIUNG 25.09.2008 - 15.00 HRS LT)

- 1 TC TRIP AA AWIWL VIA SAS SBS SPS WITH BULK PETCOKE VIA
  LONG BEACH TO JAPAN

- REDLY DLOSP 1SP JAPAN ATDNSHINC

- HIRE $ 33,250 DIOT

- BUNKER ON DEL ABT 12/1300 MT IFO AND ABT 40/45 MT MDO

BUNKERS ON REDLY ABT SAME AS ON BOARD ON DELY
SAME PRICES BENDS - $670 FOR IFO AND $900 FOR MDO

-ILOHC - USD 8,000 LUMPSUM

-C/V/E USD 1,500 PMPR

- 3.75% ADDC + 1.25% BROKERAGE EQUALLY SHARED IFCHOR/VBLO

- OWISE AS PER CP DATED  03.06.2004 LOGICALLY AMENDED AS   PER MAINTERMS
AGREED        WITH FOLLOWING ALTERATIONS:

-CHRS ENTITLED TO WHITHOLD MAX $1,000 PER PORT FOR OWS EXPENSES

- LINE 109: DELETE "30" AND INSERT  "20"

- LINE 252-259: DELETE AND INSERT "DRYDOCKING ONLY IN CASE OF EMERGENCY"

- CL. 28: ITEM 22: AS PER MAINTERMS

- CL. 52: PETCOKE PROTECTIVE CLAUSE - DELETE PARA 2 AND INSERT :

CHRRS TO SUPPLY AND APPLY HOLD BLOCK AT THEIR TIME AND EXPENSES, WITH VSL'S
CREW GIVING THEIR USUAL ASSISTANCE AND SERVICE, IF PERMITTED BY LOCAL
AUTHORITY AND REGULATION; HOLD BLOCK PACKAGE SHALL ALSO INCLUDE ALL
NECESSARY EQUPMENT FOR CLEANING AFTER DISCHARGE, HOWEVER ACTUAL CLEANING
AFTER DISCHARGE TO BE FOR OWNERS RESPONSIBILITY.

- CL 71: DELETE ALL

- LAST PAGE TO DELETE "NON PAYMENT OF HIRE CLAUSE FOR TIME CHARTER PARTIES"
END RECAP
++

MANY THANKS FOR YOUR KIND SUPPORT
BEST REGARDS
IFCHOR


*****************************************************
IFCHOR GROUP SA, Place Pépinet 1, 1003 Lausanne, Switzerland
as brokers only

capes@ifchor.ch - panamax@ifchor.ch - handy@ifchor.ch
securities@ifchor.ch - operations@ifchor.ch - capesops@ifchor.ch
              www.ifchor.com

Phone: +41 21 310.31.31 - Fax: +41 21 310.31.00/01
   Tlx: 450 351 IFC CH - 450 352 IPOPS CH

*****************************************************


0048_001.pdf   20060621160848665.pdf   20060622104733689.pdf   20060622143738532.pdf   20060919114635370.pdf


20060919114639667.pdf   20060919114644217.pdf   cert of registry expired on 19.04.2010.pdf   fukujin kisen - doc.pdf


l expired on 15.02.11.pdf   m0030402081015353200.pdf   medi lausanne - class certificate.tif

Doc-No. 5526303   25/NOV/2008 (TUE)  10:15  (+0100)  OS

IFCHOR SA, Lausanne, Switzerland
Doc.No 5525731

ALL/OSCAR
----

Subject : MV MEDI LAUSANNE -ENEL COA 13.2.2006

        acceptance COA IFCHOR/D' AMICO FCO6S033 - L/C03-12 Dec

FOLL RECVD FROM CHARTERERS:
QUOTE
Date :  25/11/2008

Dear Sirs,

 With reference to the subject, we hereby confirm our acceptance of MV
MEDI LAUSANNE in agreed laycan to load as follows:


Loading port :                    Taboneo or IBT / Indonesia

Laycan :                          03 / 12 December 2008


Kindly ask owners to appoint following agents at loading port :

Andhika-GAC Jakarta

Wisma Staco, 2nd Floor Suite 201

Jl Casablanca Kav. 18

Jakarta 12870

Indonesia

Phone : +62 21 8311000

Fax : +62 21 8311001

Capt Boris Nugraha

Andhika Business Manager +62 811837655

Capt Aloysius Dembo

Senior Operation Officer +62 8121041564

Website : shipping.indonesia@gacworld.com


and please instruct them to keep us informed by sending their
correspondence to following contacts in ENEL Rome:

LB DEP 061

Francesca Annesi                tel. +39 06 8305.4412
francesca.annesi@enel.it;

Rossana Bernabei                tel +39 06 8305 8210                    AOH
+39 3294878297          rossana.bernabei@enel.it;

Roberta Bottomei                tel. +39 068305 4851                    AOH
+39 3292267163          roberta.bottomei@enel.it

Ester Donnini                   tel +39 06 8305 7003
ester.donnini@enel.it;

Eugenio Mosca                   tel +39 06 8305 4762                   AOH
+39 3294145887          eugenio.mosca@enel.it;

Kindly make sure:

- that we receive vessel itinerary including ETC of previous discharging
port and daily position (Eta, Lat, Long) to above email addresses

- that Master is aware of the current port rules, regulations and
loading terms

- that due notices are tendered as per loadport regulations

- that vessel to proceed, with all utmost speed and through the shortest
route.

- master to give 15/10/7/4/3/2/1 days notice of vessel's E.T.A as per
contract terms to shippers/suppliers/charterers directly and/or via
appointed agents .

Furthermore please be informed about the following:

- master is requested to advise cargo temperature on board hold by hold
immediately upon departure from loading port;

- master is requested to present to receivers at discharging port, the
report with last temperatures taken during navigation;

- to make sure that Blue Code certificate contains the self ignition
temperature.

Agents that read us in copy are kindly requested to keep us informed
about the following:

- confirmation of appointment from owners;

- availability of cargo at l/port;

- master notices of arrival;

- daily updates during loading operations;

LB DEP 062

- verify that quantity shown in master stowplan is the same requested by shippers and in case of difference please immediately advise us. In this respect pls also send us written confirmation of stowplan received from Shippers;

- make sure owners/master give 15/10/7/4/3/2/1 days notice of vessel's E.T.A as per contract terms and immediately advise if same is not done. Pls insert this information in the official statement of facts.


I M P O R T A N T : Please ask owners/master to urgently send us cargo stowage plan and latest vsl position and ETA ASAP.

Thanks/regards.

Francesca Annesi
ENEL TRADE SpA
Fuels Operations
GEM Division / EM Business area
UNQUOTE
AWAITING YOURS

BEST REGARDS
IFCHOR S.A./OS

****************************************************************
IFCHOR SA, Place Pépinet 1, 1003 Lausanne, Switzerland
as brokers only

capes@ifchor.ch - panamax@ifchor.ch - handy@ifchor.ch
securities@ifchor.ch - operations@ifchor.ch - capesops@ifchor.ch
www.ifchor.com

Phone: +41 21 310.31.31 - Fax: +41 21 310.31.00/01

LB DEP 063

# EXHIBIT 4

LB DEP 064



# IFCHOR S.A.

SHIPBROKERS & CHARTERING AGENTS

### Securities & FFA Division

PLACE PEPINET 1 - CH-1003 LAUSANNE, SWITZERLAND
TEL. + 41 21 310 3131 - TELEX 450351 IFC CH - TELEFAX + 41 21 310 3100
securities@ifchor.ch

## Private & Confidential                    Lausanne,   02/09/2008

### F.F.A.   Confirmation of Trade – Contract N. 8.902.5.CoRa.TC/Ifchor

As per your instructions we have traded the following agreement on your behalf:

**Seller:**      D'Amico Dry Ltd., Dublin

**Buyer:**       Primera Maritime (Hellas) Ltd, Piraeus

**Product:**     BPI Average 4 Panamax TC Routes

| Months: | Quantity: |
|---|---|
| January 2009 | 15.5 days |
| February 2009 | 14 days |
| March 2009 | 15.5 days |
| **Total Quantity:** | 45  days |

**Settlement:**   Monthly, against all BPI days of the month

**Price**   $55,750 per day
Otherwise  NEW FFABA2007 form

Many thanks to the parties for this trade and congratulations for having chosen Ifchor.
Best regards

IFCHOR S.A.

FORWARD FREIGHT AGREEMENT BROKERS ASSOCIATION ("FFABA")

FORWARD FREIGHT AGREEMENT

FFABA 2007 TERMS

Trade Ref:            [●]
Contract Date:       [●]

The purpose of this Confirmation is to state the terms and conditions of the Transaction entered into between:

[●] (hereafter, "Seller")
Attention:          [●]
Postal Address:     [●]
Street Address:     [●]
Telephone No.:     [●]
Facsimile No.:      [●]
Email Address:     [●]


      and

[●] (hereafter, "Buyer")
Attention:          [●]
Postal Address:     [●]
Street Address:     [●]
Telephone No.:     [●]
Facsimile No.:      [●]
Email Address:     [●]


The agreement between the parties set out in this Confirmation is a Confirmation pursuant to the Master Agreement.

In this Confirmation, **"Master Agreement"** has the meaning given to it in clause 9 if that clause applies, and if it does not, means any master agreement by which the Transaction entered into pursuant to and in accordance with this Confirmation is governed.

Until superseded by notice information in a subsequent Confirmation or other communication, the above addresses are hereby recognized as the correct addresses to which any notification under this Confirmation may be properly served.

The terms of this Confirmation are as follows:

1

BLP1.3361075.07.ABAI/ADMIN/ADMIN/01.10.05

LB DEP 066

1)   **Contract Route(s):**

[•] as defined by the Baltic Exchange on the Contract Date and any route replacing or
substituting that route subsequently published by the Baltic Exchange on or before the
Settlement Date and with effect from the date of such replacement or substitution.

2)   **Contract Rate:**

[•]

3)   **Contract Quantity:**

   (i)     Total Quantity: [•]

   (ii)    Quantity by Contract Month: [•]

4)   **Contract Month(s):**

[•]

5)   **Settlement Date:**

The last Baltic Exchange Index publication day of each Contract Month.

6)   **Settlement Rate:**

   (a)    Each settlement rate (the "Settlement Rate") shall be the unweighted average
          of the rates for the Contract Route(s) published by the Baltic Exchange over the
          Settlement Period (defined as [•] Baltic Exchange Index publication days in the
          applicable Contract Month up to and including the Settlement Date).

   (b)    If, for any reason, the Baltic Exchange cannot provide any rate required for
          establishing the Settlement Rate, then the current chairman of the FFABA may
          be instructed by either party to form a panel comprising of a minimum of three
          independent brokers (the "Panel") to determine an appropriate rate, which
          determination will be final and binding on both parties.

   (c)    Each party shall bear its own costs and expenses in connection with any
          determination made pursuant to this clause 6.

   (d)    The parties shall severally indemnify and hold harmless each of the members of
          the Panel, the Baltic Exchange and its members and the FFABA and its members
          (the "Indemnified Persons") against all liabilities, actions, demands, costs and
          expenses incurred by any of them arising directly or indirectly out of or in
          connection with the formation of the Panel and any determination made by the
          Panel.

   (e)    As between the parties, each party shall have a right of contribution against the
          other party in respect of any indemnity payment made pursuant to the preceding

2

LB DEP 067

paragraph so that their respective liabilities pursuant to that paragraph shall be equal.

7)  **Settlement Sum:**

The "Settlement Sum" is the difference between the Contract Rate and the Settlement Rate multiplied by the Quantity by Contract Month. If the Settlement Rate is higher than the Contract Rate, the Seller shall pay the Buyer the Settlement Sum. If the Settlement Rate is lower than the Contract Rate, the Buyer shall pay the Seller the Settlement Sum.

8)  **Payment Procedure and Obligations:**

   (a)   Payment of the Settlement Sum is due on the later of two (2) London business days after presentation of payee's invoice (with complete payment instructions) or five (5) London business days after the Settlement Date and for this purpose a "London business day" means a day (other than a Saturday or Sunday) on which commercial banks are open for business in London) . The Settlement Sum will be deemed "paid" when it has been received into the bank account designated by the payee.

   (b)   Payment of the Settlement Sum shall be made telegraphically, in full, in United States Dollars. The costs incurred in effecting payment shall be for the account of the payer. Payment may only be effected directly between the parties. The Settlement Sum shall be paid without any deduction or setoff (except as permitted pursuant to the Master Agreement) or otherwise as agreed by the Buyer and the Seller in writing.

9)  **ISDA Master Agreement:**

This clause 9 applies only if either:

   (i)   this Confirmation does not already constitute a Confirmation under an existing master agreement entered into by the parties to this Confirmation; or

   (ii)   the parties agree, either by virtue of clause 10 or otherwise, that the terms of the Master Agreement that is constituted by this clause are to replace any such existing master agreement.

This Confirmation constitutes and incorporates by reference the provisions of the 1992 ISDA® Master Agreement (Multicurrency — Cross Border) (without Schedule) as if they were fully set out in this Confirmation and with only the following specific modifications and elections:

   (a)   Section 2(c)(ii) shall not apply so that a net amount due will be determined in respect of all amounts payable on the same date in the same currency in respect of two or more Transactions;

   (b).   Seller is the Calculation Agent except where the Seller is the Defaulting Party in which event Buyer is the Calculation Agent;

LB DEP 068

(c)     the most current published set of ISDA® Commodity Definitions and ISDA® Definitions shall apply;

(d)     Credit Event Upon Merger is applicable to both parties;

(e)     for the purposes of payments on Early Termination, Loss will apply and the Second Method will apply;

(f)     Automatic Early Termination will apply to both parties;

(g)     the Termination Currency is United States dollars;

(h)     the Applicable Rate shall mean the one month USD-LIBOR plus 2%, reset daily and compounded monthly;

(i)     Local Business Day or banking day shall each refer to such a day in London;

(j)     such other modifications as shall be necessary for such incorporation;

(k)     references to "this Master Agreement", "this Agreement", "herein" and other like expressions shall be construed as being references to this Confirmation incorporating such provisions;

and, this Confirmation, including such incorporated provisions, shall govern the Transaction referred to in this Confirmation and any other Transaction referred to in clauses 20 and 21.

This agreement constituted and incorporated by the incorporation of the provisions of the 1992 ISDA® Master Agreement (Multicurrency – Cross Border) (without Schedule) pursuant to this clause is referred to in this Confirmation as the "Master Agreement".

## 10.    Capacity and Good Standing

In line with and in addition to (as appropriate) the representations contained in Section 3 of the Master Agreement, each party represents to the other party that:

(a)     it is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation, and is solvent and in good standing;

(b)     it has the power to execute, deliver, and perform this Confirmation;

(c)     all governmental and other consents that are required to have been obtained by it with respect to this Confirmation have been obtained and are in full force and effect and all conditions of any such consents have been complied with;

(d)     in the event that a party to this Confirmation is a person organized under, domiciled in, or having its principal place of business in, the United States, each party represents to the other party that it is an "eligible contract participant" as defined in § 1a(12) of the Commodity Exchange Act (7 U.S.C. § 1a(12), as amended).

BLP1.3361079.07.ABAI/ADMIN/ADMIN/01.10.05

LB DEP 069

11)   **Telephone Recording:**

Each party consents to the recording of telephone conversations in connection with this Confirmation.

12)   **Commission:**

Each of the parties agrees to pay brokers' commission to any broker (a "Broker") as agreed with any Broker.

13)   **Non-Assignability:**

Except as provided in Section 7 of the Master Agreement, this Confirmation is non-assignable unless otherwise agreed in writing between the parties to this Confirmation.

14)   **Principal To Principal:**

This Confirmation is a principal to principal agreement with settlement directly between the two parties.  Both parties agree that any Broker shall be under no obligation or liability in relation to this Confirmation.  Both parties agree jointly and severally to indemnify and hold harmless any Broker against all actions, including but not limited to all claims, demands, liabilities, damages, costs and expenses both from the two parties and any third party.  Claims, demands, liabilities, damages, costs and expenses suffered or incurred are to be settled directly by or between the two parties.

15)   **Law and Jurisdiction:**

This Confirmation shall be governed by and construed in accordance with English law and shall be subject to the exclusive jurisdiction of the High Court of Justice in London, England.  The terms of Section 12(a) of the Master Agreement notwithstanding, proceedings may be validly served upon either party by sending the same by ordinary post and/or by fax to the addresses and/or fax numbers for each party given above.

16)   **Entire Agreement:**

This Confirmation and the Master Agreement set out the entire agreement and understanding of the parties with respect to the subject matter of this Confirmation and supersede all oral communication and prior writings with respect thereto.

17)   **Payment Account Information:**

For Seller:                                          For Buyer:
Bank address:                                        Bank address:

Aba:                                                 Aba:
Swift address:                                       Swift address:
Account no.:                                         Account no.:
Sort code:                                           Sort code:

BLP1.3361079.07.ABAY/ADMIN/ADMIN/01.10.0S

LB DEP 070

18)   **Third party rights**

    (a)    Unless provided to the contrary in this Confirmation, a person who is not a party to this Confirmation has no rights under the Contracts (Rights of Third Parties) Act 1999 to enforce or enjoy the benefit of any term of this Confirmation.

    (b)    Any Indemnified Person and any Broker shall have the right to enjoy the benefit of and enforce the terms of clause 6(d) in the case of any Indemnified Person and clause 14 in the case of any Broker;

    (c)    Notwithstanding any term of this Confirmation, the consent of any person who is not a party to this Confirmation is not required to rescind or vary this Confirmation.

19)   **Partial Invalidity**

If, at any time, any provision of this Confirmation or the Master Agreement is or becomes illegal, invalid or unenforceable in any respect under any laws of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality or enforceability of the provision under the laws of any other jurisdiction will in any way be affected or impaired.

20)   **Inclusion of historical Confirmations under Master Agreement**

    (a)    Unless the parties to this Confirmation specifically agree otherwise in writing, this clause 20 shall apply in accordance with its terms.

    (b)    This clause 20 applies to this Confirmation and to every agreement entered into between the parties to this Confirmation (and no other persons) before the date of this Confirmation that is in respect of a forward freight swap, option or derivative:

        (i)    that is expressly stated to be subject to, or is subject to substantially the same terms as, either the FFABA 2000 terms, the FFABA 2005 terms or the FFABA 2007 terms, with or without amendment; and

        (ii)    in the case of a Confirmation that is stated to be subject to, or subject to substantially the same terms as, the FFABA 2007 terms that does not incorporate a clause substantially in the same form as this clause 20.

    (c)    Each agreement to which this clause 20 applies shall be treated as a Confirmation under the Master Agreement constituted pursuant to clause 9 as if such agreement had been entered into between the parties on the terms of the Master Agreement on the date of the first such Confirmation.

    (d)    If there is any inconsistency between the provisions of any agreement constituted pursuant to paragraph (c) above and the agreement constituting a Transaction to which this clause 20 applies, the provisions of the agreement constituting the Transaction to which this clause 20 applies will prevail for the purposes of the Transaction under such agreement.

6

LB DEP 071

(e)  This clause 20 shall not affect any rights or obligations of the parties under any Transaction accrued before the date of this Confirmation.

(f)  This clause 20 is effective notwithstanding any entire agreement clause or similar provision in any such agreement relevant to any such Transaction.

21)  Inclusion of subsequent Confirmations under Master Agreement

(a)  Unless the parties to this Confirmation specifically agree otherwise in writing, this clause 21 shall apply in accordance with its terms.

(b)  This clause 21 applies to every Confirmation that is in respect of a forward freight swap, option or derivative entered into between the parties to this Confirmation (and no other persons) subsequent to an agreement incorporating a Master Agreement (as defined in and pursuant to a clause substantially in the same form as and equivalent to clause 9) having been entered into by them.

(c)  Each such subsequent Confirmation shall constitute a Confirmation under the Master Agreement on the terms of clauses 20(c), (d), (e) and (f), as if they were incorporated and fully set out in this clause 21 with appropriate and necessary modifications for such incorporation.

Signed for the Seller by                    Signed for the Buyer by

.....................................        .....................................
Duly Authorized Signatory                   Duly Authorized Signatory

7

LB DEP 072

(Multicurrency–Cross Border)

# ISDA®

International Swaps & Derivatives Association, Inc.

# MASTER AGREEMENT

dated as of        May 2007

("Party A")                    and              ("Party B")

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that
are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"),
and the documents and other confirming evidence (each a "Confirmation") exchanged between
the parties confirming those Transactions.

Accordingly, the parties agree as follows:

**1        Interpretation**

(a)    *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings
therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule
and the other provisions of this Master Agreement, the Schedule will prevail. In the event
of any inconsistency between the provisions of any Confirmation and this Master
Agreement (including the Schedule), such Confirmation will prevail for the purpose of
the relevant Transaction.

(c)    *Single Agreement.* All Transactions are entered into in reliance on the fact that this
Master Agreement and all Confirmations form a single agreement between the parties
(collectively referred to as this "Agreement"), and the parties would not otherwise enter
into any Transactions.

**2        Obligations**

(a)    General Conditions.

(i)    Each party will make each payment or delivery specified in each Confirmation to
be made by it, subject to the other provisions of this Agreement.

(ii)   Payments under this Agreement will be made on the due date for value on that
date in the place of the account specified in the relevant Confirmation or
otherwise pursuant to this Agreement, in freely transferable funds and in the

LB DEP 073

manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)   Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

(b)   *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)   *Netting.* If on any date amounts would otherwise be payable:

   (i)   in the same currency; and

   (ii)   in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)   *Deduction or Withholding for Tax.*

   (i)   *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:

      (1)   promptly notify the other party ("Y") of such requirement;

LB DEP 074

(2)     pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

(3)     promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

(4)     if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:

     (A)     the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

     (B)     the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

(ii)     *Liability.* If:

     (1)     X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

     (2)     X does not so deduct or withhold; and

     (3)     a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)     *Default Interest; Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue

3

LB DEP 075

amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3        Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:

(a)      *Basic Representations.*

    (i)     *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

    (ii)    *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

    (iii)   *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

    (iv)    *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

    (v)     *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)      *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no

LB DEP 076

such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c) *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d) *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e) *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f) *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

4   Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:

(a) *Furnish Specified Information.* It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:

(i) any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii) any other documents specified in the Schedule or any Confirmation; and

(iii) upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

13219854v2                          5                          ISDA® 1992

LB DEP 077

(b)  *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)  *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)  *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)  *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated, organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

## 5  Events of Default and Termination Events

(a)  *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:

    (i)  *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

    (ii)  *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

    (iii)  *Credit Support Default.*

        (1)  Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

LB DEP 078

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)    *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii)    *Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:

LB DEP 079

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii)  *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:

    (1)  the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

    (2)  the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)  *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:

LB DEP 080

(i)    *Illegality.* Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):

    (1)    to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

    (2)    to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii)    *Tax Event.* Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii)    *Tax Event Upon Merger.* The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv)    *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

LB DEP 081

    (v)   *Additional Termination Event.* If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)   *Event of Default and Illegality.* If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

## 6   Early Termination

(a)   *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)   *Right to Terminate Following Termination Event.*

    (i)   *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

    (ii)   *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if

LB DEP 082