such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate.* If

    (1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

    (2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)    **Effect of Designation.**

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)    **Calculations.**

(i)    *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

LB DEP 083

(ii) *Payment Date*. An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e) *Payments on Early Termination*. If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method", If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" and the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i) *Events of Default*. If the Early Termination Date results from an Event of Default:

(1) *First Method and Market Quotation*. If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss*. If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation*. If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect

LB DEP 084

of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii) *Termination Events.* If the Early Termination Date results from a Termination Event:

(1) *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties.* If there are two Affected Parties:

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii) *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv) *Pre-Estimate.* The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither

LB DEP 085

party will be entitled to recover any additional damages as a consequence of such losses.

7      Transfer

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

8      Contractual Currency

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the

LB DEP 086

purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)   *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)   *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

**9     Miscellaneous**

(a)   *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)   *Amendments.* No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)   *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)   *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)   *Counterparts and Confirmations.*

(i)    This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii)   The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will

LB DEP 087

specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f) *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g) *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

## 10   Offices; Multibranch Parties

(a) If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b) Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c) If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

## 11   Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

## 12   Notices

(a) *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:

    (i)    if in writing and delivered in person or by courier, on the date it is delivered;

    (ii)    if sent by telex, on the date the recipient's answerback is received;

LB DEP 088

(iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

13    **Governing Law and Jurisdiction**

(a)    *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:

(i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process.* Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any reason any party's Process Agent is unable to act as such, such

LB DEP 089

party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d) *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14   Definitions

As used in this Agreement:

"*Additional Termination Event*" has the meaning specified in Section 5(b).

"*Affected Party*" has the meaning specified in Section 5(b).

"*Affected Transactions*" means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

"*Affiliate*" means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

"*Applicable Rate*" means:

(a) in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b) in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c) in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d) in all other cases, the Termination Rate.

"*Burdened Party*" has the meaning specified in Section 5(b).

LB DEP 090

"*Change in Tax Law*" means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

"*Consent*" includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

"*Credit Event Upon Merger*" has the meaning specified in Section 5(b).

"*Credit Support Document*" means any agreement or instrument that is specified as such in this Agreement.

"*Credit Support Provider*" has the meaning specified in the Schedule.

"*Default Rate*" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1.10 per cent. per annum.

"*Defaulting Party*" has the meaning specified in Section 6(a).

"*Early Termination Date*" means the date determined in accordance with Section 6(a) or 6(b)(iv).

"*Event of Default*" has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

"*Illegality*" has the meaning specified in Section 5(b).

"*Indemnifiable Tax*" means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

"*law*" includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and "*lawful*" and "*unlawful*" will be construed accordingly.

"*Local Business Day*" means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified

LB DEP 091

in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

"*Loss*" means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or re-establishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

"*Market Quotation*" means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than

LB DEP 092

three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

"*Non-default Rate*" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

"*Non-defaulting Party*" has the meaning specified in Section 6(a).

"*Office*" means a branch or office of a party, which may be such party's head or home office.

"*Potential Event of Default*" means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"*Reference Market-makers*" means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

"*Relevant Jurisdiction*" means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

"*Scheduled Payment Date*" means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

"*Set-off*" means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

"*Settlement Amount*" means, with respect to a party and any Early Termination Date, the sum of:

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

"*Specified Entity*" has the meaning specified in the Schedule.

"*Specified Indebtedness*" means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

LB DEP 093

"*Specified Transaction*" means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

"*Stamp Tax*" means any stamp, registration, documentation or similar tax.

"*Tax*" means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

"*Tax Event*" has the meaning specified in Section 5(b).

"*Tax Event Upon Merger*" has the meaning specified in Section 5(b).

"*Terminated Transactions*" means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

"*Termination Currency*" has the meaning specified in the Schedule.

"*Termination Currency Equivalent*" means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

"*Termination Event*" means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

LB DEP 094

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

By: ............................................................................
Name
Title:
Date:


By: ............................................................................
Name
Title:
Date:

LB DEP 095

24

ISDA® 1992

LB DEP 096

# EXHIBIT 5

LB DEP 097

10 Sept. 2010

Primera/d'Amico

Ref Hmax Tonnage :

01    d'Amico Hmax tonnage "unfixed" at the date date of 1St September 2008 :
        - Medi Chennai
        - Medi Dubai
        - Medi Dublin
        - Medi Firenze
        - Medi Imabari
        - Medi Valencia
        - Medi Lisbon

        Totalal unfixed days Q4/2008 : about 630 days
        Total unfixed days  Q1/2009 : about 630 days


02    *Fixtures of d'Amico Hmax Tonnage  done during the period Q4/2008-Q1/2009 (recaps attached)*
        - Medi Chennai / SCT Coa 12 July 2007 (voyages # 7,8,9,10,11,12,13 in direct continuation)
        - Medi Dubai / Panocean – C/P 4 Dec 2008
        - Medi Dubai / JK Shipping – C/P 16 Mar 2009
        - Medi Dublin / Glencore – C/p 26 Jan 2006 (Voy 9 – 10/20 Oct 2008)
        - Medi Dublin / ST Shipping  - C/P 31 Aug 2007 (L/C 10/19 Nov 2008)
        - Medi Dublin/Premier Chartering – C/P 14 Nov 2008
        - Medi Dublin/Cargill – C/P 8 Jan 2009
        - Medi Dublin/Libra – C/P 23 Jan 2009
        - Medi Dublin / Jaidhi – C/P 2 Mar 2009
        - Medi Firenze / Oldendorff – C/P 25 Sept 2008
        - Medi Firenze / STX Panocean  - C/P 28 Oct 2009
        - Medi Firenze/British marine – C/P 12 Jan 2009
        - Medi Firenze/Bagadiya – C/P 19 Feb 2009
        - Medi Imabari/EE – COA 20 Sept 2006 (Voy 14 – 26 Oct/4 Nov)
        - Medi Imabari/EE – COA 20 Sept 2006 (Voy 15 – 13/22 Nov)
        - Medi Imabari/Cargill – C/P 25 Nov 2008
        - Medi Imabari/Unique – C/P 1 Dec 2008
        - Medi Imabari/Cetrapga – C/P 29 Jan 2009
        - Medi Imabari/EE – COA 11 May 2007 (Voy 18 – L/C 18/27 Feb)
        - Medi Valencia/Noble – C/P 20 Nov 2008
        - Medi Valencia/Cargill – C/P 26 Feb 2009
        - Medi Valencia / HMM – C/P xxxx  2009
        - Medi Lisbon/Cargill – C/P 12 Sept 2008
        - Medi Lisbon/Banpu – COA 4 Dec 2007 (Voy.2 – 7/16 Oct)
        - Medi Lisbon/Banpu – COA 20 Sept 2006 (V.18 – 4/13 Dec)
        - Medi Lisbon/ Acemark – C/P 11 Dec 2008
        - Medi Lisbon/Jaidhi – C/P 12 Feb 2009

LB DEP 098

03     _Forward Hmax  cargoes at the date of 1st September 2008_
  - Eastern Energy COA  May 2007
    3 voyages Indonesia  to Thailand during Q1/2009
    Total about 60 days employment
  - Kideco COA July 2007
    3 voyages Indonesia to Thailand during Q1/2009
    Total about 60 days employment
  - Banpu Coa March 2008
    3 voyages Indonesia/Thailand during Q1/2009
    Total about 60 days employment

End / LB

LB DEP 099

Adi/Thomas

We sake good order reconfirm that the M.V Medi Chennai will perform voyage number 7 under the coa.
Demurrage rate will be Usd 11.965 in line with the baltic index published yesterday.

Sake good order please reconfirm this nomination

Best Regards,
Thomas Ringberg

*********************************************************************

d'Amico Dry - Singapore
Thomas Ringberg  P +65 6854 7361 / M +65 9782 8622
Mike Williams  P +65 6854 7362 / M +65 9126 4128
Pratik Ray Chowdhury  P +65 6854 7363 / M +65 9833 9543

d'Amico Dry - Monaco
Gustavo Corfetti  P +377 9310 5604 / M +377 6 8086 3066
Paolo Montella  P +377 9310 5590 / M +377 6 8086 8799

d'Amico Dry - Vancouver
Lorenzo Bottazzi P +1 604 484 8022 / M +1 778 888 6528
***********************************************************************

LB DEP 100

ops /pratik

Medi chennai has been accepted by SCT for voy 8 in direct continuation as per the below message.

All terms are same as previous voyage.

Demmurrage agreed is usd 5551 pdpr.

++


For reference terms:-

adang bay/kohsichang
15000/12000 shinc
frt 13.40

++


Best Regards,

*******************************************************************************

d'Amico Dry - Singapore
Thomas Ringberg  P +65 6854 7361 / M +65 9782 8622
Mike Williams  P +65 6854 7362 / M +65 9126 4128
Pratik Ray Chowdhury  P +65 6854 7363 / M +65 9833 9543

d'Amico Dry - Monaco
Gustavo Corfetti  P +377 9310 5604 / M +377 6 8086 3066
Paolo Montella  P +377 9310 5590 / M +377 6 8086 8799

d'Amico Dry - Vancouver
Lorenzo Bottazzi  P +1 604 484 8022 / M +1 778 888 6528
*******************************************************************************


PT. SIMPSON SPENCE & YOUNG INDONESIA (SSY JAKARTA)
Tel: +62 21 57942330   Fax: +62 21 57942331

11/17/2008   10:43:40 AM   /   AR8124173


PRATIK / ADI

RE: MV MEDI CHENNAI/SCT - CP DD 12.07.07 - VOY 8 - NOMINATION

JUST RECEIVED FROM CHTRS

QTE

Confirm accept 8th Voyage as direct continuation from voyage 7th

Best Regards

UNQTE

LB DEP 101

ciao,

Medi Chennal has been accepted by SCT to perform d'Amico/SCT cp dd 12.July.07 - Voy.9.(laycan 3-12 jan 2009) as per the below email.

For your reference, the terms are :-

adang bay/kohsichang
15000shinc/14000shinc
frt: usd 13.10 pmt

demrr: usd 4268 pdpr

+++


Best Regards,

***************************************************************************

d'Amico Dry - Singapore
Thomas Ringberg  P +65 6854 7361 / M +65 9782 8622
Mike Williams  P +65 6854 7362 / M +65 9126 4128
Pratik Ray Chowdhury  P +65 6854 7363/ M +65 9833 9543

d'Amico Dry - Monaco
Gustavo Corfetti  P +377 9310 5604 / M +377 6 8086 3066
Paolo Montella  P +377 9310 5590 / M +377 6 8086 8799

d'Amico Dry - Vancouver
Lorenzo Bottazzi P +1 604 484 8022 / M +1 778 888 6528
***************************************************************************


PT. SIMPSON SPENCE & YOUNG INDONESIA (SSY JAKARTA)
Tel: +62 21 57942330  Fax: +62 21 57942331

12/23/2008   10:41:01 PM   /   AR8304126


Pratik / Adi

Re: D'Amico (M/v Medi Chennai)/SCT cp dd 12.July.07 - Voy.9
Laycan 3-12 January 2009
---

Have received the following from Chtrs

Qte

Charterer confirm accept Medi Chennai, to perform  voy 9 laycan 3-12
Jan 2009 with dem/des rate 4268 USD perday

Apologize for late reply

LB DEP 102

ciao,

M.V.Medi chennai will continue performing SCT shuttle voy# 10.(/SCT cp dd 12.July.07)

For your reference, the terms are :-

adang bay/kohsicheng
15000shinc/14000shinc
frt: usd 13.10 pmt

demm: usd 4498 pdpr

+++
Best Regards,

*********************************************************************************

d'Amico Dry - Singapore
Thomas Ringberg  P +65 6854 7361 / M +65 9782 6622
Mike Williams  P +65 6854 7362 / M +65 9126 4128
Pratik Ray Chowdhury  P +65 6854 7363 / M +65 9833 9543

d'Amico Dry - Monaco
Gustavo Corfetti  P +377 9310 5604 / M +377 6 8086 3066
Paolo Montella  P +377 9310 5590 / M +377 6 8086 8799

d'Amico Dry - Vancouver
Lorenzo Bottazzi P +1 604 484 8022 / M +1 778 888 6528
*******************************************************************************************

| | | |
|---|---|---|
| **Adi ARIMANSYAH** <operations@ssyjkt.com> | To | "D'amico Singapore" <drysingapore@damicoint.com> |
| 01/13/2009 03:01 PM | cc | "D'amico - Operations" <ops.dry@damicoint.com>, <ringberg.t@damicoint.com> |
| Please respond to Adi ARIMANSYAH <operations@ssyjkt.com> | Subject | D'Amico (M/V MEDI CHENNAI)/SCT cp dd 12.July.07 - Voy.10 |

PT. SIMPSON SPENCE & YOUNG INDONESIA (SSY JAKARTA)
Tel: +62 21 57942330   Fax: +62 21 57942331

1/13/2009  2:01:23 PM   /   AR8372460


Pratik / Adi
cc Thomas

Re: D'Amico (M/V MEDI CHENNAI)/SCT cp dd 12.July.07 - Voy.10

LB DEP 103

Just received from Chtrs

Qte

Confirm accept. Please advise eta loadport.

Brgds,
Joy

Unqte

Pls be advised accrdly

B. RGDS
PT SIMPSON SPENCE & YOUNG, JAKARTA/OPRS DEPT.
ADI ARIMANSAH
EMAIL: OPERATIONS@SSYJKT.COM
MOB: +62 816 140 4845
MSN: ADIARIMANSAH@HOTMAIL.COM (CHAT ONLY)
*******************************************

LB DEP 104

Ciao,

M.V.Medi chennai will continue performing SCT shuttle voy# 11.(/SCT cp dd 12.July.07)

For reference, the terms are :-

adang bay/kohsichang
15000shinc/14000shinc
frt: usd 13.10 pmt

demm: usd 4562 pdpr

+++

Best Regards,

*************************************************************
d'Amico Dry - Singapore
Thomas Ringberg  P +65 6854 7361 / M +65 9782.8622
Mike Williams  P +65 6854 7362 / M +65 9126 4128
Pratik Ray Chowdhury  P +65 6854 7363 / M +65 9833 9543

d'Amico Dry - Monaco
Gustavo Corfetti  P +377 9310 5604 / M +377 6 8086 3066
Paolo Montella  P +377 9310 5590 / M +377 6 8086 8799

d'Amico Dry - Vancouver
Lorenzo Bottazzi  P +1 604 484 8022 / M +1 778 888 6528
*************************************************************

| | | | |
|---|---|---|---|
| **Adi ARIMANSYAH**<br><operations@ssyjkt.com> | To | "D'amico Singapore" <drysingapore@damicoint.com> | |
| 01/28/2009 06:15 PM | cc | "D'amico - Operations" <ops.dry@damicoint.com> | |
| **Please respond to**<br>Adi ARIMANSYAH <operations@ssyjkt.com> | Subject | d'Amico (Mv Medi Chennai)/SCT cp dd 12.July.07 - Voy. 11 - v |

PT. SIMPSON SPENCE & YOUNG INDONESIA (SSY JAKARTA)
Tel: +62 21 57942330   Fax: +62 21 57942331

1/28/2009   7:15:09 PM   /   AR8438170

PRATIK / ADI

Re: d'Amico (Mv Medi Chennai)/SCT cp dd 12.July.07 - Voy. 11 - vsl nom

JUST RECEIVED THE FOLLOWING FROM CHTRS

LB DEP 105

QTE

Charterers hereby accepted Owners nomination for vessel nomination of voy.11. Please advise roughly eta loading port enable to inform our supplier.

Thanks & Brgds,

UNQTE

B. RGDS
PT SIMPSON SPENCE & YOUNG, JAKARTA/OPRS DEPT,
ADI ARIMANSAH
EMAIL: OPERATIONS@SSYJKT.COM
MOB: +62 816 140 4845
MSN: ADIARIMANSAH@HOTMAIL.COM (CHAT ONLY)
********************************************

LB DEP 106

**D'Amico (Mv Medi Chennai)/SCT op dd 12.July.07 - Voy.12**

**Michael John Williams**     to Lucio Bonaso, Paolo Montella, Thomas Ringberg, Pratik Ray Chowdhury, Michael Jc
                              :   Delphine Papalini, Antonio Di Giovanni, Emanuela Gibelli


Medi Chennai has been confirmed to perform voyage 12 of the SCT coa c/p dtd
12 July 2007

Dem rate is $11,385

Rgds

LB DEP 107

ciao,

Medi chennai has been accepted by SCT for voy 13 in DC.

For ref terms for voy 13 are:-;

adang bay-koslchang
15000shinc/14000shinc
frt: usd 13.10 pmt
demm: usd 17653pdpr

++

All other terms same as last.

Agents same as last

Best Regards,

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

d'Amico Dry - Singapore
Thomas Ringberg  P +65 6854 7361 / M +65 9782 8622
Mike Williams  P +65 6854 7362 / M +65 9126 4128
Pratik Ray Chowdhury  P +65 6854 7363 / M +65 6833 9543

d'Amico Dry - Monaco
Gustavo Corfetti  P +377 9310 5604 / M +377 6 8086 3066
Paolo Montella  P +377 9310 5690 / M +377 6 8086 8799

d'Amico Dry - Vancouver
Lorenzo Bottazzi P +1 604 484 8022 / M +1 778 888 8528
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| Adi ARIMANSYAH<br><operations@asyjkt.com> | To | "D'amico Singapore" <drysingapore@damicoint.com> |
| 03/17/2009 10:17 AM | cc | "D'amico - Operations" <ops.dry@damicoint.com> |
| Please respond to<br>Adi ARIMANSYAH <operations@asyjkt.com> | Subj<br>ect | MV. Medi Chennal / SCT - 13 |

LB DEP 108

PT. SIMPSON SPENCE & YOUNG INDONESIA (SSY JAKARTA)
Tel: +62 21 57942330   Fax: +62 21 57942331

3/17/2009   9:17:13 AM   /   AR8663179

Pratik / Adi

Re: MV. Medi Chennai / SCT - 13

Chtrs are pleased to confirm clean acceptance.

Agent at bends are same as previous vsl

B. RGDS
PT SIMPSON SPENCE & YOUNG, JAKARTA/OPRS DEPT.
ADI ARIMANSAH
EMAIL: OPERATIONS@SSYJKT.COM
MOB: +62 816 140 4845
YAHOO: ADI_SSY@YAHOO.COM (CHAT ONLY)
MSN: ADIARIMANSAH@HOTMAIL.COM (CHAT ONLY).
*************************************

LB DEP 109

2

MEDI DUBAI IS CLEAN FIX WITH STX PANOCEAN, RECAP AS FOLLOWS.

---- Forwarded by Paolo Montella/Montecarlo/Cogema/D'Amico Group on 04/12/2008 08:29 PM ----

      Wonsild Australia
      <dry@wonsild.com>    To  "PAP" <dry@damicoint.com>

      04/12/2008 07:33 PM    cc

                     Subj  MV MEDI DUBAI / STX PANOCEAN - C/P DD 4TH DEC., 2008
                     ect

From:   WONSILD, AUSTRALIA
       DRY CARGO - PHONE: +61 3 9599 3599
       EMAIL: DRY(AT)WONSILD.COM

Ref: 08IZ04-REP0052665.

PAOLO/RUPERT

FURTHER MSN - PLSED TO CONFIRM AS FOLLOWS

RE : MV MEDI DUBAI / STX PANOCEAN - C/P DD 4TH DEC., 2008

PLSDS TO CONFIRM HAVING FIXED CLEAN ASF : -

C/P DATED 4TH DEC., 2008
==================================================

1.VESSEL
  M.V. MEDI DUBAI
  ITALIAN FLAG / BLT SANOYAS 11/01

  52,523 MTDWAT ON 12.04 M SSW
  189.90 M LOA / 32.26 M BEAM
  GRT/NRT 29,367/17,651
  5/5 HO/HA - FOLDING TYPE FRW/AFT
  66,596/64,545 CBM GRAIN/BALE
  SPEED/CONS AT OPEN SEA ON SMOOTH WEATHER UPTO MAX BF4/DSS3 NO ADV CURRENT:

  ABT 13.75 KN (L) / 14.25 KN (B) ON ABT 31.0 MT IFO - NDAS
  PORT CONS (DAILY/24 HRS):
  Idle ABT 2.5 MT IFO + abt 0.2 mt mdo
  W/C ABT 6.0 MT IFO + abt 0.6 mt mdo
  IFO 380 CST (50DEG °C) RMH 35
  4 X 30 T SWL EL/HYDR CRANES
  4 X 12 CBM EL/HYDR GRABS
  All details "ABOUT"

OWRS G'TEE THAT,

   -VSL IS A GEARED - CRANE NR.2 IS OUT OF SERVICE BUT THE VESSEL IS A
   SELFLOADER/SELFDISCHARGER - S/D SELFTRIMMING B/C,
   GRAIN-CLEAN,
   CLASSED HIGHEST IN NK OR EQUIVALENT,
   PANDI COVERED,
   ISM CERTIFIED,
   AHL/ITF/WWF FITTED,
   AND FULLY HULL+MACHINERY INSURED BULKER.


FOLL INFORMATIONS WHICH TO BE FULLY INCORPORATED IN THE MAIN TERMS,


AA) VSL'S GRT/PANAMA NRT - GRT/NRT 29,367/17,651

BB) VSL'S CONSTANT QNTY  - 250 TON

CC) BUNKER SPEC - IFO (IF-380) ISO8217RMG35 AND MDO ISO8217DMA.


DD) BUNKER TANKS CAPACITY FOR IFO/MDO
   - 95%  IFO 2178,2M/T   MDO 307 M/T

EE) VSL'S FULL ITINERARY UPTO DELIVERY
   VESSEL IS CURRENTLY AT HAMBURG ETD 4TH AM ETA SW PASS 19TH DEC.

FF) VSL'S HOLDWISE GRAIN CAPA
   CUBIC GRAIN BREAKDOWN PER CARGO HOLD
       N.1         12273.2
       N.2         13773.8
       N.3         13324.8
       N.4         13788.2
       N.5         13436.7
       TTL         66596.7 CBM


   LAST 3 CARGOS BAUXITE-CEMENT-PETCOKE
   BIZ ROUTES VIA PANAMA CANAL OR CHTOPT VIA CAPE OF GOOD HOPE

GG) VSL'S CALL SIGN/INMARSAT TEL/FAX/TLX NBR, E-MAIL ADDRESS
   INM-C:      424702447 TLX
   INM-B:      324799969 TLX
   INM-B:      324799968 FAX
   INM-B:      324799965 PHO
   E-MAIL: medidubai@les-raisting.de
   CELL PHONE: +33 6 80863722
   IMO NUMBER: 9236896
   CALL SIGN: IBXW

HH) LAST DRY DOCKING DETAIL(WHERE/WHEN): SHANGHAI  22NOV - 16DEC  2008

II) OWS BANKING DETAILS FOR CHTRS HIRE PAYMENT
   - REMIT TO ........... JP MORGAN CHASE BANK, NEW YORK
      SWIFT CODE ......... CHASUS33
      TO THE CREDIT OF .... J.P.MORGAN BANK (IRELAND) PLC, DUBLIN

LB DEP 111

```
          SWIFT CODE .......... CHASIE2X
          IN FAVOUR OF ........ d'AMICO DRY LIMITED
          ACCOUNT NO. ........ 79700802
          IBAN CODE ........... IE23 CHAS 9309 0379 7008 02
```

+++

2. CHTRS: STX PAN OCEAN CO., LTD., SEOUL

3. OWNERS: D'AMICO DRY LIMITED (HEAD OWS)

4. DELY: AFSPS SW PASS, US GULF, ATNDSHINC

5. LAY/CAN: 00:01LT 18TH / 23:59LT 23RD DEC 2008
   VESSEL'S ETA SW PASS 18/19 DEC

6. ROUTE/DUR: 1 TCT VIA SA(S) SB(S) SP(S) AAAA AWIWL VIA USG WITH
   GRAIN/GRAIN PROD (INCLUDING SBM) IN BULK ONLY TO FEAST(INT JAPAN)
   DURATION ABOUT 50 DAYS WOG

7. REDEL: DLOSP 1SP SGP-JAPAN-PICO ATDNSHINC (INTN JAPAN)

8. HIRE: USD 9,500 DIOT PAYABLE EVERY 15 DAYS IN ADVANCE

9. PAYMENT: 1ST HIRE + VALUE OF BUNKERS TO BE PREPAID WITHIN
   3 BANKING DAYS AFTER DELIVERY
   CHTRS ARE ENTITLED TO DEDUCT FROM LAST SUFFICIENT HIRE
   PAYMENT ESTIMATED OWNERS' DISBSMT BUT MAXIMUM USD 1,000
   PER PORT OF CALL AS WELL AS VALUE OF BOR

10. ILOHC : USD 4,500 LSUMP EXCL REMOVAL /DISPOSAL OF DUNNAGES/
    DEBRIS/LASHING MATERIALS

11. C/V/E: USD 1,250 PMPR

12. BUNKER CLS :
    BODELY IFO ABT 500-600 MT NOD ABT 80MT
    BOREDLY ABT SAME AS ACTUALLY ON BOARD ON DELY
    BUNKER PRICE $ 240 PMT IIFO / $ 500 PMT MDO BENDS

13. BIMCO BUNKER FUEL SULPHUR CONTENT CLAUSE TO BE APPLIED

14. BIMCO OIL POLLUTION CHARTER PARTY CLAUSE (NON TANKERS) TO
    BE APPLIED

15. BIMCO ISM/ISPS-MT9A TO BE APPLIED

16. BIMCO US CUSTOMS ADVANCE NOTIFICATIONAMS CLAUSE FOR TIME CHARTER
    PARTIES TO BE APPLED

17. ARBITRATION IN LONDON & ENGLISH LAW TO APPLY

18. ENG LAW/LDN ARB TO APPLY

19. 3.75 PCT ADDCOMM AND 1.25 PCT TO NOORY + 1.25 PCT TO WONSILD

LB DEP 112

20. OTHERWISE, AS PER LOGICAL ALTERATIONS  AS PER MAIN TERMS AGREED INCLUDING
    FOLLOWING AMENDMENTS AGREED TO THE C/P FOR THE FIXTURE "MEDI FIRENZE /
STX
    PANOCEAN CP DTD 28.10.08" AND SOME ADDITIONAL AMENTMENTS ASF : -

    MAINBODY
    --
    LINE 25 : delete "OR ITS GUARANTEED NOMINEE"
    LINE 108 : delete "45, 30" , add "25" instead
    LINE 122 : replace "tokyo" by "SEOUL"

    CLS 20 (Drydocking) : delete all but add: "Drydocking to be allowed
    for the duration of this charter only in case of emergency."

    RIDER
    --
    CLS 34 : delete "AND COUNTER SIGNED BY RECEIVERS" (AS PER MAINTERM)

main terms:
- OWNERS ALLOW CHTRS TO DISCH CGO WITHOUT PRESENTATION OF ORIG B(S)/L
BY PROVIDING OWNRS WITH CHTRS L.O.I IN ACCORDANCE WITH OWNRS PNI CLUB
FORM AND WORDING BEFORE DISCHARGING. L.O.I. TO BE SIGNED BY CHTRS ONLY.
------

    CLS 49, 2nd para, 3rd line : replace "two" by "THREE"

    CLS 50, from 2nd para to the end : delete all (intermeidate hold
    cleaning is not applicable)

    CLS 52, 1ST PARA : AFTER "OIL CAKE" ADD "(OWNERS CONFIRM SOYA BEAN MEALS
    ARE ALWAYS TO BE PERMITTED, PROVIDING MASTER/OWS ARE FROVIDED WITH A
    CERTIFICATE FROM RECOGNISED AUTHORITY STATING THE OIL AND MOISTURE
CONTENT.
    CHARTERERS TO GUARANTEE SAID CARGO DOES QUALIFY AS UNDER APPENDIX B OF
IMO
    BC CODE".)"

    and add at the end as flwgs,

    "VESSEL IS ABLE TO CARRY A FULL CARGO OF HEAVY GRAIN AND/OR ITS
    PRODUCTS IN BULK IN VESSEL'S HOLDS. DURING THE CURRENCY OF CHARTER
    PARTY PERIOD THE VESSEL TO HAVE ON BOARD VALID GRAIN LOADING PLAN AND
    STABILITY BOOKLET ISSUED BY VESSEL'S CLASS SOCIETY ON BASIS LATEST
    SOLAS AND FURTHER AMENDMENTS."

    CLS 56, 1st line : delete "APPROVED BY OWNERS"

    add at the end as flwg
    "EVIDENCE OF WEATHER CONDITIONS TO BE TAKEN FROM THE VESSEL'S DECK
    LOGS AND INDEPENDENT WEATHER BUREAU REPORTS. IN CASE OF DISCREPANCY
    BETWEEN  VESSEL'S DECK LOGS AND OCEAN ROUTE'S REPORTING, THEN THE
    LATTER WILL BE CHOSEN AS RULING. IF CHARTERERS APPOINT ''AWT'' AS
    WEATHER ROUTING SERVICE THEN DECK LOGS WILL BE CHOSEN AS RULING.

    CLS 61 : REPLACE WITH :
    "VESSEL'S HOLDS ON DELIVERY TO BE CLEAN SWEPT/WASHED DOWN BY

LB DEP 113

FRESH WATER AND DRIED UP SO AS TO RECEIVE CHARTERERS' INTENDED
CARGOES IN ALL RESPECTS TO INDEPENDENT SURVEYOR'S, NCB AND/OR
USDA SATISFACTION.
  IF VESSEL FAILS INSPECTION AT 1ST LOADING PORT VESSEL TO BE
CONSIDERED OFF-HIRE FROM THE TIME OF REJECTION AND ALL FUEL
CONSUMPED AND ANY DIRECT RELATED EXPENSES/TIME UNTIL VESSEL'S
ALL HOLDS PASS INSPECTION TO RECEIVE CHARTERERS' INTENDED
CARGO TO BE FOR OWNERS' ACCOUNT."


CLS 73,
7th line : delete "EXCEPT FOR AN ALLOWANCE OF TOTAL EIGHT HOURS EACH
LOADING OR DISCH.PORT CALL/OPERATION"


LAST PARA : DELETE ALL BUT TO MAINTAIN LAST SENTENCE "ANYWAY, IN
CASE OF BREACK-DOWN... NO OFF-HIRE SHALL APPLY"


ADDITIONAL CLS


WATERTIGHT HATCH COVERS
-------------------------
OWNS G'TEE THAT VSL'S H.COVERS ARE TB WATERTIGHT ALL THROUGH THIS
CHARTER PERIOD N IF ANY H.COVER FOUND DEFECTIVE, SAME TB RECTIFIED
AT OWNS' TIME N EXPS TO CHTRS' SATISFACTION.


ASIAN-GYPSY MOTH CLAUSE
-------------------------
OWNERS WARRANT THAT THE VESSEL IS FREE FROM INFESTATION BY ASIAN GYPSY
MOTH(A.G.M) OR ITS AGGS. SHOULD THE OWNERS FAIL TO FULFIL SUCH WARRANTY,
THE CHARTERERS SHALL BE INDEMNIFIED BY OWNERS FOR ANY LOSS OR DAMAGE
SUSTAINED BY THE CHARTERERS  AND ALL BUT NOT LIMITED TO ANY DELAY,
EXPENSES, FINES, COST FOR REMOVAL OF THE MOTHS AND THEIR EGGS AND/OR
EVEN TRANSHIPMENT OF THE CARGO IF ON BOARD REGARDLESS OR WHETHER OR
NOT THE VESSEL WOULD BE BANNED FROM ENTERING INTO OR ORDERED TO LEAVE
THE PORT(S) BECAUSE OF THE SAID FAILURE.


BULLDOZERS
------------
CHARTERERS TO HAVE THE OPTION TO USE BULLDOZERS IN VESSEL'S HOLDS,
PROVIDED NOT EXCEEDING THE TANK TOP STRENGTH. IF REQUIRED THE STEVEDORE
TO LIFT ON BOARD THE BULLDOZERS BY USE OF VESSEL'S GEAR.


END


AGAIN MANY THANKS YOUR SUPPORT FOR ABOVE FIXTURE, HOPE ALL GOES WELL!

KIND REGARDS
RUPERT

WONSILD +613   95993599

LB DEP 114

```
DIRECT  +613   95993594
MOBILE  +614   14.646777
```

MSN:  rpuels@hotmail.com

rep@wonsild.com.au – for urgent after hours email

Please visit our homepage: http://www.wonsild.com

LB DEP 115

ciao,

M.v.Medi dubai has been fixed to JK shipping for a long nopac rv to india/bangladesh range with grains in bulk.

The charter hire is usd 11800pdpr.This business also allows us to ensure that the vessels cranes will not be used for a longer period.

The brokers are Seatown shipbroking in singapore.

As per previous discussions, the quantity loaded will be as per shore scale but chrtrs will hold us harmless and absolve us of any liability. Also the master has the right to reject any cargo which would require the mr to be claused.

The clean recap is as below.

The base CP is attached.

medi dubai amended trip tct CP.pdf

Best Regards,

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

d'Amico Dry - Singapore
Thomas Ringberg  P +65 6854 7361 / M +65 9782 8622
Mike Williams  P +65 6854 7362 / M +65 9126 4128
Pratik Ray Chowdhury  P +65 6854 7363 / M +65 9833 9543

d'Amico Dry - Monaco
Gustavo Corfetti  P +377 9310 5604 / M +377 6 8086 3066
Paolo Montella  P +377 9310 5590 / M +377 6 8086 8799

d'Amico Dry - Vancouver
Lorenzo Bottazzi P +1 604 484 8022 / M +1 778 888 6528
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

"drycargo"
<drycargo@seatown.co     To  "SPORE-DAMICO" <drysingapore@damicoint.com>
m.sg>
                         cc
03/16/2009 06:19 PM      Subj  MEDI DUBAI/J K
                         ect

FROM SEATOWN SHIPBROKING PTE LTD

16TH MARCH 2009 / REPEAT, PLEASE CONFIRM RECEIPT. THANKS


-----Original Message-----
From: drycargo [mailto:drycargo@seatown.com.sg]
Sent: Monday, March 16, 2009 5:59 PM
To: SPORE-DAMICO (drysingapore@damicoint.com)
Subject: FW: MEDI DUBAI/J K

Seatown Shipbroking Pte. Ltd. Singapore
Maxwell House #02-01, 20 Maxwell Road, Singapore 069113
Tel: (65) 6224 8444 - Fax: (65) 6225 5435/6323 7464
Email: drycargo@seatown.com.sg

PRATIK/LAWRENCE
Sori corrected recap as omitted commission


REF OUR MEETING PLS TO RECAP FULL FIXTURE AS FOLLS



M.V. MEDI DUBAI (open ex DD in CJK o/a 20th march 2009)

ITALIAN FLAG / BLT SANO&AS 11/01

52,523 MTDWAT ON 12.04 M SSW

189.90 M LOA / 32.26 M BEAM

GRT/NRT 29,367/17,651

5/5 HO/HA - FOLDING TYPE FRW/AFT

66,596/64,545 CBM GRAIN/BALE

SPEED/CONS AT OPEN SEA ON SMOOTH WEATHER UPTO MAX BF4/DSS3 NO. ADV

LB DEP 117

CURRENT(excluding sailing in restricted areas and/or in/out ports:

ABT 13.75 KN (L) / 14.25 KN (B) ON ABT 31.0 MT IFO - NDAS

PORT CONS (DAILY/24 HRS):

Idle ABT 2.5 MT IFO + abt 0.2 mt mdo

W/C ABT 6.0 MT IFO + abt 0.6 mt mdo

IFO 380 CST (50DEG °C) RMH 35

4 X 30 T SWL EL/HYDR CRANES

4 X 12 CBM EL/HYDR GRABS

Vessel may use minor quantities of diesel whilst navigating narrow, shallow, busy/restricted water areas, canals, in and out of port, engine/generator starting/stopping

All details "ABOUT"

- VSL IS ISM AND ISPS CODE COMPLIANT

- VSL IS PNI COVERED AND CLASSED LLOYDS 100A1 OR EQUIV

- VSL IS SDSTBC AND IS SUITABLE FOR GRAB DISCHARGE

- DELETE ANY REF TO "WOG" IN VESSELS DESCRIPTION

FOR

- Account JK Shipping Pty Ltd

JK Shipping Pty Ltd

Address:49,Suscatand Street,Rocklea ,Queensland4106

Tel: 61 7 3850 8111

PIC: Denis D'Cotta

- All negotiations and eventual fixture to be strictly P&C

- Delivery DLOSP CJK ATONSHINC

- Duration about 60-70 days WOG

-Laycan 20/ 28 March 2009

- Owners declare that at time of fixing etr of the vessel is 20 thMarch AGW WPWOG UCAB

1 TCT via sp/s/a/b always afloat, always within IWL, one tct via Vancouver BC to india-bangladesh range.

Charterers are allowed to load any grains wheat, peas, legumes, pulses,

LB DEP 118

beans in bulk; To W or EC India, incl Bangladesh

- Hire USD 11,800per day or pro rata including overtime

- ILOHC USD4,500.00 lump-sum

- C/V/E USD 1,500.00 per month pro rata

- Redelivery DLOSP 1 SP East or West Coast India / Bangladesh range ATDNSHINC

- Bunkers on dely abt 1000-1100 mt ifo and abt 40-60 mt mdo

- Bunkers on redelivery to be about same as on delivery

- Bunker Prices usd 280 pmt ifo / 600 pmt ifo/mdo bends

- Hold condition on arrival at first loading port, the holds to be swept clean, dried and free from loose rust scale and in every respect ready to receive Charterers intended cargo of grains. If vessel fails any Shippers and or Authorities surveys then vessel to be off-hired from the time of failure of any survey until all holds have passed all inspections and/or surveys, and any directly related expenses to be for owners account. Such expenses to be paid either by owners directly to Chtrs agents, prior to vessels sailing loadport, failing which owners agree for such expenses to be deducted by Chtrs from the next charter hire, and vouchers dispatched accordingly..

-Charterers to have the option to declare on the mates receipt, quantity of cargo loaded as per shore scale. Charterers are to hold harmless and indemnify owners for all consequences or liabilities, costs or claims whatsoever incurred as a consequence of any difference between draft survey and shore scale figures.

No remarks to be made on the mate's receipt or Bill of Lading. Clean M/R to be issued for these quantities. Master shall reject all cargo requiring remarks in and/or clausing of the mates receipt and Bills of Lading and all time lost and any costs incurred (including if required time lost and costs incurred in removing any cargo for which clean mates receipts/bills of lading cannot be issued) to be for charts account.

-Master to sign letter of authority in Chtrs format authorising Chtrs/agents/representatives to sign and release Bills of Lading as presented, strictly in accordance with Mates receipts. Charterers are to hold harmless and indemnify owners for all consequences or liabilities, costs or claims whatsoever incurred as a consequence of chrtrs or their agents signing and releasing BL's on behalf of the master -Chtrs to be allowed to issue a new set of Bills of Lading for the purpose of splitting or consolidation or to meet receivers L/C requirements . The complete old set to be returned to owners in originals prior to signing and releasing new set. After issuing of the new originals, the old set to be considered cancelled, null and void. Chtrs to provide owners with an LOI ( in owners format) and hold harmless and indemnify owners for all consequences or liabilities, costs or claims whatsoever incurred as a consequence of cancellation and reissuing bills of lading.

-In the event of split or consolidated b/l ows/vsl to be responsible for the

total quantity as per loadport draft survey or loadport shore scale
whichever is the lesser and not for the qty of each individual b/l .
Discharge quantity will be determined by draft survey only and owners not to
be responsible for shore outturn and quantity figures.Charterers to hold
harmless and indemnify owners for all consequences or liabilities, costs or
claims whatsoever incurred as a consequence of any discrepancy of quantity
between shore figures and draft survey at discharge port.

- In the absence of original Bills of Lading, Owners to authorise discharge
of cargo against a single LOI in owners format signed by an authorised
signatory fm Chtrs.

Otherwise owrs cp  based on MEDI DUBAI CP 22nd AUG 2005 and with foll
alterations

L 22 - delete "for the way of" insert " 3rd party"

L 90 - delete "actual"

L108 - delete "30 "

L 122 - add "except for 1st hire"

L 128 - add "max USD2,000'' after "disbursements".

L 212 - delete additional wording, insert " Such deviation to be for owners
account and time lost and bunkers consumed to be deducted fm the hire."

Rider

Cl 43 - after "promptly" in brackets add "e-mail documents to suffice".

Cl 56 - delete '20 days' insert '15 days'

CL 70 - delete delete (a) 'if the hire....have under this charterparty'

Add Clause - Chtrs are allowed to conduct hose test to ascertain condition of vessels hatchcovers.

2.5pc address + 1.25pc spectrum + 1.25pc seatown shipbroking pte ltd

Many tks fxtre

Rgds

ciao,

medi dublin has been accepted by glencore to perform d'Amico /glencore cp dated 26/jan/2008-voy 9

the terms of the contract are:-

- Laydays: 10 - 20 October 2008
- Loadport: 1sa Samarinda@8000shinc
- Dischport: 1sb Map Ta Phut @20000shinc
-frt: usd 8.25 pmt
Demm @loadport: usd 28000
demm @disport: 13000

←→

Best Regards
d'Amico Dry – Singapore
*****************************************************
Kindly note our NEW DIRECT numbers
Thomas Ringberg (Direct):      +65 6854 7361
Mike Williams (Direct):      +65 6854 7362
Pratik Ray Chowdhury (Direct):   +66 6854.7363
German Garcia (Direct):      +65 6854 7364
Capt.Satish Kotakonda (Direct):  +65 6854.7365
Queenie Cheam (Direct):      +65 6854 7366
Fax +65 6586 0879
www.damicoint.com
*****************************************************

_____

Pratik / Henrik

Re D'amico / Giag - CP dd 26-01-2008

We herewith confirm that shippers and receivers have accepted the nominated vessel "Medi Dublin"
in accordance with the terms and conditions of the CP with:

- Laydays: 10 – 20 October 2008
- Loadport: 1sa Samarinda
- Dischport: 1sb Map Ta Phut

Please be advised that Ms. Vanessa Wang (vanessa.wang@glencore.com) is handling all post fixture
matters for subject vessel and therefore kindly make sure she is copied on all messages.

Brgds
Henrik Nørgaard
ST Shipping & Transport Pte. Ltd.

LB DEP 122

Tel +65 6415 7633
Mob +65 9647 1535

Brgds
Henrik Nørgaard
ST Shipping & Transport Pte. Ltd.
Tel +65 6415 7633
Mob +65 9647 1535

dry@damicoint.com
Sent by: chowdhury.p@damicoint.com

30/09/2008 08:04 PM

To Henrik Noergaard/singapore/glen@glencore
cc dry@damicoint.com, Harjote
Singh/singapore/glen@glencore, Joe
Lea/singapore/glen@glencore, Kelvin
Lee/singapore/glen@glencore, Kevin
Wongso/singapore/glen@glencore, Tommy
Lund/singapore/glen@glencore, Vanessa
Wang/singapore/glen@glencore
Subject Re: D'Amico/Glag - 9th Shipment Laycan under C/P dated
26th Jan 2008;nomination

henrik/pratik

ref d'Amico/Glencore CP dated 26/jan/2006-voy 9-Laycan 10-20 oct 2008

we wish to nominate m.v. medi dublin or sub for the abv shipment.

**M.V. MEDI DUBLIN**
PAN FLAG BLT MES 11/2005
56,040 MTDW ON 12.575 SWS (TPC 55.57)
189.99 LOA / 32.26 BEAM
31,247/18,504 GRT/NT
CLASS NK
5HO/5HA – END FOLDING TYPE H/COVERS
70,808 CBM GR IN M/H
4 CR 30 T SWL
4 EL/HYDR GRABS 12 CBM CAPACITY

ALL DETAILS ABOUT

Itinery:
ETCD kohsichang 6/7 oct agw wp wog ucae
ETA samarinda 11/12 oct agw wp wog ucae

estimated loadable qty abt 54000 mt  to be confirmed by the master

Demm at loadport: usd 28000

LB DEP 123