**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
————————————————————————

**D'AMICO DRY LIMITED,**

                              **Plaintiff,**              **09-cv-07840 (JGK)**

          **- against -**                    <u>**OPINION AND ORDER**</u>

**PRIMERA MARITIME (HELLAS) LIMITED,**
**ET AL.**

                              **Defendants.**
————————————————————————

**JOHN G. KOELTL, District Judge:**

        This case is a judgment enforcement action that turns
primarily on the question of whether the plaintiff, D'Amico Dry
Limited ("D'Amico"), can properly collect on a judgment,
obtained in England (the "English Judgment"), in a United States
federal court pursuant to federal maritime jurisdiction. More
specifically, the issue is whether a claim for breach of the
Forward Freight Agreement ("FFA") between D'Amico and defendant
Primera Maritime (Hellas) Limited ("Primera") is a maritime
claim under United States admiralty law.

        The plaintiff contends that the Court should recognize the
English judgment and, first, enter a judgment against Primera;
second, enter default judgments against non-appearing defendants
Paul Coronis, Nicholas (or Nikolaos) Coronis, Primera Ocean
Services S.A., and J.P.C. Investments S.A.; and, third, enter a
judgment against the other appearing defendants as the

successors in interest and/or alter egos of the Coronis family
and Primera.

Defendant Primera maintains that the FFA at issue in this
case is not a maritime contract and therefore a claim for breach
of that contract is not a maritime claim, and there is no
federal maritime jurisdiction to enforce the English Judgment.

The Court held a non-jury trial in which it assessed the
credibility of the witnesses. The record is clear that the FFA
between D'Amico and Primera (the "D'Amico/Primera FFA" or "the
FFA") is not a maritime contract. There is no credible evidence
that it is a maritime contract. Therefore, the Court lacks
jurisdiction to enforce the English Judgment, and it is
unnecessary to reach the remaining issues.

## I. PROCEDURAL POSTURE

In September 2009, D'Amico filed suit in this Court under
this Court's admiralty jurisdiction to enforce a money judgment
issued by the English High Court of Justice for breach of the
D'Amico/Primera FFA. Primera moved to dismiss this action for
lack of subject matter jurisdiction.

In July 2009, the Court denied the defendant's motion to
dismiss for lack of subject matter jurisdiction without
prejudice because the Court concluded that an evidentiary
hearing would be necessary to determine jurisdiction. On
December 23, 2010, after Primera commenced liquidation

proceedings, D'Amico amended its complaint to add over a dozen additional companies as named defendants and alleged alter-egos of Primera. These defendants also moved to dismiss for lack of subject matter jurisdiction.

In 2011, rather than presenting live testimony, the parties relied on evidentiary submissions to resolve the issue of jurisdiction. The Court dismissed D'Amico's enforcement action for lack of subject matter jurisdiction and denied D'Amico's motion for reconsideration. In its initial decision, the Court concluded that, "[b]ecause the English court was not sitting as an admiralty court when it rendered the English Judgment, this Court does not have jurisdiction over an action to enforce that judgment." D'Amico Dry Ltd. v. Primera Mar. (Hellas) Ltd., No. 09-cv-7840 (JGK), 2011 WL 1239861, at *4 (S.D.N.Y. Mar. 28, 2011).

D'Amico moved for reconsideration, arguing that enforcement of the English judgment lies within a federal court's admiralty jurisdiction because the claim on which the judgment was rendered would have come within federal admiralty jurisdiction if it had been brought in the courts of the United States. Upon reconsideration, this Court rejected D'Amico's argument that the classification of the claim under United States law---whether it was an admiralty claim or not---determined whether the English Judgment could be enforced in the federal courts. See D'Amico

Dry Ltd. v. Primera Mar. (Hellas) Ltd., No. 09-cv-7840 (JGK),
2011 WL 3273208, at *4 (S.D.N.Y. Aug. 1, 2011) ("An action to
enforce a foreign judgment is a separate civil action imposing
its own jurisdictional requirements, and a suit to enforce a
judgment rendered on a maritime claim is not itself maritime in
nature."), *vacated sub nom.*, D'Amico Dry Ltd. v. Primera Mar.
(Hellas) Ltd., 756 F.3d 151 (2d Cir. 2014).

On an issue of first impression, the Court of Appeals for
the Second Circuit held that United States law rather than
foreign law should determine whether the claim underlying a
foreign judgment is a maritime claim. See D'Amico Dry Ltd. v.
Primera Mar. (Hellas) Ltd., 756 F.3d 151, 157-162 (2d Cir.
2014). It held that federal admiralty jurisdiction extends to a
suit to enforce a foreign judgment if the claim underlying the
foreign judgment is a maritime claim under United States law,
pursuant to 28 U.S.C. § 1333. "Accordingly, this suit to enforce
an English judgment comes within the admiralty jurisdiction of
§ 1333 if the underlying claim on the FFA is deemed maritime
under the standards of U.S. law." D'Amico, 756 F.3d at 162.

The Court of Appeals vacated the judgment and remanded the
issue to this Court to determine in the first instance whether
the D'Amico/Primera FFA is a maritime contract under United
States admiralty law.

On March 31, 2015, this Court denied the defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) because there were genuine issues of material fact whether the FFA was entered into by the parties as part of their maritime businesses for the purpose of hedging against the unemployment of vessels---and, thus, a maritime contract---or as a means of financial speculation---and, thus, unlikely to be a maritime contract. See Tr. (Mar. 31, 2015) at 39.

Subsequently, sixteen of the alter ego defendants moved to dismiss the claims against them pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, arguing that the plaintiff's action against them is barred by claim and issue preclusion arising from decisions of the United States District Courts for the Eastern and Southern Districts of Texas. The Court denied that motion in July 2015. See D'Amico Dry Ltd. v. Primera Mar. (Hellas) Ltd., 116 F. Supp. 3d 349, 351 (S.D.N.Y. 2015).

The Court held a non-jury trial from May 09, 2016 through May 12, 2016. Having reviewed the evidence and assessed the credibility of the witnesses, the Court makes the following Findings of Fact and reaches the following Conclusions of Law.

## II.  FINDINGS OF FACT

### A. The Parties

1. D'Amico was at all material times a dry bulk vessel owning and operating company incorporated in Ireland. It is a wholly

owned subsidiary of D'Amico International S.A. which is a
wholly owned subsidiary of D'Amico Societa di Navigazione SpA.
Stipulation of Facts ¶ 1; Tr. at 119-20.

2. Primera was, at all material times, a Liberian corporation
incorporated in 1991 and was engaged in the business of ship
management with a registered address at 80 Broad Street,
Monrovia, Liberia. Stipulation of Facts ¶ 2; Ex. 92.

3. In 2008, D'Amico owned and operated a fleet of about 25 to 30
dry bulk vessels. The fleet was comprised of about 10 to 12
Panamax vessels, about 10 to 12 Supermax vessels, and about 10
Handysize vessels. Tr. 45. Approximately 15 to 20 of those
vessels were owned directly by D'Amico while the rest were
chartered for ten-year, long-term time charters from Japanese
ship owners. Tr. 48. In addition to those ships, D'Amico
chartered usually about 20 ships for short-term voyages to
perform D'Amico's cargo commitments. Tr. 44-46, 48.

4. In 2008, D'Amico employed approximately 50% of its fleet on
long term time charters and 50% of its fleet on the "spot"
market, generally single trip time charters or voyage charters
that were entered into once the vessel was returned from its
earlier employment. Tr. at 46.

5. In 2008, D'Amico also had a number of Contracts of
Affreightment ("COAs") pending. These contracts provided for a
certain number of voyages to be performed within a certain

period of time. These voyages were performed by D'Amico's core vessels, or by vessels it chartered on a short-term basis. Tr. at 46-47.

6. D'Amico also entered into forward cargo contracts which, in effect, were voyage charters or short-term time charters with vessel delivery dates further in the future rather than spot voyages. Tr. at 47-48.

7. In his capacity as General Manager of D'Amico, Luciano Bonaso ("Mr. Bonaso") was responsible for planning the future employment of the D'Amico vessels. Tr. at 50. To assist with that effort, Mr. Bonaso used a spreadsheet that listed the future employment of his vessels, his cargo commitments on a fixture-by-fixture and vessel-by-vessel basis, as well as his FFA trades. Ex. 101; Tr. at 51-52. These spreadsheets were "working" documents, updated each time there was a commitment of any sort that affected his fleet. Using these spreadsheets, at any given time, Mr. Bonaso would have an image of his fleet's future commitments, the number of days employed and the number of days free for each business segment (vessel size), and the cost of those days. Tr. at 52-55.

8. The spreadsheet (Ex. 101) was a tool in projecting the fleet's future employment. It allowed Mr. Bonaso, together with his colleagues and brokers, to assess the situation and to devise

a plan about the number of ships on long term time charter and
those available to be traded on the spot market. Tr. at 56.

   **B. FFAs**

9. The Baltic Exchange in London publishes an index each day of
   the physical freight fixtures of various classes of vessels.
   Tr. at 416.

10.  The Baltic Exchange does not establish the contract rate
   for FFAs. Tr. at 415.

11.  The FFA market is independent of the actual physical
   market. Tr. at 318.

12.  FFA trades need not involve any maritime activity such as
   the provision of a ship or cargo to perform shipping services
   at a future date. Furthermore, they need not require physical
   performance of any kind. There is typically no direct or
   substantial link between an FFA and the operation of a ship,
   its navigation, or its management afloat. An FFA is a
   "contract for differences" denominated in U.S. dollars. Tr. at
   406.

13.  FFAs are paper swaps containing a fixed rate (contract
   price), quantity, and period (month, quarter or calendar year)
   based on a specific route or a basket of routes of a
   designated index in the future and can be bought or sold and
   are settled against the specified index published by the
   Baltic Exchange on a daily basis. Tr. at 346, 415-16.

14.  When FFAs are settled and payment is made as required by the FFA, it is not possible to tell the difference between an FFA that was entered into for the purpose of speculation and one that was entered into for the purpose of hedging. Tr. at 104.

15.  An FFA even when entered into by a shipowner is an entirely separate contract from the employment or chartering of a vessel. Tr. at 318, 406.

16.  The ISDA (International Swaps & Derivatives Association, Inc.) 2007 Master Agreement (Ex. SS) is incorporated by reference into FFAs. Tr. at 65-66. Section 2(c) of the ISDA Master Agreement permits parties to an FFA to "net" amounts payable to various parties with respect to multiple other FFA transactions and to pay the netted amount to a different party than the party identified in their FFA. See Tr. at 412-13, 437.

17.  FFAs are traded over the counter on a principal to principal basis or can be cleared through a trading house. Tr. at 328, 351-52.

18.  The over the counter FFA market was and is unregulated and there was no requirement of security and no requirement of showing sufficient assets to cover an FFA. Ex. 31; Tr. at 327.

19.  At the time that the FFA was entered into, Primera was solvent. Tr. at 491.

9

20.   The Baltic Panamax Index ("BPI") represents the standard
routes on which a Panamax carrier usually trades. A standard
Panamax carrier is 74,000 dead weight and has the dimensions
that are the maximum that would allow the vessel to pass
through the Panama Canal. Tr. at 397.

### C. The D'Amico/Primera FFA at Issue

21.   The D'Amico/Primera FFA, which was entered into on
September 2, 2008, provided that Primera agreed to buy, and
D'Amico agreed to sell, freight futures for 45 days within the
months of January, February, and March 2009, with settlement
monthly. The settlement price was $55,750 per day and was
measured against the Baltic Panamax Index Average for certain
routes. Ex. 31; Stipulated Facts ¶ 32. D'Amico took the
"downside." If freight rates dropped, Primera would be
required to pay D'Amico the difference between the Baltic
Panamax Index Average rate at the time of settlement and the
contract price of $55,750 per day. Stipulated Facts ¶ 33.

22.   The D'Amico/Primera FFA is subject to English law and was
traded over the counter. Ex. 31; Stipulated Facts ¶ 39.

23.   The D'Amico/Primera FFA is governed by and incorporates the
2007 ISDA Master Agreement. Ex. 31; Tr. at 412.

24.   The D'Amico/Primera FFA is a derivative contract that does
not reference a ship, cargo or crew, or specific voyage, and
it does not provide for any form of maritime service. Ex. 31.

25.  The D'Amico/Primera FFA does not involve parties to a
     charter party. It is not part of a transaction involving any
     identifiable charter party, vessel, cargo or voyage. Ex. 31.

26.  The D'Amico/Primera FFA was for an assessment or basket of
     Panamax routes and not a specific route. Tr. at 63; Ex. 31.

27.  The Baltic Exchange collects physical freight fixtures and
     freight indications from its panelists (independent brokers)
     daily prior to 1:00 p.m. British (GMT) time and publishes the
     average of those freight numbers and panel estimates in form
     of the respective indices according to vessels sizes and
     specific routes. Tr. at 416.

28.  The D'Amico/Primera FFA is a contract that provides the
     parties the opportunity to speculate on freight rate
     volatility for the BPI Average Panamax TC Routes for the
     average of 45 days, calling for cash settlement at the end of
     each contractual month. Tr. at 64; Stipulated Facts ¶¶ 32-34.

29.  Through their FFA, D'Amico and Primera were able to take an
     investment position about future market rates for Panamax
     vessels by making opposite bets about whether those rates on
     the future settlement dates would be higher or lower than the
     rate identified in the FFA. Tr. at 63, 416; Ex. 31.

30.  To determine the prevailing better, the FFA between D'Amico
     and Primera required a financial calculation of the difference
     between the "contract rate" of USD 55,750 and the "settlement

rate," as determined by the Baltic Panamax Index rate. Tr. at
63, 416; Ex. 31. If freight rates dropped, Primera owed the
difference between the contract rate of USD 55,750 and the BPI
rate. If freight rates rose, D'Amico owed the difference to
Primera.

31. The D'Amico/Primera FFA called for settlement by cash,
without any subsequent physical obligation. Tr. at 406.

32. The settlement rate is based on the collective assessment
of brokers of freight values that would apply to a theoretical
ship carrying a theoretical amount of a certain type of cargo
over a particular route. Tr. at 63, 416; Ex. 31.

33. The D'Amico/Primera FFA does not, on its face, operate as a
hedge against either party's shipping losses; it is a
straightforward agreement for financial speculation on
shipping rates. Ex. 31.

34. As a result of the financial crisis at the end of 2008, the
freight market collapsed. This in turn caused a crash in the
in the market for FFAs. Tr. at 413-14.

35. Primera suffered financially in 2008 from the financial
crisis and was faced with substantial defaults against it. Tr.
at 206-08, 323-24; Ex. 15; see also Stipulated Facts ¶ 35.

36. Unable to collect amounts due to it and with amounts due to
others that could not be settled, it commenced wind-up
proceedings in March 2010. Ex. RR at 1.

37.   In this lawsuit, D'Amico relied on Mr. Bonaso's testimony
      for the proposition that D'Amico used the D'Amico/Primera FFA
      not for simple financial speculations but rather as a means to
      hedge against the possible underuse of its fleet and, thereby,
      to promote maritime commerce. D'Amico had no other material
      evidence to support that contention. However, Mr. Bonaso's
      testimony was not credible. His testimony was conflicting and
      inconsistent and belied by the actual facts of D'Amico's FFA
      transactions. There was, in short, no credible testimony that
      D'Amico used the D'Amico/Primera FFA for anything other than
      speculation on future freight rates and a means of obtaining a
      quick buck.

38.   In a Declaration filed with this Court on October 8, 2010,
      Mr. Bonaso stated:  "12. As noted above, d'Amico Dry used this
      FFA to hedge its physical trade. As best I can recall, there
      have not been any instances where D'Amico Dry merely
      speculated in the FFA trade. The trade with Primera was
      strictly to offset d'Amico Dry's physical Panamax trade at
      that time." Ex. BB at 5. That declaration proved to be untrue.

39.   Mr. Bonaso testified on October 1, 2010 at his first
      deposition (the "First Bonaso Deposition") in response to a
      direct question that the only relevant FFA for the first
      quarter of 2009 was the D'Amico/Primera FFA and another FFA

that he would send. <u>See</u> First Bonaso Deposition, ECF Dkt. No. 36, at 37. That was also untrue.

40.   Mr. Bonaso testified at his first deposition that D'Amico's intent in entering the D'Amico/Primera FFA was to guarantee a set income for the Panamax vessels for a certain number of days. <u>See</u> First Bonaso Deposition at 52. But he gave conflicting statements as to the number of days of income that could be derived from the Primera FFA. In his declaration signed before his first deposition, Mr. Bonaso stated that he "entered into the Primera FFA to add another 90 days employment to our fleet employment calculations," which reduced the unemployed days to about 170, and that D'Amico expected to fill the remaining 170 days on the spot market. <u>See</u> Ex. LL at 3, ¶ 7.

41.   Mr. Bonaso also stated that D'Amico "agreed to sell, and Primera agreed to buy 90 days "BPI Average 4 Panamax TC Routes" subject to the "New FFBA2007 form" terms. Ex. BB at 2 (citing Ex. LL ¶ 9).

42.   In the First Bonaso Deposition, Mr. Bonaso acknowledged that D'Amico's FFA agreement was only for 45 days and was confused about whether D'Amico sought to cover 90 or 45 days of unemployment. <u>See</u> Ex. BB at 3, ¶¶ 4-5; First Bonaso Deposition at 19-20. The difference between 45 days and 90 days is significant because it undercuts Mr. Bonaso's

explanation of how he carefully calculated the number of days
that he wanted to cover with an FFA to protect against the
underuse of his fleet.

43.  After the First Bonaso Deposition, Mr. Bonaso signed a
Supplemental Declaration to clarify his prior declaration and
his testimony at his first deposition. See Ex. BB.

44.  In his Supplemental Declaration, Mr. Bonaso stated:  "6.
Here is how it would have worked if Primera had honored its
agreement. In the Primera FFA, d'Amico Dry, as 'seller' would
earn money from Primera if the average of the market rate for
that month was less than $55,750 per day. In that case,
Primera would pay d'Amico Dry the difference between the
agreed rate and the average of the actual rate for that
period. If the average market rate that month was higher than
the agreed rate of $55,750 per day, then d'Amico Dry would pay
Primera the difference between the agreed rate and the average
actual rate. In addition, d'Amico Dry would be trading its
Panamax bulk carriers in that spot market during that same
period, earning the then current higher rate."

45.  In his trial testimony, Mr. Bonaso testified that D'Amico
entered into the D'Amico/Primera FFA as a hedge against the
possibility that freight rates would fall and D'Amico would
not earn as much on the placement of its vessels in the first
quarter of 2009. In that circumstance, D'Amico could rely on

15

the earnings from its FFA with Primera. Tr. at 64-65. In the
FFA with Primera, D'Amico sold 45 days of first quarter (Q1)
2009 at USD 55,750 per day to Primera on September 2, 2008.
Ex. 31. However, two days later, on September 4, 2008, D'Amico
bought 44 days of Q1 2009 at USD 53,750 per day from Songa
Bulk Carriers. Tr. 93-94, 110, 403, 501; Exs. KK and 101. By
matching the sale to Primera with the purchase from Songa,
D'Amico was no longer hedging against the possibility that the
market would go down. Rather, D'Amico had effectively closed
out its position and made a profit of USD 81,000 after two
days of FFA transactions. Tr. at 95. The fact that D'Amico
bought FFAs, and the Songa FFA in particular, contradicted Mr.
Bonaso's deposition testimony that D'Amico was always a seller
and never a buyer of FFAs because a ship owner could not buy
FFAs as a hedge against the underuse of its fleet. Tr. at 90,
112. In fact, D'Amico entered into numerous FFAs as a buyer.
Tr. at 92.

46.  Mr. Bonaso's various statements that the D'Amico/Primera
FFA was used as a hedge are not credible because, among other
reasons, a mere two days after D'Amico entered into the
D'Amico/Primera FFA, it closed its position with a matching
opposite trade. Consequently, D'Amico had no financial
protection for unemployed or "underemployed" vessels or any

vessels at all in the first quarter of 2009 as a result of the
D'Amico/Primera FFA. <u>See</u> Tr. at 110, 501.

47.  A closed position cannot hedge against future events. The
financial gain or loss is locked in and no future physical or
paper freight movements can affect this gain or loss. Tr. at
317, 408.

**D. The Litigation**

48.  D'Amico commenced legal proceedings against Primera in the
United Kingdom in the High Court of Justice Queen's Bench
Division, Commercial Court under Claim No. 2009 Folio 218 in
accordance with the FFA contract. Ex. 1.

49.  On June 19, 2009, the High Court of Justice entered a final
un-appealable judgment against Primera in the amount of
USD 1,766,278.54 (comprising the principal due of USD
1,752,973.3 together with interest at the contractual rate
accrued up to June 19, 2009). Legal costs in the amount of GBP
17,000 which converts to USD 28,056.39, were also awarded. <u>See</u>
Stipulated Fact ¶ 41. Ex. 1. Post-judgment interest at the
rate of 8% was also awarded in accordance with English law as
were future legal fees incurred to collect the judgment. <u>See</u>
Exs. 1, 104.

50.  D'Amico commenced this action against Primera on September
11, 2009 to recognize and enforce the English Judgment.
Thereafter, in December 2010, D'Amico moved to add alleged

alter-ego defendants. On December 21, 2010, the Court granted D'Amico's Motion to Amend the Complaint. On December 23, 2010, D'Amico filed the Amended Complaint and commenced efforts to serve the alter-ego defendants. ECF Dkt. Nos. 1, 44.

51. Since 2009, vessels connected to the defendants in this case were attached in the Central District of California, the Eastern and Southern Districts of Texas, and the Eastern District of Louisiana. See Flame S.A. v. M/V Lynx, No. 1:10-CV-278, 2010 WL 10861354, at *1 (E.D. Tex. June 22, 2010), released by stipulation, ECF No. 91 (Aug. 6, 2010); Flame S.A. v. Pasha Fin., Inc., No. CV 10-5245 (GW) (MAN), 2010 WL 2902774, at *5 (C.D. Cal. July 26, 2010), stay lifted and attachment vacated, Order, ECF No. 34 (July 27, 2010); Flame S.A. v. Primera Mar. (Hellas) Ltd., et al., No. 2:10-cv-02081 (MVL) (JCW) (E.D. La July 26, 2010), released by stipulation, ECF No. 22 (Aug. 6, 2010); D'Amico Dry Ltd. v. Pasha Fin., Inc., C.A. No. 4:15-0039, (S.D. Tex. Jan. 16, 2015), vacated, Order, ECF No. 16 (Jan. 16, 2015).

### III. CONCLUSIONS OF LAW

1. The plaintiffs bear the burden of demonstrating that subject matter jurisdiction exists. MLC Fishing, Inc. v. Velez, 667 F.3d 140, 141 (2d Cir. 2011).

2. If the FFA between D'Amico and Primera is a maritime contract, the Court has subject matter jurisdiction. D'Amico Dry, 756 F.3d at 162.

3. Federal maritime law governs the Court's determination of admiralty subject matter jurisdiction. See Blue Whale Corp. v. Grand China Shipping Dev. Co., 722 F.3d 488, 494 (2d Cir. 2013). Federal district courts have original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1). The authority of the federal courts "to make decisional law for the interpretation of maritime contracts stems from the Constitution's grant of admiralty jurisdiction to federal courts." Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 23 (2004)[1]; see U.S. Const. art. III, § 2, cl. 1 (providing that the federal judicial power "shall extend . . . to all Cases of admiralty and maritime Jurisdiction").

4. Protection of maritime commerce is the fundamental interest giving rise to maritime jurisdiction. See Exxon Corp v. Cent. Gulf Lines, Inc., 500 U.S. 603, 608 (1991).

---

[1] Kirby held that bills of lading for the transportation of cargo from a port in Australia to an inland city in the United States were "maritime contracts," even though the bills of lading called for some transportation on land.  Kirby, 543 U.S. at 24-25.  The Supreme Court held that the fact that the final leg of the journey occurred by rail did "not alter the essentially maritime nature of the contracts." Id. at 24.  For reasons discussed below, the essential nature of the D'Amico/Primera contract is not maritime.

5. Section 1333(1)'s grant of jurisdiction "includes jurisdiction 'over all contracts which relate to the navigation, business, or commerce of the sea.'" Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y., 822 F.3d 620, 632 (2d Cir. 2016) (quoting Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 199 (2d Cir. 1992)).

6. But the mere fact that the services to be performed under a contract relate to a ship or its business, does not, in and of itself, make the contract maritime. See Kirby, 543 U.S. at 23-24. Rather, the correct inquiry is whether the "principal objective" of the contract is the furtherance of maritime commerce. See id. at 25; see also Exxon, 500 U.S. at 611 ("[T]he trend in modern admiralty case law . . . is to focus the jurisdictional inquiry upon whether the nature of the transaction was maritime."); Folksamerica Reinsurance Co. v. Clean Water of N.Y., Inc., 413 F.3d 307, 315 (2d Cir. 2005) (a court should focus "'on whether the principal objective of a contract is maritime commerce' rather than on whether the non-maritime components are properly characterized as more than 'incidental' or 'merely incidental' to the contract" (internal citations omitted)).

7. In order for a contract "to be considered maritime, there must be a *direct and substantial link* between the contract and the operation of the *ship, its navigation, or its management*

*afloat* . . . ." <u>Alphamate Commodity GMBH v. CHS Eur. SA</u>, 627
F.3d 183, 187 (5th Cir. 2010) (quoting 1 Benedict on Admiralty
§ 182 (2010)).

8. The definition of what constitutes a maritime contract has
"proved easier to state than to apply, as seemingly
incompatible results abound." <u>CTI-Container Leasing Corp. v.
Oceanic Operations Corp.</u>, 682 F.2d 377, 379–80 (2d Cir. 1982).
"For example, it is well established that a contract to build
a ship is not maritime, while a contract to repair a ship is.
A 'general agency' agreement is outside admiralty
jurisdiction, while a contract for managing a ship is within
it. A contract to procure a policy of marine insurance is
nonmaritime, while a contract for marine insurance is
maritime. A contract to purchase a vessel is outside admiralty
jurisdiction, while a contract to charter or hire a vessel is
within it." <u>Id.</u> at 380 n.4 (internal citations omitted).

9. The Court of Appeals for the Second Circuit recently discussed
how to navigate these analytically choppy waters: "[T]here are
few clean lines between maritime and non-maritime contracts.
The boundaries of admiralty jurisdiction over contracts are
conceptual rather than spatial, and defined by the purpose of
the jurisdictional grant---to protect maritime commerce."
<u>Fireman's Fund</u>, 822 F.3d at 632 (internal quotation marks and
citations omitted) (alteration in original). "[W]hether a

contract is a maritime one . . . depends upon the nature and
character of the contract, and the true criterion is whether
it has reference to maritime service or maritime
transactions." Id. (internal quotation marks and citations
omitted) (alteration in original). The Court's "inquiry
focuses on 'whether the principal objective of a contract is
maritime commerce.'" Id. (quoting Kirby, 543 U.S. at 25).
"Therefore, the contract's subject matter must be our focal
point." Id. (quoting Folksamerica, 413 F.3d at 312).

10.  Thus, in determining whether there is admiralty
     jurisdiction here, the Court must determine whether the
     subject matter of the particular FFA at issue here can fairly
     be said to constitute a maritime contract.

11.  The plaintiff argues that the Court has jurisdiction over
     the D'Amico/Primera FFA because FFAs in general, and this one
     in particular, are integral to the protection of maritime
     commerce by allowing parties to hedge against the unemployment
     or underemployment of their vessels.[2]

_____

[2] The plaintiff also argues in its post-trial papers that the FFA
is a maritime contract because it was a contract that involved
mixed maritime and non-maritime obligations, and that the Court
of Appeals for the Second Circuit has held that such contracts
fall within admiralty jurisdiction. See Fireman's Fund, 822 F.3d
at 625-26 (holding pollution insurance policy that covered the
costs of removing a dry dock and the pollutants it produced upon
sinking in navigable waters was a marine insurance contract
subject to the doctrine of uberrimae fidei), Williamson v.

12.  The Fourth Circuit Court of Appeals recently addressed the
     question of whether FFAs are maritime contracts in <u>Flame S.A.</u>
     <u>v. Freight Bulk Pte, Ltd.</u>, 762 F.3d 352 (4th Cir. 2014). In
     <u>Flame</u>, the plaintiff sought to attach a ship for purposes of
     satisfying a judgment rendered by the English High Court of
     Justice, which followed from the defendant's breach of FFAs on
     Baltic Exchange shipping routes. <u>See</u> <u>id.</u> at 354. The Court of
     Appeals affirmed the district court's finding that the FFAs at
     issue were maritime contracts under federal law and were
     therefore subject to admiralty jurisdiction. <u>See</u> <u>id.</u> at 361,
     363; <u>see also</u> <u>Flame S.A. v. Indus. Carriers, Inc.</u>, No. 2:13-
     CV-658, 2014 WL 108897, at *3 (E.D. Va. Jan. 10, 2014) ("While
     it is true that the FFA's are a form of derivative financial
     contracts and therefore are not purely maritime, they are
     singularly concerned with shipping routes; specifically,
     shipping routes as specifically defined by the Baltic
     Exchange.").

---

Recovery Ltd. P'ship, 542 F.3d 43, 49 (2d Cir. 2008) (holding
non-compete, nondisclosure and lease contract agreements were
maritime contracts when used in the context of employment aboard
an exploration vessel); <u>Folksamerica</u>, 413 F.3d at 315 (holding
insurance policy with both marine and land components fell
within the court's admiralty jurisdiction).  However, the
contract at issue in this case is entirely a land-based
transaction for both parties, unlike the "mixed" contracts at
issue in <u>Fireman's Fund</u>, <u>Williamson</u>, and <u>Folksamerica</u>.
Accordingly, these cases are inapposite.

13.  The Fourth Circuit's <u>Flame</u> decision, however, did not
     resolve whether *all* FFAs are maritime contracts as a matter of
     law. <u>See</u> <u>Flame</u>, 762 F.3d. at 361 ("We leave to another case
     the issue of whether all FFAs are maritime contracts as a
     matter of law."). Instead, the inquiry in <u>Flame</u> was limited to
     the nature of the specific FFAs at issue and their use by the
     parties in the course of business. The Court of Appeals found
     it particularly relevant that the parties were both shipping
     companies engaged in maritime commerce that used FFAs to hedge
     the risks inherent in their shipping businesses, rather than
     as mere financial speculators. <u>See</u> <u>id.</u> at 361-62; <u>Flame</u>, 2014
     WL 108897, at *3.

14.  Here, the plaintiff relies heavily on <u>Brave Bulk Transp.</u>
     <u>Ltd. v. Spot On Shipping Ltd.</u>, No. 07-cv-4546 (CM), 2007 WL
     3255823 (S.D.N.Y. Oct. 30, 2007), which held that FFAs
     constitute maritime contracts when used in the shipping
     industry with the specific purpose of hedging and managing
     market risks relating to the employment of vessels. <u>See</u> <u>Id.</u> at
     *2. In that case, the court noted that the FFAs at issue were
     agreements to "buy and sell a specified tonnage freight at an
     agreed price for an agreed route and time span so that both
     corporations could reliably predict their ocean freight
     revenues and costs for the duration of the contract for those
     ocean routes." <u>Id.</u> The court found that the plaintiff had met

its burden of demonstrating maritime subject matter jurisdiction. Brave Bulk premised its conclusion on the fact that the FFA at issue in that case was "negotiated with the express purpose of hedging and managing market risks relating to the employment of vessels in today's volatile freight market." Id. Brave Bulk did not establish a *per se* rule that FFAs are maritime contracts. To the extent that it suggested in *dicta* that FFAs are "commitments to perform in the future a shipping service between ship owners, charterers and/or traders," id. at *4, that description does not accurately depict the FFA at issue in this case. See, e.g., Tr. at 318, 406.

15.  Brave Bulk cited the judgments of other courts in this district that found that FFAs are maritime contracts in the context of Rule B attachments. Fed. R. Civ. P. Supp. Admiralty Rule B; see Brave Bulk, 2007 WL 3255823, at *2 (collecting cases). But Rule B attachments require only a *prima facie* showing of maritime jurisdiction, see, e.g., Blue Whale Corp. v. Grand China Shipping Dev. Co., 722 F.3d 488, 491 (2d Cir. 2013), and, as the record in this case demonstrates, a trial record may be very different from the affidavits presented on an attachment motion.

16.  The plaintiff, relying on Brave Bulk and the cases it cites, argues that FFAs are, in general, maritime contracts.

But the Rule B attachment cases that the plaintiff cites, and those collected in Brave Bulk, held that the plaintiffs in those cases established a *prima facie* case for maritime contract jurisdiction. That level of proof is lower than the level of proof required at trial, and the trial record in this case clearly shows that the D'Amico/Primera FFA was not a contract whose "principal objective" was the furtherance of maritime commerce. See Kirby, 543 U.S. at 24.[3]

---

[3] Primera argues that FFAs are not *per se* maritime contracts.  It is unnecessary for the Court to conclude that FFAs are, as a matter of law, not maritime contracts.  Other jurisdictions have concluded that FFAs are not maritime contracts. See, e.g., Transfield ER Futures Ltd. v. The Ship 'Giovanna Iuliano', [2012] FCA 548, at ¶¶ 21-37 (Austl.), 2012 WL 1964585. The advantage of such a categorical approach is that it would avoid the necessity of determining, in individual cases, whether an FFA, which is a financial instrument, is a maritime contract based on the subjective purpose for which it is allegedly being used---whether for speculation (when it would not be a maritime contract) or for hedging against the possible unemployment or underemployment of vessels (when courts have held it is a maritime contract). On the other hand, relying on a subjective approach is problematic when Rule B attachments can be issued on the basis of a *prima facie* showing that would not, as in this case, survive a trial. A categorical approach would also be consistent with the way in which courts have categorized other types of contracts where the objective nature of the contracts has dictated whether or not they are maritime contracts. See Conclusions of Law ¶ 8, supra. However, just as in Flame, 762 F.3d. at 361, it was unnecessary to determine whether all FFAs are maritime contracts, it is unnecessary in this case to determine that all FFAs are *not* maritime contracts because D'Amico has failed to show that the D'Amico/Primera FFA in this case is a maritime contract.

17.   The preponderance of the credible evidence shows that the D'Amico/Primera FFA at issue in this case did not have the furtherance of maritime commerce as its "principal objective" because the FFA was not used for hedging and managing market risks relating to the employment of marine vessels but was, instead, used for speculative purposes.

18.   The evidence shows that D'Amico used the D'Amico/Primera FFA for speculation rather than to hedge against a drop in shipping prices in the first quarter of 2009. D'Amico took its profit from the FFA of USD 81,000 in September 2008, when it entered into the FFA with Songa Bulk Carriers two days after it entered into the D'Amico/Primera FFA. At that point, D'Amico left its shipping position uncovered, evidencing the speculative nature of the FFA. See Tr. at 95, 113-14.

19.   The evidence shows that Primera did not own, manage, or charter any Panamax type vessels during the relevant time period. Tr. at 315-16. Paul Coronis testified credibly that Primera used the FFA for speculation. Tr. at 316

20.   Mr. Bonaso has confirmed that the D'Amico/Primera FFA was closed out after 48 hours with the Songa Bulk/D'Amico FFA. Tr. at 110, 501.

21.   When an FFA is "closed out," it is no longer hedging against the future. Tr. at 111-13.

22.  Mr. Bonaso testified that he is not aware of any documents maintained by D'Amico that correlate any of the FFA contracts with specific charters or vessels or cargo commitments. Tr. at 105-06.

23.  There is no credible evidence that the plaintiff used the D'Amico/Primera FFA, or indeed any of its FFAs, to hedge its shipping business or to protect its physical shipping positions in any other way. See Tr. at 404, 409-10.

24.  Contrary to Mr. Bonaso's sworn testimony at his first deposition that that the only relevant FFA for the first quarter of 2009 was the D'Amico/Primera FFA and one other, during this period there were eight FFAs at issue. Tr. at 92-93. These eight FFAs were also mixture of short and long positions that were closed out in short order and reflect that D'Amico was engaged in speculative trading unrelated to its maritime commerce. Ex. 101. None of the eight FFA positions was documented in conjunction with vessels' names, charter party dates, or specific voyages. Ex. 101; Tr. at 105-06.

25.  D'Amico's FFA contract positions showed that D'Amico quickly closed its FFA position. Between the long- and short-positions there were only one to two days between when some of the positions were entered into and the opposite trades closed out those position. Ex. KK, Ex. 101; Tr. at 402-04.

26.   Ms. Karina Albers, an expert on FFAs, testified credibly that D'Amico's FFA trading pattern was typical of a derivatives trader as opposed to a shipowner who was hedging a physical position in the freight market. Tr. at 40304.[4]

27.   Mr. Bonaso testified at his deposition that D'Amico always entered into FFAs as a seller and never as a buyer. Tr. at 83, 90. It was only as a seller that D'Amico could hedge against a drop in shipping rates and thereby protect the employment of its physical fleet. However, at trial, Mr. Bonaso admitted that D'Amico bought FFAs to close positions. Tr. at 92; Ex. 101.

28.   With regard to its 2009 FFAs, D'Amico was buying approximately 50% of the time. Ex. 101.

29.   D'Amico has failed to prove that the D'Amico/Primera FFA is a maritime contract. There is no credible evidence that the principal objective of the D'Amico/Primera FFA was to further maritime commerce. Primera did not own, charter, or manage

---

[4] The plaintiff argues in its post-trial papers that Ms. Albers's expert testimony was *ipse dixit* and is inadmissible. Ms. Albers was properly qualified as an expert, see Fed. R. Evid. 702; Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589-91 (1993), and her testimony was not *ipse dixit*, see, e.g., Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A., No. 09-cv-686 (SAS), 2011 WL 6288415, at *12 (S.D.N.Y. Dec. 15, 2011) ("Plaintiffs' mere disagreement with [the expert's] conclusions is insufficient to render her opinions inadmissible *ipse dixit*.").

Panamax vessels and thus could not have used the FFA as a
component of its shipping business. Primera admitted that the
purpose of the FFA was speculation. Similarly, the
preponderance of credible evidence is that D'Amico used the
FFA as a speculative trade and as a potential source of
revenue separate and distinct from its maritime business and
not in furtherance of maritime commerce. D'Amico closed out
the D'Amico/Primera FFA two days after it was entered into for
a profit of USD 81,000. Therefore, a claim for the breach of
that FFA is not a maritime claim, and the Court lacks federal
maritime jurisdiction to enforce a foreign judgment for breach
of that contract. This action must be dismissed for lack of
maritime jurisdiction.

30. Because the action must be dismissed for lack of
jurisdiction, the Court does not reach the request for a
default judgment and the successor-in-interest/alter-ego
issues raised by the plaintiff.

CONCLUSION

The case is **dismissed** for lack of jurisdiction. The Clerk is directed to enter judgment dismissing this case. The Clerk is also directed to close all pending motions and to close the case.

**SO ORDERED.**

**Dated:      New York, New York
             August 13, 2016**

_____/s/_____
John G. Koeltl
United States District Judge