USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12-22-18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

D'AMICO DRY D.A.C.,

      Plaintiff,

   - against -

PRIMERA MARITIME (HELLAS) LIMITED,
ET AL.

     Defendants.

09-cv-7840 (JGK)

OPINION AND ORDER

**JOHN G. KOELTL, District Judge:**

This case is a judgment enforcement action. The Court of Appeals for the Second Circuit has determined that this Court has subject matter jurisdiction to hear this action. See d'Amico Dry Ltd. v. Primera Mar. (Hellas) Ltd., 886 F.3d 216 (2d Cir. 2018). The plaintiff, d'Amico Dry d.a.c. ("d'Amico Dry"), seeks to collect on a judgment of $1,766,278.54 plus attorney's fees, costs, and interest, obtained in England and entered on June 19, 2009 (the "English Judgment"), against defendant Primera Maritime (Hellas) Limited ("Primera").

d'Amico Dry contends that the Court should recognize the English Judgment and, first, enter a judgment against Primera; second, enter default judgments against nonappearing defendants Paul Coronis, Nicholas (or Nikolaos) Coronis, Primera Ocean Services S.A., and J.P.C. Investments S.A.; and, third, enter a

judgment against the other appearing defendants[1] as the successors-in-interest and/or alter egos of the Coronis family and Primera. This case is a saga of the almost ten-year-long efforts d'Amico Dry has made to enforce its English Judgment against Primera and the efforts Primera and its alter egos have made to evade enforcement of that judgment. The time for payment has come.

The Court held a nonjury trial. Having reviewed the evidence and assessed the credibility of the witnesses, the Court now makes the following findings of fact and reaches the following conclusions of law.

## I. PROCEDURAL POSTURE

In September 2009, d'Amico Dry filed suit in this Court under this Court's admiralty jurisdiction to enforce a money judgment issued by the English High Court of Justice for breach

---

[1] The other appearing defendants are Sonic Finance Inc., Mirage Finance Inc., Handy Finance Inc., Pasha Finance Inc., Movida Finance Inc., Element Finance Inc., Caldera Marine Co. Ltd., Adalia Marine Co. Ltd., Seasatin Navigation Inc., Annamar Navigation Inc., Seasafe Navigation Inc., Chemnav Inc., Primebulk Shipmanagement Ltd., Bulknav Inc., and Chemnav Shipmanagement Ltd. (collectively, the "alter ego defendants"). While Nikka Finance, Inc. ("Nikka"), initially appeared in this action, the Court granted the motion by that defendant to dismiss the case against it for lack of personal jurisdiction. Dkt. No. 349. That motion was uncontested so that the underlying issue of alter ego liability with respect to that defendant could be decided in the Southern District of Alabama.

of the Forward Freight Agreement ("FFA") between d'Amico Dry and Primera. Primera moved to dismiss this action for lack of subject matter jurisdiction.

The complex procedural history of this case is detailed in this Court's August 13, 2016 Opinion, D'Amico Dry Ltd. v. Primera Maritime (Hellas) Ltd., 201 F. Supp. 3d 399, 401-02 (S.D.N.Y. 2016), and the Court of Appeals' opinion, d'Amico Dry Ltd., 886 F.3d at 219-22. This Court held a nonjury trial from May 9, 2016 through May 12, 2016, to determine whether this Court had subject matter jurisdiction and, if so, whether the FFA should be enforced against Primera and the other defendants. The Court of Appeals has now determined that this Court has subject matter jurisdiction. This Court now addresses the defendants' new argument that there is no personal jurisdiction over them, and then proceeds to determine whether the English Judgment should be enforced against Primera and the other defendants.

## II. FINDINGS OF FACT

### A. The Parties

1. d'Amico Dry was at all material times a dry bulk vessel owning and operating company incorporated in Ireland. Stipulated Fact ¶ 1.[2] In 2008, d'Amico Dry owned and operated a fleet of

---

[2] "Stipulated Fact" refers to the Stipulations of Fact appended to the Pretrial Order.

Panamax and Handysize bulk carriers. Many of the vessels were owned by d'Amico Dry and others were chartered on long term time charters. Tr.[3] at 45, 48.

2. Primera was, at all material times, incorporated in Liberia with its registered address of 80 Broad Street, Monrovia, Liberia. Stipulated Fact ¶ 2.

3. J.P.C. Investments S.A. a/k/a JPC Investments S.A. ("J.P.C. Investments") was, at all material times, incorporated in Liberia with its registered address of 80 Broad Street, Monrovia, Liberia. Exs.[4] 4, 30.

4. Primera Ocean Services S.A. ("Primera Ocean") was, at all material times, incorporated in Liberia with its registered address of 80 Broad Street, Monrovia, Liberia. Ex. 19 at 9.

5. Caldera Marine Co., Ltd. ("Caldera") was, at all material times, incorporated in Malta with its registered address of 198 Old Bakery Street, Valletta, Malta. Stipulated Fact ¶ 3.

6. Adalia Marine Co., Ltd. ("Adalia") was, at all material times, incorporated in Malta with its registered address of 198 Old Bakery Street, Valletta, Malta. Stipulated Fact ¶ 4.

---

[3] "Tr." refers to the transcript of the trial in this case held between May 9 and 12, 2016.

[4] "Ex." refers to d'Amico Dry's trial exhibits unless otherwise noted.

7. Mirage Finance, Inc. ("Mirage") was, at all material times, incorporated in The Marshall Islands with its registered address of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, The Marshall Islands MH 96960. Stipulated Fact ¶ 5.

8. Sonic Finance, Inc. ("Sonic") was, at all material times, incorporated in The Marshall Islands with its registered address of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, The Marshall Islands MH 96960. Stipulated Fact ¶ 6.

9. Pasha Finance, Inc. ("Pasha") was, at all material times, incorporated in The Marshall Islands with its registered address of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, The Marshall Islands MH 96960. Stipulated Fact ¶ 7.

10. Movida Finance, Inc. ("Movida") was, at all material times, incorporated in The Marshall Islands with its registered address of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, The Marshall Islands MH 96960. Stipulated Fact ¶ 8.

11. Element Finance, Inc. ("Element") was, at all material times, incorporated in The Marshall Islands with its registered address of Trust Company Complex, Ajeltake Road,

Ajeltake Island, Majuro, The Marshall Islands MH 96960.
Stipulated Fact ¶ 9.

12.   Handy Finance, Inc. ("Handy") was, at all material times,
incorporated in The Marshall Islands with its registered
address of Trust Company Complex, Ajeltake Road, Ajeltake
Island, Majuro, The Marshall Islands MH 96960. Stipulated Fact
¶ 11.

13.   Seasatin Navigation, Inc. ("Seasatin") was, at all material
times, incorporated in The Marshall Islands with its
registered address of Trust Company Complex, Ajeltake Road,
Ajeltake Island, Majuro, The Marshall Islands MH 96960.
Stipulated Fact ¶ 12.

14.   Annamar Navigation, Inc. ("Annamar") was, at all material
times, incorporated in The Marshall Islands with its
registered address of Trust Company Complex, Ajeltake Road,
Ajeltake Island, Majuro, The Marshall Islands MH 96960.
Stipulated Fact ¶ 13.

15.   Seasafe Navigation, Inc. ("Seasafe") was, at all material
times, incorporated in The Marshall Islands with its
registered address of Trust Company Complex, Ajeltake Road,
Ajeltake Island, Majuro, The Marshall Islands MH 96960.
Stipulated Fact ¶ 14.

16.   Bulknav, Inc. ("Bulknav") was, at all material times, a
Marshall Islands corporation with its registered address of

Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, The Marshall Islands MH 96960. Stipulated Fact ¶ 15.

17.   Bulknav was, at all material times, a holding company for all of the shares of Caldera, Adalia, Sonic, Mirage, Nikka, Handy, Pasha, Movida, Element, Moondance Maritime Enterprises S.A. and Rocket Finance Inc. Stipulated Fact ¶ 16.

18.   Primebulk Shipmanagement, Ltd. ("Primebulk") was, at all material times, a ship-management company incorporated in The Marshall Islands with its registered address of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, The Marshall Islands MH 96960. Stipulated Fact ¶ 17.

19.   Chemnav Shipmanagement, Ltd. ("Chemnav Shipmanagement") was, at all material times, a ship-management company incorporated in The Marshall Islands with its registered address of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, The Marshall Islands MH 96960. Stipulated Fact ¶ 18.

20.   Chemnav, Inc. ("Chemnav") is incorporated in The Marshall Islands with its registered address of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, The Marshall Islands MH 96960. Stipulated Fact ¶ 19.

21.   Paul Coronis is an individual born in England to Nicholas Coronis and Annabel Charlton. He was educated and qualified as

an English solicitor and practiced with the law firms Reed Smith and Norton Rose. Tr. at 156–57.

22. Nicholas Koronis a/k/a Nikolaos Koronis a/k/a Nicholas Coronis ("Nicholas Coronis") is the father of Paul Coronis. Stipulated Fact ¶ 20.

23. Annabel Charlton, a/k/a Annabel Coronis, is the wife of Nicholas Coronis and the mother of Paul Coronis, Chianna Coronis, and Jonathon Coronis. Stipulated Fact ¶ 21.

24. Chianna Coronis is the only daughter of Nicholas Coronis and Annabel Coronis. Stipulated Fact ¶ 22.

25. Jonathon Coronis is the youngest son of Nicholas Coronis and Annabel Coronis. Stipulated Fact ¶ 23.

26. Anastasia Kalogirou is the grandmother of Paul Coronis, Chianna Coronis and Jonathon Coronis. Stipulated Fact ¶ 24.

27. Paul Coronis ordered the incorporation of Sonic, Mirage, Pasha, Handy, Movida, Seasatin, Annamar, Seasafe, and Bulknav. Tr. at 158–59.

### B. Primera/d'Amico Dry FFA

28. d'Amico Dry entered into the FFA with Primera on September 2, 2008, whereby Primera agreed to buy and d'Amico Dry agreed to sell freight futures for 45 days within the months of January, February and March 2009 respectively. Stipulated Fact ¶¶ 32, 34. Paul Coronis was responsible for trading FFAs at Primera. Tr. at 178.

29.  At the time it entered into this and other FFA trades
     representing potentially tens of millions of dollars of debt
     for Primera, Primera had assets of approximately $132,000. Tr.
     at 205-06.

30.  Starting around mid-September or October 2008, the freight
     market dropped precipitously. Tr. at 206-07. As of October
     2008, Paul Coronis believed that Primera would lose
     substantially on its FFA trade with d'Amico Dry, as it already
     had and would in many of its other FFA trades. Tr. at 207.
     Paul Coronis knew as of that time that he would likely be
     unable to pay Primera's FFA obligations because others,
     especially Industrial Carriers, Inc., were not paying Primera.
     Tr. at 210.

31.  In late 2008 and early 2009, Primera was unable to pay its
     FFA obligations. Tr. at 210.

32.  As of January 30, 2009, Primera owed d'Amico Dry
     $795,963.20 under the FFA. Ex. 32. Despite d'Amico Dry's due
     demand for payment, Primera failed to remit payment to d'Amico
     Dry in respect of the January 2009 contract month. This was a
     breach of the FFA. Stipulated Fact ¶ 36.

33.  As a result of Primera's breach, d'Amico Dry became
     entitled to terminate the FFA. Stipulated Fact ¶ 37.

34.  d'Amico Dry terminated the FFA on or about February 23,
     2009. Stipulated Fact ¶ 38.

35.  Primera's breach of the FFA resulted in d'Amico Dry's loss
of $1,752,973.30 exclusive of interest, costs and attorney's
fees. Ex.1.

36.  Pursuant to Clause 15 of the FFA contract, all disputes
arising thereunder were to be submitted to the English High
Court with English law to apply. Stipulated Fact ¶ 39.
Pursuant to the ISDA Master Agreement, the Defaulting Party is
responsible for the other party's costs of collection. Ex. 31
at 88.

37.  d'Amico Dry commenced legal proceedings against Primera in
the High Court of Justice Queen's Bench Division, Commercial
Court under Claim No. 2009 Folio 218 in accordance with the
FFA contract. Ex. 1.

38.  On June 19, 2009, the High Court of Justice, by The
Honorable Mr. Justice Flaux, entered a final, unappealable
judgment against Primera in the sum of $1,766,278.54
(comprising the principal due of US $1,752,973.30 together
with interest at the contractual rate accrued up to June 19,
2009). Ex. 1. Legal costs in the amount of GBP 17,000 which
converts to $28,056.39, were also awarded. Stipulated Fact
¶ 41. Postjudgment interest at the rate of 8 percent per annum
was also awarded in accordance with English law, as were
future legal fees incurred to collect the judgment. Exs. 1,
104.

39.  d'Amico Dry commenced this action against Primera on September 11, 2009, to recognize and enforce the English Judgment. Thereafter, in December 2010, d'Amico Dry moved to add the alleged alter ego defendants. On December 21, 2010, the Court granted d'Amico Dry's motion to amend the complaint and on December 23, 2010, d'Amico Dry filed the amended complaint and commenced efforts to serve the alter ego defendants. Dkt. Nos. 1, 44, 64.

40.  Since 2009, vessels connected to the defendants in this case were attached in Los Angeles, Houston, and New Orleans. Flame S.A. v. M/V Lynx, No. 10cv278, 2010 WL 10861354 (E.D. Tex. June 22, 2010); Flame S.A. v. Pasha Fin., Inc., No. cv 10-5245-GW, 2010 WL 2902774, at *1 (C.D. Cal. July 26, 2010); Flame S.A. v. Primera Maritime (Hellas) Ltd., et al., No. 2:10cv02081, (E.D. La. Aug. 6, 2010); d'Amico Dry Ltd. v. Pasha Fin., Inc., C.A. No. 4:15-0039, (S.D. Tex. Jan. 16, 2015).

### C. The Coronis Family's Control of Primera and the Shipowning Companies

41.  Primera was incorporated on June 22, 1990. Ex. 92 at 25-44. Nicholas Coronis was appointed President, Director and sole shareholder of Primera when it was incorporated. Ex. 92 at 1, 3, 23, 241-43.

42. Foreign ship management companies wishing to do business in Greece, like Primera, must seek authorization and comply with Greek Law 89. Tr. at 162-63. Submissions under Law 89 must be truthful and accurate. Tr. at 163.

43. Nicholas Coronis was the company representative for Primera under Greek Law 89. Ex. 92 at 133, 198.

44. On May 12, 1991, Nicholas Coronis, as the sole shareholder of Primera, appointed himself the sole Director, President, Vice-President, Treasurer and Secretary of Primera. Ex. 92 at 241-43.

45. Paul Coronis joined Primera in 2002 as a trainee. He became a Director of Primera in 2004 and maintained that position until November 15, 2008. Tr. at 171-72; Stipulated Fact ¶¶ 26-27. Paul Coronis was responsible for the commercial and legal desk at Primera. Tr. at 172, 178.

46. Although incorporated in Liberia, Primera had no offices or employees there. Instead, at all material times, Primera operated out of 6, Roupel Street, 145 64, Kifissia, Athens, Greece. Tr. at 161. The building which occupies this address (and which is used by all of the Coronis controlled entities) is owned by Paul Coronis, Jonathan Coronis and Chianna Coronis. Tr. at 161; Stipulated Fact ¶¶ 30-31.

47. As of the time Primera entered into the FFA with d'Amico Dry, the President, Treasurer and Secretary was Nicholas

Coronis. He was also a Director. The other Director was Paul
Coronis. The shareholders were Nicholas Coronis with some
minor ownership by others. Ex. 92 at 129; Tr. at 177-80, 192.

48. At all material times, Nicholas or Paul Coronis controlled
Primera and the other defendants. As Director and General
Manager of Primera, Nicholas Coronis controlled the day-to-day
affairs of Primera and the other Coronis family controlled
shipowning and ship-operating companies as a single
enterprise. Tr. at 172.

49. In 2008, the Coronis family used Primera to attempt to
insulate their shipowning companies from liability. In 2008,
the only vessels Primera managed were controlled by the
Coronis family. Tr. at 173-74. In particular, at that time
Primera managed the following vessels (as well as the accounts
and records of each shipowning company): AQUADANCE (owned by
Adalia), MOONDANCE II (owned by Moondance Maritime Enterprises
S.A.), SEAGLASS II (owned by Nikka), and SUNRAY (owned by
Sonic). Tr. at 173.

50. Sonic and Moondance were Marshall Islands corporations with
their registered office c/o Trust Company Complex, Ajeltake
Road, Ajeltake Island, Majuro. However, these corporations had
no offices or employees in The Marshall Islands. Rather, other
than possibly the ships' crews, each company had no employees
but operated out of the Primera office at 6 Roupel Street, 145

13

64, Kifissia, Athens, Greece. Stipulated Fact ¶¶ 5, 6, 12; Ex. 17 at 4; Tr. at 158-60.

51.  In 2008 and 2009, Paul Coronis was the sole Director of Sonic and Moondance. Tr. at 175. Paul Coronis was the person who ordered the incorporation of these companies. Tr. at 158-60. The Coronis family owned 70 percent of the shares of these companies and "silent partners" owned the remaining 30 percent. Tr. at 174-75. Paul Coronis authored the Law 89 letter for Sonic, and his father Nicholas Coronis authored the Law 89 letter for Moondance. Ex. 92 at 215A, 219.

52.  Adalia was a Malta corporation with its registered office at 198 Old Bakery Street, Valletta, Malta. Stipulated Fact ¶ 4. Although it was a Maltese corporation, it had no offices or employees there. Rather, other than possibly a ship's crew, it had no employees but operated out of the Primera office at 6 Roupel Street, 145 64, Kifissia, Athens, Greece. Ex. 17 at 4; Tr. at 158-60. The Coronis family owned 70 percent of Adalia's shares. Tr. at 184. Paul Coronis authored the Law 89 letter for Adalia. Ex. 92 at 220A. No other information about Adalia was produced by the defendants. The entire production of Adalia corporate records consists of three pages. Sonic et al. Ex. K.

53.  Before the Primera/d'Amico Dry FFA was executed on September 2, 2008, and before the market crash, on or before

14

May 21, 2008, Paul Coronis helped obtain a $204,000,000
Facilities Agreement with HSH Nordbank (the "May 21, 2008
Facilities Agreement") on behalf of Sonic and Adalia (and
others) as "Joint and Several Borrowers." Other Coronis
controlled companies, Nikka, Mirage, Handy, Pasha, Movida,
Element and Caldera were also Joint and Several Borrowers
(collectively referred to as the "Joint and Several
Borrowers"). Tr. at 184–87; Ex. 17 at Cover Page, 105–08;
Stipulated Fact ¶ 42. At that time, the Coronis family owned
approximately 70 percent of each of these entities. Tr. at
184. Notice under the Facilities Agreement for all the Joint
and Several Borrowers was to be sent c/o Primera Maritime at 6
Roupel Street, 145 64 Kifissia, Athens, Greece. Ex. 17 at 80.

54.   Movida, Mirage and Pasha were also all Marshall Islands
companies, incorporated at the request of Paul Coronis. Tr. at
158–59. They had no offices or employees in The Marshall
Islands and at all times operated through Primera. Tr. at 158–
61. Insofar as Movida and Pasha are concerned, between 2008
and 2009, Paul Coronis and Nicholas Coronis were the President
and Secretary/Treasurer, respectively, and were also the only
Directors. Exs. 72–74, 81–82, 85. Insofar as Mirage is
concerned, Nicholas Coronis was the President and Director,
and Evangelos Bairactaris (Primera's counsel) was the
Secretary/Treasurer and only other Director. Ex. 79. As with

the other companies, the Coronis family owned 70 percent of the shares of these companies, with the remainder being owned by silent partners. Tr. at 173-74, 184.

55.  As part of the Facilities Agreement, the existing vessels owned by the Joint and Several Borrowers were collateral for the loan. Each company guaranteed the performance of the other. Tr. at 187; Ex. 17 at Cover Page, 82; Ex. 19 at Cover Page; Stipulated Fact ¶ 44. In addition, funds from the Facilities Agreement were to be used to pay for the construction of five new bulk carriers. Tr. at 187. Sonic, for instance, built the 57,000-ton SUNRAY using some of the funds. Ex. 17 at 4; Tr. at 186.

56.  Each of the Joint and Several Borrowers was required to post $500,000 in a retention account to secure the payment of the loan. Tr. at 187.

57.  The May 21, 2008 Facilities Agreement was guaranteed by Primera, as well as Paul Coronis and Nicholas Coronis personally. Stipulated Fact ¶¶ 43, 45. Because Primera managed the Coronis controlled vessels in any event, there does not appear to be any independent consideration for Primera to have agreed to this guarantee. The original Facilities Agreement was signed either by Paul Coronis or an attorney he authorized to sign on behalf of all of the Joint and Several Borrowers and Primera. Ex. 17.

58.  In the Facilities Agreement, it was agreed that Primera would be the manager of the new and existing ships identified in the Facilities Agreement while the Agreement was in effect. Ex. 17 at 2-3; Tr. at 189. It was also agreed that the "beneficial ownership" of the Joint and Several Borrowers and Primera would not change during the pendency of the Agreement. Tr. at 189.

59.  At or about the same time, Paul Coronis helped secure contracts for the construction of various bulk carriers including Sonic's SUNRAY and Mirage's MOONRAY. Ex. 17 at 4, 13; Tr. at 183-84.

60.  In addition, Pasha was to build an unnamed Panamax bulk carrier, Movida was to build an unnamed Handysize bulk carrier, and Element was also to build a Handysize bulk carrier using funds from the Facilities Agreement. Ex. 17 at 4, 14.

61.  Thus, as of the time Primera entered into the FFA with d'Amico Dry, and as of the time Paul Coronis concluded that Primera was in a dire financial condition, Paul Coronis had ordered the incorporation of these Joint and Several Borrowers. Paul Coronis and Nicholas Coronis were the Officers and Directors of the Joint and Several Borrowers, and the Coronis family owned 70 percent of the shares of each. None of the Joint and Several Borrowers had offices or employees of

their own but were operated by Primera which maintained and controlled their assets, including their bank accounts. Tr. at 158-61, 304-05, 339.

62.  Primera was an alter ego of the Coronis family. It disregarded its corporate formalities and was inadequately capitalized at the time it entered into the FFA at issue. It intermingled its corporate funds with Chemnav Shipmanagement and the various shipowning companies eventually owned by Bulknav or managed by Chemnav Shipmanagement. Primera operated out of 6 Roupel Street, 145 64 Kifissia, Athens, Greece along with all of the Coronis family controlled entities including Chemnav Shipmanagement, subsequently Primebulk, and all of the shipowning companies. Its ownership and management was completely dominated and controlled by Nicholas Coronis, and later by Paul Coronis. Primera exercised no business discretion of its own but was instead a tool for the Coronis family's sole use. Primera siphoned funds from FFAs away from Primera and directed the money to other Coronis controlled companies. It also guaranteed the debts of the shipowning companies, becoming collateral for and jointly and severally liable under construction contracts of new ships owned by the Coronis family. It was a tool to co-mingle and/or shelter Coronis family assets. See Findings of Fact, supra, at ¶¶ 41-61.

### D. Primera Diversion of Assets

63. After the freight market collapsed, and parties sought to
    enforce FFA debt against Primera, on or about October 6, 2009,
    Paul Coronis and Primera used a three-way netting-off
    agreement to collect on Primera's earlier FFA trade with TMT
    Asia. Tr. at 254; Ex. 12. Despite the fact that Primera was
    the party to the FFA, instead of directing payment to
    Primera's account, Paul Coronis diverted funds that should
    have been paid to Primera to other Coronis controlled
    entities. For example, the first payment of $203,228.58 was
    directed to Primrose Shipping, Ltd., a Coronis controlled
    company. Tr. at 255-56, 259; Exs. 11, 12, 124-25. The second
    payment of $185,000.00 was directed to Seadance Maritime, a
    company related to Primrose and controlled by the Coronis
    family. Exs. 124-25; Tr. at 261.

64. Primrose and Seadance were controlled directly or
    indirectly by the Coronis family. Tr. at 268-70; Exs. 124-25.
    Despite having money directed to their accounts, Primera had
    no written agreements of any sort with Seadance. Paul Coronis
    claimed to have a written agreement between Primera and
    Primrose, but it was never produced. Tr. at 263.

65. For example, Primrose (whose shares were held in part by
    Nicholas Coronis and Annabel Charlton and then by Seadance)
    seated as Director Christos Georgopoulos, who was at that same

time the accountant at Primera. Tr. at 270; Ex. 125. Seadance
Maritime became the sole owner of Primrose Shipping in 2005.
Nicholas Coronis executed a Power of Attorney on behalf of the
sole shareholder of Primera, Seadance Maritime, on June 30,
2005. In an effort to cover up the Coronis control of
Seadance, Mr. Georgopoulos resigned as Director of Seadance
six days after FFA funds were directed to the company by Paul
Coronis. Thereafter, a corporation was inserted as Director of
Seadance. See Exs. 124-25. Mr. Georgopoulos was subsequently
employed by Primebulk. Tr. at 262.

66.  Also in 2008 and 2009, Paul Coronis directed other payments
    due to Primera to the Coronis controlled company J.P.C.
    Investments. Tr. at 275.

67.  J.P.C. Investments had made an interest free loan to
    Primera in July 2008 for working capital but Paul Coronis
    claims to have known nothing about the loan. Tr. at 272-73;
    Ex. 4. The 2008 Primera Profit and Loss and Balance Sheet
    makes no reference to any such loan having been made or any
    such obligation. Ex. 15.

68.  Annabel Charlton, Paul Coronis's mother, was at all
    material times the only known Director of J.P.C. Investments.
    Tr. at 272-76; Ex. 4 at 48; Ex. 30; Ex. 126 at 3.

69.  Primera diverted funds to J.P.C. Investments, Seadance and Primrose without any consideration for the transfer having been established. Tr. at 255-76.

70.  Paul Coronis's resignation from Primera on November 15, 2008 was a sham. Tr. at 181. He continued to perform the same work he previously did at Primera before resigning.

71.  For example, on January 26, 2009, Paul Coronis contacted d'Amico Dry (using his Primera email address) to offer a guarantee backed by one of the shipowning companies managed by Primera in exchange for d'Amico Dry agreeing to payment in installments by Primera. Tr. at 212-14; Ex. 33. In October, 2009, Paul Coronis negotiated and signed a netting-off agreement on behalf of Primera, communicating again through his Primera email address. Ex. 12; Tr. at 252-54. He also negotiated the changes to the Facility Agreement (discussed in further detail below).

### E. The Coronis Family Creates Primebulk to Avoid Enforcement of the English Judgment

72.  In early 2009, with a collapsed freight market and significant FFA debts, the Coronis family continued their efforts to avoid paying their debts.

73.  On January 26, 2009, (despite allegedly having resigned from Primera) Paul Coronis contacted d'Amico Dry to offer a guarantee backed by one of the shipowning companies managed by

Primera in exchange for d'Amico Dry's agreeing to installment payments by Primera. Tr. at 212-14; Ex. 33. When d'Amico Dry did not respond to his satisfaction, on February 9, 2009, Paul Coronis wrote to d'Amico Dry stating:

> I therefore understand that this is to mean that you are not interested in a commercial solution as per the terms previously put forward and your sole interest is to pursue something aggressively and with limited or no results.

Ex. 33 at 8. Paul Coronis communicated with d'Amico Dry and its counsel using his Primera email address. Ex. 33.

74. During trial, Paul Coronis testified that he offered to negotiate on behalf of Primera (where he had already resigned, Stipulated Fact ¶ 27) a guarantee to d'Amico Dry from Moondance Maritime (a company whose Director was Paul Coronis and was majority owned by the Coronis family), for the benefit of J.P.C. Investments (which was "implied[ly]" responsible for paying d'Amico Dry and whose Director was Annabel Charlton). Tr. at 174-75, 215, 278-80; Ex. 30 at 6-7.

75. Not long after writing his February 9, 2009 email to d'Amico Dry, Paul Coronis ordered the incorporation of Primebulk. Ex. 33 at 8; Ex. 9 at 11. Primebulk was incorporated on February 25, 2009. Stipulated Fact ¶ 46. Although Primebulk was incorporated in The Marshall Islands and had its registered address there, it did not have any

employees or office in The Marshall Islands. It operated out
of 6 Roupel Street in Athens, Greece. Tr. at 216-17.

76.  Once incorporated, Primebulk took the place of Primera for
all intents and purposes. With the exception of one person
(Jonathon Coronis), all of the employees of Primebulk had been
employed by Primera. Stipulated Fact ¶ 57. Panagiotis
Yannoutsos, who oversaw the construction of vessels for
Primera, now oversaw the construction of the same vessels for
Primebulk. Tr. at 218. Primebulk took over office space,
office equipment (including computers), and furniture
previously used by Primera. Tr. at 219-20, 334; Stipulated
Fact ¶ 58. (Paul Coronis contends that the landlord provided
the furnishings and office equipment, but nothing of that sort
is found in Primebulk's lease. Tr. at 222-24.) Primebulk
assumed the management of vessels previously managed by
Primera. Tr. at 220; Ex. 95 at 61; Ex. 92 at 199A. No
consideration was paid by Primebulk to Primera for these
assets. Tr. at 222. The fee to register Primebulk as a Greek
Law 89 company was paid by Chemnav Shipmanagement, another
Coronis entity. Tr. at 221.

77.  Greek Law 89 required shipowners to report to the Ministry
of Mercantile Marine which Greek manager was responsible for
managing its ships. Tr. at 176.

78.   Paul Coronis and Nicholas Coronis signed the letters
      required under Law 89 to transfer the management of the
      MOONDANCE II (Moondance), SEAGLASS II (Nikka), MOONRAY
      (Mirage) and SUNRAY (Sonic) from Primera to Primebulk. Ex. 95
      at 74, 75A, 76A, 77A.

79.   When Primebulk was established, Paul Coronis and Anastasia
      Kalogirou, his grandmother, owned 70 percent of its shares
      through Riverside Holdings Co. Stipulated Fact ¶ 48. The other
      shareholder was a "silent partner." The only Officer and
      Director initially appointed was Anna Papanikolaou, one of the
      Coronis family lawyers employed by the firm G.E. Bairactaris &
      Partners. Ex. 95 at 56; Tr. at 234-35. In April 2010, Ms.
      Papanikolaou resigned and Dimitrios Vitzileos took her place.
      Ex. 95 at 56; Tr. at 234-35. Mr. Vitzileos had been an
      employee of Primera from 1996 through 2009. Stipulated Fact
      ¶ 59.

80.   Because of the freight market collapse and the FFA losses
      causing the demise of Primera and the replacement of Primera
      with Primebulk, in 2009 Paul Coronis had to address and revise
      the May 21, 2008 Facilities Agreement. Once again, Paul
      Coronis facilitated the amendments on behalf of all of the
      Joint and Several Borrowers and Primebulk. Tr. at 248-50.
      These negotiations led to the Second and Third Supplemental
      Agreements dated February and September 2009. Exs. 18-19.

81.  As part of this negotiation, Paul Coronis negotiated
     changes in the vessels to be constructed. It was agreed that
     the bulk carrier construction contracts for Pasha and Movida
     would be canceled and two tankers would be built in their
     place. Tr. at 250; Stipulated Fact ¶ 62. Both the M/T CAPE
     TALARA, owned by Pasha, and the M/T CAPE TROY, owned by
     Movida, were built using funds provided by the May 21, 2008
     Facilities Agreement. Tr. at 250; Stipulated Fact ¶ 63. Handy,
     Adalia and Element were removed as Joint and Several
     Borrowers. Tr. at 251.

82.  In addition, the guarantee from Primera was replaced by a
     guarantee from Primebulk without any evident consideration.
     Moreover, Primera Ocean Services and Bulknav were also added
     as guarantors. Tr. at 251. Paul Coronis and Nicholas Coronis
     also increased their personal guarantees. Tr. at 251;
     Stipulated Fact ¶ 61.

83.  Moreover, although vessel managers approved in Facilities
     Agreements generally must have a proven track record as ship
     managers, Primebulk replaced Primera as the ship management
     company despite having only been in operation for fewer than
     six months. Ex. 17-19; Tr. at 251-52; Stipulated Fact ¶ 60.
     Primebulk managed the Coronis family bulk carriers. There was
     no additional consideration received by Primebulk for agreeing
     to replace Primera as a guarantor of the Facilities Agreement.

84. In 2010, all vessels managed by Primebulk were delivered or financed under the May 21, 2008 Facilities Agreement. Tr. at 247-48.

85. Primebulk was, at all material times, undercapitalized for the obligations it had assumed. Ex. 41.

86. When it began operating vessels in the summer of 2009, Primebulk managed only ships that were majority owned by the Coronis family. Tr. at 247-48.

87. Just as with Primera, Paul Coronis handled the legal and commercial/chartering desk at Primebulk on a day-to-day basis. Tr. at 236.

88. In the first eight months of essentially operating Primera's business, Primebulk earned net profits of $525,703. In its first full year of operation, Primebulk earned net profits of $969,936. Combined, these profits approach the sum that Primera owed d'Amico Dry but which it avoided paying by depleting its assets and emerging as Primebulk. Ex. 41 at 421, 434.

89. Primebulk's minutes of the Board of Directors indicate that steps were taken to "backfill" the corporate records. Mr. Coronis could not explain why the 2010, 2011, 2012 and 2013 meetings of the sole Director were on "short notice." He also could not explain why these minutes were nearly identical to one another. Tr. at 291-96; Ex. 37.

90. During the course of 2014 and 2015, while discovery in this
matter was ongoing, Primebulk's books and records from the
start of its operation on April 30, 2009, including its
management fee and commission revenue, overhead and general
expenses were being analyzed by Moore Stephens. Various
documents – including charter parties, recaps, the Memorandum
of Agreement for the purchase and sale of vessels, web-banking
records, and wages and expense records – were all available
and reviewed by Moore Stephens. Ex. 41. Many of these same
records were never produced in this litigation (as
demonstrated by comparing the records enumerated in Ex. 41
with the alter ego defendants' list of exhibits wherein their
entire production is identified).

91. Primebulk is a successor-in-interest and an alter ego of
the Coronis family and Primera. In complete disregard of
corporate formalities, the Coronis family abused the corporate
form by using Primebulk to replace the debt laden Primera as
the ship manager for the Coronis family fleet of ships.
Primebulk took over Primera's assets without consideration but
did not take over all of its liabilities. Primebulk was
grossly undercapitalized because its assets were insufficient
to satisfy the obligations that it guaranteed. It intermingled
funds with all of the shipowning companies. Its only Officer
and Director was initially Primera's attorney and later was

27

Dimitrios Vitzileos, an employee of Primera. Primebulk's employees were almost entirely employees transferred from Primera and its controlling shares were owned by the Coronis family. Primebulk operated out of 6 Roupel Street, 145 64 Kifissia, Athens, Greece in the office space formerly occupied by Primera – in the same building as Chemnav Shipmanagement and the other shipowning companies. It exercised no degree of independent business discretion but was instead controlled by Paul Coronis. Its dealings with the other Coronis family companies were not at arm's length. Primebulk did not pay consideration for any of the business, assets or equipment that it received from Primera including Primera office space, furniture, computers, employees, ships managed and shipowning company accounts and records. Primebulk was not treated as an independent profit center in that it assumed all of Primera's work without assuming all of Primera's debt. It replaced Primera as the corporate guarantor in the loan agreement to buy new Coronis family ships and became jointly and severally liable for the other Coronis family entities' debt. See Findings of Fact, supra, at ¶¶ 72-90.

**F. The Coronis Family's Relationship with Bulknav**

92.  The shares of each of the Joint and Several Borrowers under the May 21, 2008 Facilities Agreement were 70 percent owned by

the Coronis family by way of Shelly Ventures, Inc., and 30

percent owned by silent partners. Tr. at 184, 198; Ex. 84.

93.  Shelly Ventures was the entity used by Paul Coronis to

enter into the contract for the construction of the vessel

later to be owned by Pasha and named CAPE TALARA. Tr. at 200-

02; Ex. 19 at 2.

94.  After the CAPE TALARA was built and delivered, on July 5,

2010, Nicholas Coronis signed and submitted a letter on behalf

of Pasha to the Greek Mercantile Marine stating that Primebulk

was the manager of CAPE TALARA. Ex. 95 at 78A.

95.  After the CAPE TROY was built and delivered, on September

20, 2011, Nicholas Coronis signed and submitted a letter on

behalf of Movida to the Greek Mercantile Marine stating that

Primebulk was the manager of CAPE TROY. Ex. 95 at 80A.

96.  Also in and about this time, the shareholding of the Joint

and Several Borrowers changed. Bulknav was incorporated at

Paul Coronis's request. Tr. at 159. It became the holding

company for all of the shares of the Joint and Several

Borrowers, i.e., Sonic, Mirage, Handy, Pasha, Nikka, Movida

and Element. It also owns the shares of Moondance Maritime,

Rocket Finance, Inc., Caldera and Adalia. Tr. at 196. No

consideration was paid by Bulknav for these shares. Tr. at

197.

97.   Bulknav, which is incorporated in The Marshall Islands and has a registered address in The Marshall Islands, does not maintain any offices or employees in The Marshall Islands. Tr. at 196.

98.   The Coronis family continued to own 70 percent of the shares of the shipowning companies by owning 70 percent of the shares of Bulknav through Shelly Ventures. Tr. at 197-98; Stipulated Fact ¶ 50. The remaining shares were owned by silent partners. Tr. at 197-98.

99.   During 2009 and 2010, Nicholas Coronis and Paul Coronis were both Directors and the President and Treasurer, respectively, of Bulknav. Tr. at 198. Their lawyer, Evangelos Bairactaris, who incorporated Bulknav at Paul Coronis's request, was the only other Director and Secretary. Ex. 69. Later in 2010, Nicholas Coronis and Evangelos Bairactaris resigned. Konstantinos Kremydas was appointed President and Director, and Paul Coronis was made Secretary and Director. Stipulated Fact ¶¶ 51-52; Tr. at 198-99; Ex. 68. (The April 19, 2010 minutes indicate that Paul Coronis was made a Director that day, but the July 30, 2009 minutes show that Paul Coronis was already a Director and Treasurer of Bulknav. Exs. 68-69).

100. Despite the fact that Bulknav and all of the Joint and Several Borrowers were either Marshall Islands or Malta

corporations, none of them had offices or employees in their places of incorporation. They operated through Primera and later Primebulk at their address in Kifissia, Athens, Greece. Tr. at 158-61.

101. Other than occasions when the shipowning companies hired the vessel's crew, none of these Joint and Several Borrowers had employees. Tr. at 160.

102. After the formation of Bulknav, Paul Coronis resigned from the Boards of the shipowning companies. Paul Coronis stated that, among other reasons, it was duplicative for him to be a Director of the Bulknav subsidiaries because he exercised sufficient control over them as Director of Bulknav. Tr. at 199. In fact, Paul Coronis makes decisions for Bulknav. Ex. 68; Tr. at 200.

103. Bulknav did not have its own bank account. Tr. at 200.

104. At his own discretion, Paul Coronis moved money among the Bulknav individual shipowning companies to balance out gains and losses across all of the companies. Tr. at 200-01.

105. Paul Coronis unilaterally designated himself as the Rule 30(b)(6) witness for Bulknav, Sonic, Mirage, Pasha, Movida, Handy, Element, Caldera and Adalia without receiving authority from anyone else. Tr. at 170, 200.

106. During the course of these proceedings, d'Amico Dry requested that the defendants produce banking, financial and

accounting records from Primebulk, Bulknav and the Bulknav
owned entities from January 1, 2008 to date. No bank records
were produced for Bulknav, Sonic, Handy, Element, Caldera or
Adalia.

107. Bulknav is an alter ego of the Coronis family and Primera.
Bulknav disregarded corporate formalities by operating as a
shell company used by the Coronis family to add another layer
of corporate protection for family members. It was
inadequately capitalized. It had no bank account. While
Bulknav had no funds, money was intermingled and moved among
the shipowning entities it owned on a regular basis at the
discretion of Paul Coronis to cover shortfalls in the
operation of each company. While it has never had employees,
Bulknav's Officers and Directors overlapped with the other
Coronis family companies and included Paul Coronis and
Nicholas Coronis, with Paul Coronis remaining an Officer and
Director to date. The controlling Bulknav shares have always
been held by the Coronis family. All of Bulknav's shipowning
companies are managed out of 6 Roupel Street, 145 64 Kifissia,
Athens, Greece, where both Primera and Primebulk housed their
day-to-day operations. Bulknav exercised no independent
business discretion. Its Director, Paul Coronis, unilaterally
designated himself as the Rule 30(b)(6) witness for Bulknav
and all of the shipowning companies without seeking permission

from any other person. In a less than arm's length
transaction, Bulknav novated a contract for the construction
of a tank vessel from another Coronis family operated company
without consideration for the transaction. It was not treated
as its own profit center. It paid no consideration to the
shipowning companies for the transfer of their shares, it
guaranteed the loan agreement for the purchase of new vessels
for the Coronis family, and it became jointly and severally
liable for the debt. It intermingled the assets of the Coronis
family when two of its single-purpose shipowning companies
came to own the Primebulk managed vessels CAPE TALARA and CAPE
TROY, the fruits of the loan agreement guaranteed by Primera
and the Coronis family. See Findings of Fact, supra, at ¶¶ 92-
106.

### G. Primera Ocean Services S.A.

108. Primera Ocean was a Liberian corporation but did not
maintain offices or employees there. Ex. 94 at 76; Tr. at 283.
Its only office was at 6 Roupel Street, 145 64 Kifissia,
Athens, Greece. Tr. at 283. Its few employees included Paul
Coronis and his parents – Nicholas Coronis and Annabel
Charlton. Ex. 94 at 17-19, 25-29, 45-47, 58-59; Tr. at 282-83.
The Greek Law 89 representative was Nicholas Coronis. Ex. 94
at 93, 126A. Primera paid the Greek Law 89 registration fee
for Primera Ocean. Ex. 94 at 61A.

109. At all material times, Primera Ocean managed one vessel, BLUDANCE, owned by Caldera Marine Co. Ltd. Tr. at 283; Ex. 94 at 89A, 96A, 106A, 132. Like other Coronis controlled shipowning companies, Caldera acted through Primera Ocean at its office in Kifissia, Athens, Greece. Tr. at 283; Ex. 94 at 76-77.

110. Caldera and Primera Ocean were parties to the May 21, 2008 Facilities Agreement and Joint and Several Borrowers in that they guaranteed performance of the others. Exs. 17-19; Tr. at 285. There is no evidence that consideration was exchanged for these guarantees.

**H. The Coronis Family Tanker Fleet**

111. In addition to the bulk carriers managed by Primera in 2008, the Coronis family also had a tank vessel management company Chemnav Shipmanagement, Ltd. ("Chemnav Shipmanagement") and shipowning companies.

112. At Paul Coronis's request, Chemnav Shipmanagement was incorporated in The Marshall Islands, but it did not maintain any offices or employees there. Tr. at 297; Stipulated Fact ¶¶ 75, 79.

113. Like Primera and Primebulk, Chemnav Shipmanagement operated out of 6, Roupel Street, 145 64, Kifissia, Athens, Greece. Stipulated Fact ¶ 76.

114. Paul Coronis was, at all material times, the President and sole owner of Chemnav Shipmanagement through Starboard Holdings. Tr. at 297; Stipulated Fact ¶¶ 80-81. He was also a Director of Chemnav Shipmanagement from 2006 to April 19, 2010. Ex. 46; Ex. 93 at 1; Stipulated Fact ¶ 78.

115. The Greek Law 89 establishment fee for Chemnav Shipmanagement was paid by Primera on April 3, 2008. Ex. 93 at 25.

116. In 2008 and 2009, the Greek Law 89 representative of Chemnav Shipmanagement was Paul Coronis. Ex. 93 at 70, 77. In 2010, Panagiotois Yannoutsos (the person responsible for supervising the construction of vessels for Primera and Primebulk, Tr. at 218-19) became the Greek Law 89 representative as well as a Director of Chemnav Shipmanagement. Ex. 46.

117. In 2008, Chemnav Shipmanagement managed COMMENCEMENT (owned by Annamar, Stipulated Fact ¶ 65) and LYNX (owned by Camela Navigation Inc. ("Camela"), Ex. 93 at 104A). In 2009, Chemnav also managed POLARIS (owned by Seasatin, Stipulated Fact ¶ 74), and SATURN (owned by Seasafe, Stipulated Fact ¶ 69). Chemnav Shipmanagement's service included managing the accounts and records for these entities. Stipulated Fact ¶ 77.

118. Even as of August 13, 2009, financial sources such as Lloyd's List Intelligence, in a report concerning Primera,

referred to Chemnav as the "tanker interests of the Coronis family," noting further that "the principals behind Primera and Chemnav have 14 vessels on order including bulkers and chemical tankers at a reported cost of US $600[ million]." Primera Ex. OO.

119. Paul Coronis ordered the incorporation of Annamar, Seasafe, Seasatin and Camela. Stipulated Fact ¶ 64; Tr. at 297.

120. The shares of Annamar, Seasafe, Seasatin and Camela were not collectively held by a single holding company. Tr. at 297-98, 301.

121. Annamar, Seasafe, Seasatin and Camela are each owned by the same parties. Tr. at 297-98, Exs. 57, 67. The Coronis family, at all material times, owned the majority of the shares of Annamar, Seasafe and Seasatin. Tr. at 297-98; Stipulated Fact ¶ 66; Exs. 57, 67.

122. Like other Coronis shipowning companies, Annamar, Seasafe and Seasatin were Marshall Islands corporations but had no offices or employees there. They were operated almost exclusively by Chemnav Shipmanagement at 6 Roupel Street, 145 64 Kifissia, Athens, Greece. None of these entities had any employees of their own. Tr. at 298.

123. At the relevant time, Paul Coronis and/or Nicholas Coronis were Directors of Annamar, Seasafe and Seasatin. Stipulated Fact ¶¶ 67-68, 70-73.

124. On March 3, 2008, Paul Coronis signed and submitted a letter on behalf of Annamar to the Greek Mercantile Marine stating that Chemnav Shipmanagement was the manager of COMMENCEMENT. Ex. 93 at 114.

125. On December 22, 2008, Nicholas Coronis signed and submitted a letter on behalf of Camela to the Greek Mercantile Marine stating that Chemnav Shipmanagement was the manager of LYNX. Ex. 93 at 115A.

126. On February 16, 2009, Nicholas Coronis signed and submitted a letter on behalf of Seasatin to the Greek Mercantile Marine stating that Chemnav Shipmanagement was the manager of POLARIS. Ex. 93 at 116A.

127. On May 12, 2009, Nicholas Coronis signed and submitted a letter on behalf of Seasafe to the Greek Mercantile Marine stating that Chemnav Shipmanagement was the manager of SATURN. Ex. 93 at 119A.

128. In 2007, Paul Coronis, on behalf of Camela, Seasafe, Seasatin and Annamar, negotiated a Facilities Agreement with HSH Nordbank (the "April 23, 2007 Facilities Agreement"). Ex. 42 at 2; Tr. at 299-300.

129. Primera executed a guarantee in favor of a shipyard for the construction of the four chemical tank ships being funded under the April 23, 2007 Facilities Agreement. Stipulated Fact ¶¶ 82-83. Correspondence under the April 23, 2007 Facilities

Agreement was to be sent to the different borrowers thereunder c/o Primera at its office in Kifissia, Athens, Greece. Ex. 42 at 101. There is no evidence that consideration was exchanged for this guarantee.

130. Camela, Seasafe, Seasatin and Annamar were all jointly and severally liable under the April 23, 2007 Facilities Agreement. Ex. 42 at 2, 103; Tr. at 301. Stipulated Fact ¶ 84.

131. The April 23, 2007 Facilities Agreement required that Annamar, Seasafe, Seasatin and Camela maintain $2,500,000 in a retention account until the construction of the ships was complete and $2,000,000 thereafter. Ex. 42 at 45; Tr. at 301.

132. Paul Coronis, Nicholas Coronis, Chemnav Inc. and Chemnav Shipmanagement provided guarantees under the April 23, 2007 Facilities Agreement. Stipulated Fact ¶¶ 83-84. There is no evidence that consideration was exchanged for these guarantees.

133. Chemnav Shipmanagement and the companies it managed (Annamar, Seasafe, Seasatin and Camela) advanced funds to one another or paid bills on behalf of each other. Exs. 111-19.

134. Despite the fact that there is no holding company owning the shares of Annamar, Seasafe, Seasatin and Camila, these companies regularly satisfied debts and obligations owed by another one of these entities. Tr. at 301; Exs. 113-17, 119-20.

135. The payment of bills by Bulknav controlled companies on behalf of Chemnav managed companies can be seen from the payment of the legal invoices in this case. For instance, Chalos & Co. was counsel for Chemnav, and the shipowning entities Chemnav managed (Annamar, Seasafe and Seasatin), as well as Chemnav, Inc. Seven invoices were submitted to Chemnav Shipmanagement by Chalos & Co., but these were paid by wire transfer by Primebulk Shipmanagement. Ex. 14 at 1-7, 27. Later, despite representing the "Chemnav Defendants," Chalos & Co. sent the next six invoices to "Bulknav" which, at the time was represented by Blank Rome LLP. These invoices were also paid by Primebulk. Ex. 14 at 8-13, 27. Thereafter, despite representing the Chemnav Defendants, Chalos & Co. continued to bill Blank Rome's client, Bulknav, on another six invoices that were then paid by Nikka. Ex. 14 at 14-19, 27. Each of these invoices was approved for payment by Paul Coronis, who oversaw this litigation on behalf of all of the alter ego defendants. Tr. at 233-34, 236. Later, both Blank Rome and Chalos & Co. billed the UK Defense Club for the legal services, despite the fact that the UK Club insured only two of the defendants, Bulknav owned Mirage and Nikka, and the other five vessels for which policies were produced were insured by other clubs. Ex. 14 at 24-26; Ex. 106.

136. During the course of these proceedings, d'Amico Dry requested that the defendants produce banking, financial and accounting records from Chemnav Shipmanagement, Chemnav Inc., Annamar, Seasatin, Seasafe, Caldera and Primera Ocean from January 1, 2008 to date. Despite repeated requests, these entities produced bank records for only limited periods. See generally Sonic et al. Ex. T. No bank records were provided for Chemnav Inc. or Primera Ocean.

137. Moreover, no internal accounting or financial records were produced by any of the foregoing parties.

138. Paul Coronis designated himself to be the 30(b)(6) witness for Chemnav Shipmanagement, Annamar, Seasatin and Seasafe. No authorization was required from anyone else. Tr. at 170.

139. Chemnav Shipmanagement and the shipowning companies it manages are the alter egos of the Coronis family and Primera. Chemnav Shipmanagement and the shipowning companies were incorporated at the direction of Paul Coronis. Their corporate forms were disregarded by the Coronis family and Paul Coronis currently makes all decisions for all of the corporations. Chemnav Shipmanagement was inadequately capitalized – its assets were insufficient to satisfy the obligations that it assumed under the loan agreement to buy the Coronis chemical tankers. Chemnav Shipmanagement paid the debts of other Coronis companies. Its Law 89 fee was paid by Primera and it

paid the Law 89 fee for Primebulk. Its sole owner, Paul
Coronis, was a Director of Primera. Paul Coronis and Nicholas
Coronis were Directors and Officers of the shipowning
entities. They all operated out of 6 Roupel Street, 145 64
Kifissia, Athens, Greece, along with Primera, Primebulk and
all of the Coronis controlled companies. The companies
exercised no independent business discretion. Chemnav
Shipmanagement's sole shareholder, Paul Coronis, unilaterally
designated himself as the Rule 30(b)(6) witness for Chemnav
Shipmanagement and all of the shipowning companies without
seeking permission from any other person. Funds of the
shipowning companies were regularly transferred among the
companies (despite having no formal relationship) to cover
operational deficits at the direction of Paul Coronis. Debts
were also paid for the Bulknav shipowning companies. Chemnav
Shipmanagement was the corporate guarantor for the loan
agreement to build the Coronis family chemical tanker fleet
(the construction contracts for which were guaranteed by
Primera) and became jointly and severally liable for the debt.
All of these companies intermingled assets and personnel with
the other Coronis family companies. See Findings of Fact,
supra, at ¶¶ 111-138.

### I. Primera's Purported Liquidation

140. Because of threats and action taken by Flame in England to
force Primera into involuntary insolvency in 2010, Primera
commenced dissolution and later liquidation proceedings in
Monrovia, Liberia. None of the alter ego defendants in this
case were parties directly or indirectly in the Liberian
liquidation. In 2010, Liberia had no established law regarding
the liquidation of corporations. Tr. at 485-86.

141. Primera's liquidator, H. Varney Sherman, met with Linos
Choo and other unidentified individuals in Athens on April 6,
2010. Mr. Sherman did nothing to verify the information which
was provided to him during the April 6, 2010 meeting. He did
nothing to investigate Primera's assets. Tr. at 463, 469, 480.

142. At their meeting, Mr. Sherman was shown copies of Primera's
last bank statement for 2009. Tr. at 466-68. The statement
showed a balance of $510.90. Tr. at 484. Despite the fact that
these documents were made available to the liquidator, they
were not produced by Primera in this action, which was
commenced nine months before the Athens meeting. Tr. at 484;
Primera Ex. RR at 5-8.

143. Mr. Sherman was not aware of any of Primera's pre-
dissolution activities, including the transfers to Primrose,
Seadance or J.P.C. Investments. Tr. at 479-80. In fact, Mr.

Sherman was unaware that Primera conducted any business in 2009. Tr. at 468.

144. Although the Primera 2008 Balance Sheet and Profit and Loss Statement showed assets of $132,862 as of December 31, 2008, Mr. Sherman made no investigation into the disposition of those assets; he testified that doing so was outside the scope of his responsibilities. Tr. at 475, 484-85.

145. Despite being the liquidator, Mr. Sherman was unaware that Primera was a party to an English arbitration in which it was seeking to recover from two shipyards. Tr. at 483. He was also unable to specify what action, if any, Primera had taken to recover the FFA sums due from Industrial Carriers, Inc., and TMT Asia. Tr. at 471, 481-82.

146. The liquidation was essentially dormant between 2011 and 2015. Tr. at 481.

147. For all intents and purposes, Primera's Liberian liquidation is a sham. See Findings of Fact, supra, at ¶¶ 140-146.

### J. Credibility of Paul Coronis

148. Much of the testimony from Paul Coronis was not credible and his testimony cannot be relied upon. But the defendants rely on the testimony of Paul Coronis in their attempt to defeat the allegations of alter ego liability.

149. Paul Coronis testified that, even though he was directing money to Seadance Maritime under the TMT FFA (to be paid by Meadway under the netting-off agreement), he had no knowledge regarding the owners or Officers of Seadance. Tr. at 254, 259-62; Exs. 11-12. Annabel Charlton and Nicholas Coronis, the parents of Paul Coronis, were shareholders of Seadance and Nicholas Coronis was the proxy for the shareholding. Tr. at 267-69. Christos Georgopoulos, who was an employee of both Primera and Primebulk, was the only Director of Seadance. Tr. at 269-70.

150. Paul Coronis testified that he was not familiar with Astradance Shipping S.A. and could not recall if Primera ever managed a vessel called ASTRADANCE. Tr. at 268. Astradance Shipping S.A. was the primary shareholder, presumably in bearer shares, of Seadance. Tr. at 268. In fact, while Paul Coronis was a Director at Primera (specifically between 2004 and 2006), Primera managed ASTRADANCE for Primrose Shipping Ltd. Tr. at 171-72; Ex. 92 at 168, 174, 180.

151. Paul Coronis testified that, even though he was directing money to J.P.C. Investments under various FFAs, he had no knowledge of the Officers, Directors or shareholders of J.P.C. Investments. Tr. at 274-76. Paul Coronis's mother, Annabel Charlton, is the only known Officer and/or Director of J.P.C. Investments. Ex. 30 at 6-7; Ex. 31. Furthermore, Paul Coronis

testified that he was not aware of the $1,500,000 interest-free loan provided by J.P.C. Investments to Primera in 2008 while Paul Coronis was a Director of Primera. Tr. at 171-72, 271-73. The loan documents were signed by Annabel Charlton in 2008. Ex. 4 at 48; Tr. at 273.

152. Paul Coronis testified that he was never a Director of Primera Ocean, which he claimed was a corporate guarantor under the Third Supplement to the May 21, 2008 Facilities Agreement. Tr. at 251, 281. However, the Law 89 documents show that Paul Coronis became an Officer and Director of Primera Ocean in December 2004. Ex. 94 at 45-47. Nicholas Coronis and Annabel Charlton were also Officers. Ex. 94 at 17-19, 45-47. The Law 89 fee for Primera Ocean was paid by Primera. Ex. 94 at 61.

153. Paul Coronis testified that there are no overlapping shareholders between Primera and Chemnav Shipmanagement or Primera and Primebulk, although there is no time period specified in his response. Tr. at 314. However, Paul Coronis testified that he never gained an understanding as to who was the dominant shareholder of Primera. Tr. at 315. Furthermore, no documents have been produced by the defendants that indicate the identity of the beneficial owner of Primera beyond the holding company, Denton Shipping, which Paul Coronis also testified was unfamiliar to him. Tr. at 178;

Primera Ex. RR at 1. According to Primera's Law 89 documents, the sole Officer and Director of Primera from December 5, 1991 to November 21, 2008 was Nicholas Coronis. Furthermore, the sole shareholder of Primera was listed as Nicholas Coronis. Ex. 92 129, 241-43; Tr. at 166-67.

154. Paul Coronis testified that the office equipment used by both Primera and Primebulk belonged to the office and the landlord. Tr. at 222. The building was owned by Paul Coronis, Chianna Coronis, and Jonathan Coronis; therefore, any equipment belonging to the landlords would have also belonged to the Coronis family. Tr. at 161. However, Primebulk's lease does not list any furniture or equipment to be provided by the landlord or the building. Tr. at 224.

155. Throughout the trial, Paul Coronis testified that he was acting on behalf of the Board of Directors for varying companies. See, e.g., Tr. at 183-84, 200-01, 213-15, 249. The Boards included a combination of Coronis family members and their attorneys. See, e.g., Tr. at 174, 198, 249; Exs. 23, 69, 73, 77, 87; Ex. 92 at 219.

**K. The Defendants' Production of Documents was Deficient**

156. In the course of this litigation Primera has produced only a handful of corporate documents, no banking records, and was unable to produce any witness in response to d'Amico Dry's 30(b)(6) Notice of Deposition. Tr. at 170-71.

157. The Primera corporate records were kept in a cupboard in Primera's office at 6 Roupel Street. Tr. at 161, 169-70.

158. Paul Coronis admitted that he failed to produce documents in this proceeding because he deemed them irrelevant. Tr. at 232-33.

159. Paul Coronis testified that the alter ego defendants had Board of Directors meetings once a month or when a significant decision took place. Tr. at 339. The minutes from these meetings have not been produced in this litigation.

160. The meeting minutes produced in this litigation are inadequate to establish respect of corporate formalities in light of the fact that they are identical or near identical copies. See, e.g., (1) Primebulk: Ex. 37; Tr. at 293-95; Sonic et al. Ex. C at 351-55; (2) Bulknav: Sonic et al. Ex. E at 747-53; (3) Seasatin: Sonic et al. Ex. N at 1140-43; (4) Annamar: Sonic et al. Ex. R at 2858-62; (5) Seasafe: Sonic et al. Ex. Q at 2340-44. (6) Chemnav Shipmanagement: Sonic et al. Ex. S at 3516-21.

## L. The Proceedings and Personal Jurisdiction

161. On September 9, 2009, d'Amico Dry commenced this action against Primera in this Court.

162. On December 23, 2010, d'Amico Dry amended its complaint to add the alter ego cause of action and the alter ego defendants. Dkt. No. 64.

163. The Supreme Court decided Daimler AG v. Bauman, 571 U.S. 117 (2014), on January 14, 2014.

164. Primera and the alter ego defendants, excluding J.P.C. Investments, Primera Ocean, Nicholas Coronis, and Paul Coronis, raised lack of personal jurisdiction as an affirmative defense in their answers to the amended complaint, which were filed in late April 2015, by stating, "Th[is] Court lacks personal jurisdiction over [the defendants]." Dkt. Nos. 176 at 10, 178 at 11, 179 at 8. (Primera and these answering alter ego defendants will be referred to as the "appearing defendants.")

165. J.P.C. Investments, Primera Ocean, Nicholas Coronis, and Paul Coronis did not answer the amended complaint or otherwise appear in this case. (These nonanswering defendants will be referred to as the "nonappearing defendants.") The Clerk entered certificates of default as to Primera Ocean, Dkt. No. 293, and J.P.C. Investments, Dkt. No. 294. Because the nonappearing defendants never answered the amended complaint or appeared in this action, they accordingly never raised lack of personal jurisdiction as an affirmative defense.

166. The appearing defendants first raised the issue of whether the Court lacks personal jurisdiction over them under Daimler in a letter dated April 16, 2018. See Dkt. No. 315.

167. In the time between the decision in Daimler and the

defendants' April 16, 2018 letter, the appearing defendants:

>  Answered d'Amico Dry's amended complaint without
>  mentioning Daimler, Dkt. Nos. 176, 178-79;
>
>  Filed two motions to dismiss the amended complaint on
>  grounds other than lack of personal jurisdiction, Dkt.
>  Nos. 153-58, 163-65, 186-87, 196-97;
>
>  Raised numerous pretrial discovery issues with the
>  Court, Dkt. Nos. 173, 218, 221, 227, 231, 236;
>
>  Participated in a Court-supervised settlement
>  conference, Dkt No. 216 and ECF entry on November 30,
>  2015;
>
>  Participated in several conferences with the Court,
>  see, e.g., Dkt. Nos. 136-37, 151-52, 183-84, 246, 265;
>
>  Signed onto a joint pretrial order, Dkt. No. 250;
>
>  Submitted pretrial findings of fact and conclusions of
>  law, Dkt. Nos. 251, 254, 256;
>
>  Participated in a four-day bench trial (May 9-12,
>  2016); and
>
>  Submitted posttrial findings of fact and conclusions
>  of law, Dkt. Nos. 299, 302-05, 307.

168. On February 18, 2016, the Second Circuit Court of Appeals

decided Brown v. Lockheed Martin Corp., in which it applied

Daimler and held that registration to do business in

Connecticut did not provide consent to general jurisdiction in

Connecticut courts. 814 F.3d 619, 639-41 (2d Cir. 2016). In

the period between Brown was decided and the defendants' April

16, 2018 letter, the appearing defendants appeared at a

conference, participated in the four-day bench trial, and

submitted posttrial findings of fact and conclusions of law.

See Findings of Fact, supra, at ¶ 167.

## III. CONCLUSIONS OF LAW

### A. Personal Jurisdiction over Primera and the Other Appearing Defendants

1. The Supreme Court's decision in Daimler established that, except in an "exceptional" case, a corporate defendant may be treated as "essentially at home," and subject to a state's general personal jurisdiction, only where it is incorporated or maintains its principal place of business. 571 U.S. at 138-39 & nn.18-19.

2. The Daimler decision addressed minimum contacts, holding that "continuous and systematic" contacts alone are insufficient to establish general personal jurisdiction and thus rejected the idea that a company could be brought into court merely for "doing business" in a state. Id.; see Gucci Am., Inc. v. Weixing Li, 768 F.3d 122, 135 (2d Cir. 2014).

3. In light of Daimler, courts have determined that a company's compliance with a state's registration statutes cannot constitute consent to general jurisdiction. See, e.g., Brown, 814 F.3d at 639-41 (applying Daimler and holding that registration to do business in Connecticut did not provide consent to general jurisdiction in Connecticut courts); Chatwal Hotels & Resorts LLC v. Dollywood Co., 90 F. Supp. 3d 97, 105 (S.D.N.Y. 2015) ("[T]he mere fact of [a defendant's] being registered to do business is insufficient to confer

general jurisdiction in a state that is neither its state of incorporation or its principal place of business."); AstraZeneca AB v. Mylan Pharm., Inc., 72 F. Supp. 3d 549, 556 (D. Del. 2014) (discussing Daimler and holding that complying with Delaware's business registration statutes – which are mandatory for doing business with the state – does not constitute consent to general jurisdiction), aff'd sub nom., Acorda Therapeutics Inc. v. Mylan Pharm. Inc., 817 F.3d 755 (Fed. Cir. 2016).

4. The parties explicitly or implicitly agree that under Daimler, there is no general personal jurisdiction over any of the appearing defendants in this case. The plaintiff has not contended that there is specific personal jurisdiction over any of the appearing defendants to enforce the English Judgment against them. The only issue, then, is whether the appearing defendants are entitled to dismissal for lack of general personal jurisdiction or whether they have forfeited that defense.

5. Summarily asserting the affirmative defense of lack of personal jurisdiction in an answer is sufficient to preserve the defense under Federal Rule of Civil Procedure 12(h)(1). Hamilton v. Atlas Turner, Inc., 197 F.3d 58, 60 (2d Cir. 1999).

6. However, a delay in pursuing a personal jurisdiction defense – such as failing to argue lack of personal jurisdiction in a motion to dismiss – may result in forfeiture of the defense, even where the defense was asserted in a timely answer. See id.; Datskow v. Teledyne, Inc., Cont'l Prod. Div., 899 F.2d 1298, 1303 (2d Cir. 1990) (holding that a defendant forfeited the defense of improper service by participating in litigation for four months after raising the personal jurisdiction issue in its answer).

7. In determining whether the appearing defendants have forfeited their personal jurisdiction defense, the Court considers the length of time between the filing of their answers and the April 16, 2018 letter that specifically argued the effect of Daimler – nearly three years – and the appearing defendants' considerable pretrial, trial, and posttrial activity during that period. See Hamilton, 197 F.3d at 61; Findings of Fact, supra, at ¶¶ 163-164, 166-167. These considerations weigh heavily against the ability of the appearing defendants to claim a defense of lack of personal jurisdiction. See Hamilton, 197 F.3d at 61-63 (holding that a defendant forfeited the personal jurisdiction defense raised in its answer by waiting four years to pursue the defense and passing up at least four opportunities to do so); Datskow, 899 F.2d at 1303 (same, where the defendant waited four months to pursue

the defense after raising it in the answer and, in the
interim, the defendant attended a conference and participated
in scheduling discovery and motion practice); Allgaier v.
Peterson, No. 13cv5112, 2015 WL 5459808, at *3 (S.D.N.Y. Aug.
13, 2015) (same, where the defendants delayed seventeen months
in litigating personal jurisdiction after raising it, and
attended several conferences and "passed up multiple chances
to litigate" the defense in that period); see also Laydon v.
Mizuho Bank, Ltd., No. 12cv3419, 2015 WL 1499185, at *7
(S.D.N.Y. Mar. 31, 2015) (holding that a set of defendants
waived their personal jurisdiction defense based on Daimler by
failing to "promptly assert" it in the seven months following
the date Daimler was decided).

8. The circumstances of the proceedings at the time the personal
jurisdiction defense was first raised in the answers and
subsequently pursued in April 2018 is also significant. See
Hamilton, 197 F.3d at 62 ("By withholding its motion [to
dismiss], [the defendant] gambled that it could raise the
personal jurisdiction issue on the eve of trial, in case a
trial occurred."). In this case, after initially raising the
defense of lack of personal jurisdiction in their answers, the
appearing defendants waited about three years to pursue that
defense in their April 2018 letter. The appearing defendants
asserted that defense after litigating two motions to dismiss

and participating in a four-day bench trial. There is a powerful inference that those defendants were simply attempting to preserve yet another litigation tactic.

9. Given this case's circumstances, it is plain that the appearing defendants have forfeited their personal jurisdiction defense and are therefore subject to this Court's jurisdiction.[5]

10. Therefore, the English Judgment may be enforced against Primera. Whether the English Judgment may be enforced against the other appearing defendants depends on whether they are alter egos of Primera. That issue is discussed below. See Section III. C., infra.

### B. Personal Jurisdiction over the Nonappearing Defendants

11. d'Amico Dry seeks default judgments against the nonappearing defendants, namely Paul Coronis, Nicholas

---

[5] The appearing defendants argue that the date beginning the period in which any forfeiture of their personal jurisdiction defense could take place is February 18, 2016, when Brown, 814 F.3d 619, was decided because Brown determined that registration to do business in a state is not a basis for general personal jurisdiction. But, by basing their personal jurisdiction argument primarily on Daimler, the appearing defendants tacitly concede that the date on which Brown was decided is not relevant to the forfeiture issue. In any event, the time between when Brown was decided and when the appearing defendants raised their personal jurisdiction defense, as well as the significant activity they engaged in during that period related to this case, see Findings of Fact, supra, at ¶¶ 167–168, similarly justify forfeiture of the defense.

Coronis, Primera Ocean Services S.A., and J.P.C. Investments S.A. The Clerk issued certificates of default against Primera Ocean and J.P.C. Investments but Paul Coronis and Nicholas Coronis successfully urged the Clerk not to enter certificates of default against them. The defendants contend that Paul Coronis and Nicholas Coronis were not properly served under the Hague Convention and therefore the Court cannot enter default judgments against them because the Court does not have jurisdiction over them. No specific argument has been made on behalf of Primera Ocean and J.P.C. Investments.

12.   Before entering a default judgment, a court may consider sua sponte whether it has personal jurisdiction over the defaulting parties. City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 133 (2d Cir. 2011). "A non-appearing defendant does not, by defaulting, forfeit its right to challenge any ensuing default judgment for lack of personal jurisdiction."[6] Id. at 139. The Court chooses to assess the

---

[6] The Second Circuit Court of Appeals has recognized that "[i]t might seem anomalous" that an appearing party can forfeit a personal jurisdiction defense while a nonappearing party with notice may challenge a default judgment as void for lack of personal jurisdiction. See "R" Best Produce, Inc. v. DiSapio, 540 F.3d 115, 123 (2d Cir. 2008). The court noted, however, that "the unstated rationale for the distinction is very likely that a non-appearing defendant, even with notice, should be spared the burden of defending in a distant forum and a plaintiff should be careful to join only those defendants as to whom

personal jurisdiction of the nonappearing defendants in this

case. Cf. Johnson & Johnson v. Azam Int'l Trading, No.

07cv4302, 2013 WL 4048295, at *4 (E.D.N.Y. Aug. 9, 2013) ("In

light of the facts of this case, in which the defendants in

default are not residents of the Eastern District of New York

and had only limited contacts here, I elect to consider the

question of personal jurisdiction.").

13.  When seeking a default judgment, "although the plaintiffs

retain the burden of proving personal jurisdiction, they can

satisfy that burden with a prima facie showing, and may rest

their argument on their pleadings, bolstered by such

affidavits and other written materials as they can otherwise

obtain." SEC v. Aimsi Techs., Inc., 650 F. Supp. 2d 296, 301

(S.D.N.Y. 2009) (quotation marks omitted). In this case,

d'Amico Dry takes the additional step of arguing that they

proved at the nonjury trial that the nonappearing defendants

are alter egos of Primera, and therefore the Court has

personal jurisdiction over them under an alter ego theory of

jurisdiction. Specifically, d'Amico Dry contends that the

nonappearing defendants are alter egos of Primera and argues

that (1) because Primera is subject to the Court's

jurisdiction, so are its alter egos; and (2) because Primera

---

personal jurisdiction can successfully be established in the
original action." Id.

and the other appearing defendants participated fully in the proceedings, any objections to service of process and personal jurisdiction by the nonappearing defendants were forfeited by the appearing defendants.

14. In general, alter egos are treated as one entity for purposes of jurisdiction. Wm. Passalacqua Builders Inc. v. Resnick Dev. So., Inc., 933 F.2d 131, 142-43 (2d Cir. 1991). Moreover, personal jurisdiction exists over a party where its corporate alter ego has "participated fully in the proceedings and therefore waived any objections to lack of service of process." Kidder, Peabody & Co. v. Maxus Energy Corp., 925 F.2d 556, 562 (2d Cir. 1991).

15. d'Amico Dry pleaded adequately that the nonappearing defendants were alter egos of Primera and bolstered this claim with evidence at trial. This Court has jurisdiction over Primera, and Primera, as well as the rest of the appearing defendants, participated fully in this proceeding. Therefore, the Court has personal jurisdiction over the nonappearing defendants including Paul Coronis and Nicholas Coronis, regardless of whether Paul Coronis and Nicholas Coronis were properly served. See Passalacqua Builders, 933 F.2d at 142-43; Kidder, Peabody & Co., 925 F.2d at 562; cf. Totalplan Corp. of Am. v. Lure Camera Ltd., 613 F. Supp. 451, 458 (W.D.N.Y. 1985) (concluding that a first corporate defendant's forfeiture of

its personal jurisdiction defense extended to a second corporate defendant and two individual defendants who allegedly used the first corporate defendant as a mere shell for their own conduct).

16.   It would be particularly inappropriate to find that there was no personal jurisdiction over Paul Coronis and Nicholas Coronis based on the alleged insufficiency of the service of process on them. They both had actual knowledge of these proceedings. Moreover, Paul Coronis actually appeared in New York and testified at the trial on behalf of the appearing defendants, and also testified at a deposition as the Rule 30(b)(6) witness on behalf of the appearing alter ego defendants.

17.   Because the Court has jurisdiction over the nonappearing defendants, and because those defendants did not appear in this action, d'Amico Dry's request for a default judgment against the nonappearing defendants – namely Paul Coronis, Nicholas Coronis, Primera Ocean Services S.A., and J.P.C. Investments S.A. – is **granted.**

18.   Therefore, the nonappearing defendants are liable for the English Judgment against Primera.

## C. Alter Ego Liability of the Appearing Alter Ego Defendants

19.  The parties agree that federal maritime law applies in assessing whether the web of appearing alter ego defendants are alter egos of Primera. See NYKCool A.B. v. Ecuadorian Line, Inc., 562 F. App'x 45, 46 (2d Cir. 2014) (summary order); N. Tankers (Cyprus) Ltd. v. Backstrom, 967 F. Supp. 1391, 1398-99 (D. Conn. 1997); see also Alter Ego Defs.' Posttrial Mem. at 4; d'Amico Dry's Posttrial Mem. at 37.

20.  To pierce the corporate veil under federal maritime law, a plaintiff must show that an alter ego was used to "perpetrate a fraud" or was "so dominated" and its corporate form so "disregarded" that the alter ego "primarily transacted [another entity's] business rather than [its] own corporate business." Kirno Hill Corp. v. Holt, 618 F.2d 982, 985 (2d Cir. 1980). d'Amico Dry contends that the corporate veil should be pierced because the appearing alter ego defendants were "so dominated" by Primera.

21.  The alleged domination asserted as the basis for piercing the corporate veil must have occurred at or about the time of the complained-of transaction. See In Re Arbitration Between Holborn Oil Trading Ltd. & Interpol Bermuda Ltd., 774 F. Supp. 840, 845 (S.D.N.Y. 1991) (citing Passalacqua Builders, 933 F.2d at 138). "As clearly indicated in Passalacqua Builders,

the inquiry for piercing the corporate veil examines the full

spectrum of the relations between the parent corporation and

its alleged alter ego." <u>Holborn Oil</u>, 774 F. Supp. at 845.

22.   Factors relevant to determining whether one entity is the

"alter ego" of another – or, in this case, whether the web of

appearing Coronis family controlled alter ego defendants are

alter egos of Primera – include the following:

> (1) the absence of the formalities and paraphernalia
> that are part and parcel of the corporate existence,
> <u>i.e.,</u> issuance of stock, election of directors,
> keeping of corporate records and the like, (2)
> inadequate capitalization, (3) whether funds are put
> in and taken out of the corporation for personal
> rather than corporate purposes, (4) overlap in
> ownership, officers, directors, and personnel, (5)
> common office space, address and telephone numbers of
> corporate entities, (6) the amount of business
> discretion displayed by the allegedly dominated
> corporation, (7) whether the related corporations deal
> with the dominated corporation at [arm's] length, (8)
> whether the corporations are treated as independent
> profit centers, (9) the payment or guarantee of debts
> of the dominated corporation by other corporations in
> the group, and (10) whether the corporation in
> question had property that was used by other of the
> corporations as if it were its own.

<u>Passalacqua Builders</u>, 933 F.2d at 139; <u>Clipper Wonsild Tankers</u>

<u>Holding A/S v. Biodiesel Ventures, LLC</u>, 851 F. Supp. 2d 504,

509-10 (S.D.N.Y. 2012).

23.   There is no rule about how many factors must be met to

warrant piercing the corporate veil; rather, "the general

principle guiding courts in determining whether to pierce the

corporate veil has been that liability is imposed when doing

so would achieve an equitable result." <u>Williamson v. Recovery</u>

<u>Ltd. P'ship</u>, 542 F.3d 43, 53 (2d Cir. 2008) (quotation marks

omitted).

24.  The facts of this case warrant piercing the corporate veil.

<u>See generally</u>, Findings of Fact, <u>supra</u>, at ¶¶ 62, 91, 107,

139; <u>see, e.g.</u>,

  (1)  Lack of corporate formalities, <u>id.</u> at ¶¶ 89, 156–
       160;

  (2)  Inadequate capitalization, <u>id.</u> at ¶¶ 29, 85, 88,
       120, 144;

  (3)  Intermingling of funds, <u>id.</u> at ¶¶ 63–66, 69, 104;

  (4)  Overlap in ownership, officers, directors, and
       personnel, <u>id.</u> at ¶¶ 50–54, 61, 99, 113–114, 121–
       122;

  (5)  Common office space and addresses, <u>id.</u> at ¶¶ 7–
       16, 18–20, 76;

  (6)  Lack of business discretion, <u>id.</u> at ¶¶ 125–128;

  (7)  Lack of arm's length dealing, <u>id.</u> at ¶¶ 63–69,
       82;

  (8)  Corporate entities not treated as individual
       profit centers, <u>id.</u> at ¶¶ 63–69, 104;

  (9)  Payment or guarantee of debts between the
       defendants, <u>id.</u> at ¶¶ 53–57, 82, 129–135; and

  (10) Intermingling of property, <u>id.</u> at ¶¶ 76, 154.

25.  Indeed, this case is factually similar to <u>NYKCool A.B. v.</u>

<u>Pacific International Services, Inc.</u>, in which a court in this

District applied factors mirroring the <u>Passalacqua Builders</u>

factors to hold a web of alter ego defendants liable for a

maritime arbitration award against the parent company

defendant. <u>See</u> No. 12cv5754, 2013 WL 1274561, at *8–12

(S.D.N.Y. Mar. 29, 2013), aff'd sub nom. NYKCool A.B. v. Ecuadorian Line, Inc., 562 F. App'x 45. In NYKCool, as in this case, each of the ten factors weighed toward piercing the corporate veil. See id. at *9-10.

26.   The web of appearing Coronis family controlled alter ego defendants are liable for the English Judgment against Primera, namely Sonic Finance Inc., Mirage Finance Inc., Handy Finance Inc., Pasha Finance Inc., Movida Finance Inc., Element Finance Inc., Caldera Marine Co. Ltd., Adalia Marine Co. Ltd., Seasatin Navigation Inc., Annamar Navigation Inc., Seasafe Navigation Inc., Chemnav Inc., Primebulk Shipmanagement Ltd., Bulknav Inc., and Chemnav Shipmanagement Ltd. See Passalacqua Builders, 933 F.2d at 139-40; NYKCool, 2013 WL 1274561 at *8-12.

27.   Therefore, all of the defendants – both the nonappearing defendants and the appearing defendants – are liable for the English Judgment against Primera.

### D. Liability of Primebulk as a Successor-in-Interest to Primera

28.   In addition to holding Primebulk liable as an alter ego of Primera, d'Amico Dry seeks to hold Primebulk liable as the successor-in-interest to Primera.[7]

_____

[7] The alter ego defendants request that the Court exercise "its discretion" to refuse to consider d'Amico Dry's successor-interest argument because it was not alleged in d'Amico Dry's

29.  "New York . . . recognizes that when one company sells or transfers all of its assets to another company, the acquiring company generally does not become liable for the debts or liabilities of the seller/transferor. . . . New York also recognize[s] four exceptions to this rule: (1) where the buyer expressly assumed the debt at issue; (2) where the transaction was undertaken to defraud creditors; (3) where the transaction constitutes a de facto merger; or (4) where the successor is a mere continuation of the predecessor." Tommy Lee Handbags Mfg. Ltd. v. 1948 Corp., 971 F. Supp. 2d 368, 378 (S.D.N.Y. 2013) (citation omitted).[8]

---

amended complaint. Alter Ego Defs.' Posttrial Mem. at 10. The alter ego defendants cite to Federal Rule of Civil Procedure 8(a)(2), which requires a plaintiff to plead a short and plain statement of its claim in order to provide the defendants with fair notice of the plaintiff's claim and the grounds upon which the claim rests. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554 (2007). The amended complaint contains sufficient allegations concerning Primebulk's taking over of Primera's business to provide fair notice of d'Amico Dry's successor-in-interest theory. See Amended Compl. ¶¶ 59-70.

[8] The parties do not specify whether New York law or federal common law applies in determining successor-in-interest liability. However, the result in this case would not change based upon application of one versus the other. "In the context of successor liability and the exceptions to the general rule, it is best understood that federal common law and traditional common law are virtually synonymous, and, for the most part, traditional common law and the common law of a particular state are essentially interchangeable . . . . In terms of cases occurring within New York, the Second Circuit held that New

30.   Generally, successor-in-interest liability "attaches to a corporation as a mere continuance only when one corporation survives the transaction"; that is, where the predecessor corporation is extinguished. NYKCool, 2013 WL 1274561 at *13 (quotation marks omitted). But courts have made exceptions to this rule where "it appeared that the successor corporation was created to avoid liability to the plaintiff, or where the predecessor corporation continued only as a shell and conducted no business." Id.

31.   In this case, Primera transferred its assets to Primebulk, a corporation created apparently to avoid liability to d'Amico Dry for the English Judgment. See Findings of Fact, supra, at ¶¶ 72-78, 83, 91. After the transfer, Primera continued to exist as a corporation, but only as a shell devoid of assets. See id. Therefore, Primera's continued existence does not preclude Primebulk's liability as a successor-in-interest to Primera under a mere continuance theory.

32.   To determine whether Primebulk is a mere continuance of Primera, the Court assesses four factors:

> (1) continuity of ownership; (2) cessation of ordinary business and dissolution of the acquired corporation as soon as possible; (3) assumption by the purchaser

---

York's common law follows the traditional common law rules of successor liability." Gallo v. Wonderly Co., No. 12cv1868, 2014 WL 36628, at *10 n.15 (N.D.N.Y. Jan. 6, 2014) (citing New York v. Nat'l Serv. Indus., Inc., 460 F.3d 201, 203 (2d Cir. 2006)).

of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation; and (4) continuity of management, personnel, physical location, assets, and general business operation.

NYKCool, 2013 WL 1274561 at *12–14.

33. Each factor supports holding Primebulk liable as a successor-in-interest under the mere continuance theory: (1) Primera transferred its business to Primebulk without consideration while maintaining similarities in ownership, see Findings of Fact, supra, at ¶¶ 76–78; (2) Primera then became a shell, devoid of assets, see id. at ¶¶ 76–78, 83, 91; (3) Primebulk assumed some of Primera's liabilities (along with other alter ego entities) – although not Primera's debt to d'Amico Dry – and continued Primera's business without interruption, see id. at ¶¶ 76–88, 91; and (4) Primebulk and Primera share the same leaders, personnel, location, assets, and general business, see id.

34. Primebulk is liable for the English Judgment as Primera's successor-in-interest.

### E. Interest and Attorney's Fees

35. As part of the English Judgment, postjudgment interest has accrued at a rate of 8 percent per annum, in accordance with English law, since June 19, 2009.

36. When determining the interest rate to be applied when enforcing a foreign judgment, courts generally apply the

interest rate set forth in the foreign country judgment under the law of the rendering court. See, e.g., Armada (Singapore) Pte Ltd. v. N. China Shipping Co. Ltd. (BVI), No. 09cv5069, 2010 WL 481061, at *4 (S.D.N.Y. Jan. 14, 2010) (applying the 8 percent per annum English judgment interest as "pre-judgment" interest to the enforcement action); Dynamic Cassette Int'l Ltd. v. Mike Lopez & Assocs., 923 F. Supp. 8, 10, 12 (E.D.N.Y. 1996) (applying 8 percent per annum English judgment interest from the date of the entry of the English judgment to the entry of the federal court judgment on that English judgment), report and recommendation adopted, Dkt. No. 17, E.D.N.Y. April 24, 1996.

37.  d'Amico Dry is entitled to the interest that has accrued at a rate of 8 percent per annum on the English Judgment after it was entered on June 19, 2009.

38.  After judgment is entered in this case, postjudgment interest shall accrue at the rate set forth in 28 U.S.C. § 1961.

39.  The English Judgment and the FFA also provided for future legal fees incurred in collecting the judgment. Ex. 1; Ex. 31 at 88; Ex. 104; Stipulated Fact ¶ 39.

40.  d'Amico Dry is awarded the legal fees and costs incurred in its efforts to enforce the English Judgment. These costs and

fees are to be assessed in accordance with Federal Rule of Civil Procedure 54(d).

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit.

d'Amico Dry's request for a default judgment against Paul Coronis, Nicholas Coronis, Primera Ocean Services S.A., and J.P.C. Investments S.A. is **granted.**

The Clerk is directed to enter judgment for d'Amico Dry and against all of the defendants as follows:

- $1,794,334.93, representing the English Judgment, which awarded d'Amico Dry $1,766,278.54 (comprising the principal and compound interest at the contractual rate up until the English Judgment was entered) plus $28,056.39 in legal costs related to that action;
- the interest that has accrued on the $1,794,334.93 award at a rate of 8 percent per annum since June 19, 2009, until judgment is entered in this case; and
- attorney's fees and costs to be assessed in accordance with Federal Rule of Civil Procedure 54(d).

Once judgment is entered, d'Amico Dry is entitled to postjudgment interest pursuant to 28 U.S.C. § 1961.

The Clerk is directed to close all pending motions in this case.

**SO ORDERED.**

Dated:      New York, New York
            December 22, 2018

                                           John G. Koeltl
                                  **United States District Judge**